**ATTACHMENT I**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
- - - - - - - - - - - - - - - - X
In re:                          :
                                :   Chapter 11
AL COPELAND ENTERPRISES, INC.,  :
                                :   Case No. 91-12575-FM-11
                      Debtor    :
- - - - - - - - - - - - - - - - X
```

RESTATED FOURTH AMENDED PLAN OF REORGANIZATION
PROPOSED BY CANADIAN IMPERIAL BANK OF COMMERCE, as AGENT

October 20, 1992

OPPENHEIMER, ROSENBERG & KELLEHER, INC.
711 Navarro, Sixth Floor
San Antonio, Texas  78205
(512) 224-2000

    John H. Tate, II
    State Bar No. 19666500
    Raymond W. Battaglia
    State Bar No. 01918055
    Timothy N. Tuggey
    State Bar No. 20282900

SIDLEY & AUSTIN
2049 Century Park East
Los Angeles, California  90067
(310) 553-8100

    J. Ronald Trost, P.C.
    State Bar No. 20238200

SIDLEY & AUSTIN
875 Third Avenue
New York, New York  10022
(212) 906-2000

    Thomas E. Pitts, Jr.

TABLE OF CONTENTS

Page

ARTICLE I.  DEFINITIONS

    1.01 Definitions . . . . . . . . . . . . . . . . . .  1

ARTICLE II.  ADMINISTRATIVE AND TAX CLAIMS

    2.01 Superpriority Claims . . . . . . . . . . . .  11
    2.02 Administrative Claims . . . . . . . . . . . .  11
    2.03 Tax Claims . . . . . . . . . . . . . . . . .  11

ARTICLE III.  CLASSIFICATION OF CLAIMS AND INTERESTS

    3.01 Class  1 -- Priority Claims . . . . . . . . .  12
    3.02 Class  2 -- Miscellaneous Secured Claims . . .  12
    3.03 Class  3 -- Acquisition Bank Claims . . . . .  12
    3.04 Class  4 -- Small Trade Claims . . . . . . .  12
    3.05 Class  5 -- Large Trade Claims . . . . . . .  12
    3.06 Class  6 -- Section 157(b)(5) Claims . . . .  12
    3.07 Class  7 -- Compensatory Cure Claims . . . . .  12
    3.08 Class  8 -- Merrill Lynch Claims . . . . . .  12
    3.09 Class  9 -- Exemplary Damage Claims. . . . .  12
    3.10 Class 10 -- Subordinated Insider Claims. . . .  12
    3.11 Class 11 -- Preferred Stock Interests. . . .  12
    3.12 Class 12 -- Preferred Stock Claims . . . . .  12
    3.13 Class 13 -- Common Stock Interests . . . . . .  13

ARTICLE IV.  TREATMENT OF CLASSES NOT IMPAIRED UNDER THE PLAN

    4.01 Class  1 -- Priority Claims . . . . . . . . .  13
    4.02 Class  2 -- Miscellaneous Secured Claims . . .  13
    4.03 Class 3A -- Acquisition Letters of Credit . . .  13
    4.04 Class  4 -- Small Trade Claims . . . . . . .  13
    4.05 Class  6 -- Section 157(b)(5) Claims . . . . .  13
    4.06 Class  7 -- Compensatory Cure Claims . . . . .  14
    4.07 Unimpaired Classes . . . . . . . . . . . . .  14

ARTICLE V.  TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN

    5.01 Class 3B -- Other Acquisition Bank Claims . . .  14
    5.02 Class  5 -- Large Trade Claims . . . . . . .  14
    5.03 Class  8 -- Merrill Lynch Claims . . . . . .  14
    5.04 Class  9 -- Exemplary Damage Claims. . . . . .  15
    5.05 Class 10 -- Subordinated Insider Claims. . . .  15
    5.06 Class 11 -- Preferred Stock Interests. . . .  16
    5.07 Class 12 -- Preferred Stock Claims . . . . . .  16
    5.08 Class 13 -- Common Stock Interests . . . . . .  16
    5.09 Impaired Classes . . . . . . . . . . . . . .  16

ARTICLE VI.   MEANS OF EXECUTION OF THE PLAN

6.01 Amendments to Articles of Incorporation . . . .    16
6.02 New Stock . . . . . . . . . .    17
6.03 New Credit Agreement; New Credit Documents . .    17
6.04 Cancellation of Securities . . . . . . . . .    17
6.05 Retiree Benefits . . . . . . . . . . . .    17
6.06 Copeland Consent . . . . . . . . . . . .    17
6.07 Disputed Claims. . . . . . . . . . . . . .    17

ARTICLE VII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.01 Supply Contract. . . . . . . . . . . . .    18
7.02 Formula Agreement and Recipe Royalty Agreement .    18
7.03 Insider Contracts. . . . . . . . . . . . .    18
7.04 Non-Insider Contracts. . . . . . . . . . .    19
7.05 Post-Petition Contracts. . . . . . . . . .    19
7.06 Cure and Compensation. . . . . . . . . . .    19

ARTICLE VIII.   CONDITIONS PRECEDENT

8.01 Conditions to Confirmation . . . . . . . .    20
8.02 Conditions to Consummation . . . . . . . .    22

ARTICLE IX.   EFFECTS OF PLAN CONFIRMATION

9.01 Discharge . . . . . . . . . . . . . . .    22
9.02 Revesting . . . . . . . . . . . . . . .    23
9.03 Retention and Enforcement of Causes of Action .    23
9.04 Retention of Jurisdiction . . . . . . . . .    23
9.05 Post-Consummation Effect of Evidences of Claims
     or Interests . . . . . . . . . . . . . .    24
9.06 Failure of Court to Exercise Jurisdiction . . .    24
9.07 Term of Injunctions or Stays . . . . . . . .    24

ARTICLE IX.   MISCELLANEOUS PROVISIONS . . . . . . . . .

10.01 Unclaimed Distributions . . . . . . . . .    24
10.02 Fractional Dollars . . . . . . . . . . . .    25
10.03 Modification of Plan . . . . . . . . . . .    25
10.04 Withdrawal of Plan . . . . . . . . . . .    25
10.05 Cramdown . . . . . . . . . . . . . . .    25
10.06 Payment Dates . . . . . . . . . . . . .    25
10.07 Headings . . . . . . . . . . . . . . .    25
10.08 Successors and Assignees . . . . . . . . .    26
10.09 Governing Law. . . . . . . . . . . . . .    26

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

- - - - - - - - - - - - - - - - X
In re:                            :
                                  :   Chapter 11
AL COPELAND ENTERPRISES, INC.,    :
                                  :   Case No. 91-12575-FM-11
                        Debtor    :
- - - - - - - - - - - - - - - - X


RESTATED FOURTH AMENDED PLAN OF REORGANIZATION
PROPOSED BY CANADIAN IMPERIAL BANK OF COMMERCE, as AGENT


        Canadian Imperial Bank of Commerce, as Agent for the
Acquisition Banks (as hereinafter defined), hereby proposes the
following plan of reorganization pursuant to the provisions of
Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101
et seq.


ARTICLE I

DEFINITIONS

        Section 1.01.  Definitions.  Unless the context otherwise
requires, the following terms shall have the following meanings
when used in initially capitalized form in this Plan.  Such
meanings shall be equally applicable to both the singular and
plural forms of such terms.  The words "herein," "hereof" and
"hereunder" and other words of similar import refer to this Plan
as a whole and not to any particular section, subsection, or
clause contained in this Plan unless the context requires
otherwise.  Whenever from the context it appears appropriate,
each term stated in either the singular or the plural includes
the singular and the plural, and pronouns stated in the
masculine, feminine or neuter gender include the masculine,
feminine and the neuter.  Any term used in initially capitalized
form in this Plan that is not defined herein but that is used in
the Bankruptcy Code or the Bankruptcy Rules shall have the
meaning assigned to such term in the Bankruptcy Code or the
Bankruptcy Rules.  Definitions set forth below for agreements or
documents that are referred to in this Plan are for descriptive
purposes only, and shall not be deemed to limit or otherwise
affect the substantive provisions of any such agreement or
document.


        "Acquisition Bank Claim" shall mean a Claim of CIBC or the
Acquisition Banks against the Debtor for payment or performance
of the Acquisition Debt or of any obligation under an Acquisition
Letter of Credit.

"Acquisition Banks" shall mean, collectively, CIBC, Inc., Eaton Vance Prime Rate Reserves, Pilgrim Prime Rate Trust, Van Kampen Merritt Prime Rate Income Trust, Fidelity Bankers Life Insurance Company, and First Capital Life Insurance Company, and their legal successors and assigns.

"Acquisition Credit Agreement" shall mean that certain Amended and Restated Merger Loan Agreement dated as of September 21, 1989, as amended or supplemented, among the Company, as borrower, CIBC, as Agent, and the Acquisition Banks, as lenders, and all ancillary instruments, agreements, and documents evidencing or securing the indebtedness incurred, or otherwise covered by, the Acquisition Credit Agreement.

"Acquisition Debt" shall mean all indebtedness and obligations of the Debtor under the Acquisition Credit Agreement, including, without limitation, all liabilities on account of interest rate swaps and all Reimbursement Obligations under Acquisition Letters of Credit, whenever arising.

"Acquisition Letter of Credit" shall mean a letter of credit issued by CIBC or an Acquisition Bank pursuant to the terms of the Acquisition Credit Agreement.

"Administrative Claim" shall mean a Claim, other than a Cure Claim, to the extent that it is of the kind described in Section 503(b) of the Bankruptcy Code and is entitled to priority under Section 507(a)(1) of the Bankruptcy Code.

"Affiliate" shall mean (a) with respect to the Company or the Debtor (as the case may be), any corporation, partnership or other entity, excluding natural persons, which, directly or indirectly, controls, is controlled by, or is under common control with the Company or the Debtor (as the case may be); (b) with respect to any entity other than the Company, the Debtor, a governmental unit or a natural person, any corporation, partnership, association or other entity which, directly or indirectly, controls, is controlled by or is under common control with such entity; or (c) with respect to Copeland, the parties to the Copeland Consent. For purposes of this definition, the term "control" means the ownership or effective control of more than 20 percent of the beneficial or voting interest in the corporation or other entity referred to.

"Allowed" shall mean (a) with respect to an Administrative Claim of the kind described in Section 503(b)(2), (3), (4), (5), or (6) of the Bankruptcy Code, an Administrative Claim that has been allowed by a Final Order; (b) with respect to any other Administrative Claim, an Administrative Claim to which no objection has been filed; (c) with respect to a Cure Claim, a Cure Claim that has been allowed by a Final Order, or by settlement; or (d) with respect to any Claim that is not a Superpriority Claim, an Administrative Claim, or a Cure Claim, a

Claim that is not a Disputed Claim or has been allowed by a Final Order, to the extent so allowed.

"Articles of Incorporation" shall mean the articles of incorporation to be adopted by the New Company pursuant to Section 6.01 of the Plan, the form of which shall be filed with the Bankruptcy Court no later than the Confirmation Hearing Date.

"Assumed Insider Contract" shall mean an Insider Contract designated to be assumed in the Schedule of Insider Contract Assumptions and Rejections.

"Ballot Deadline" shall mean that date set in an order of the Bankruptcy Court, with extensions (if any), as the deadline for the return of ballots accepting or rejecting the Plan.

"Bankruptcy Code" shall mean title 11 of the United States Code, as in effect on the date of the Plan or as thereafter amended, but only to the extent that any such amendment purports to become effective for the Reorganization Case on or before the Confirmation Date.

"Bankruptcy Court" shall mean the bankruptcy court unit of the United States District Court for the Western District of Texas, Austin Division, or in the event and to the extent that such unit ceases to exercise subject matter jurisdiction over the Reorganization Case (whether by abstention, withdrawal of reference, change of venue or otherwise), such court, or unit or adjunct thereof, that exercises subject matter jurisdiction over the Reorganization Case in lieu of such unit.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as in effect on the date of the Plan or as thereafter amended, but only to the extent that any such amendment purports to become effective for the Reorganization Case on or before the Confirmation Date.

"Bridge Loan Agreement" shall mean that certain Financing Agreement dated as of March 21, 1989, as amended or supplemented, between the Company, as borrower, and Merrill Lynch, as lender, and all ancillary instruments, agreements, and documents evidencing the indebtedness incurred, or otherwise covered by, the Bridge Loan Agreement.

"Business Day" shall mean any day other than a Saturday, Sunday, or day on which commercial banks in New York City are authorized or required to close.

"CIBC" shall mean Canadian Imperial Bank of Commerce, a Canadian chartered bank acting through its New York agency.

"Claim" shall mean a claim against the Debtor within the meaning of Section 101(5) of the Bankruptcy Code, as supplemented by Section 102(2) of the Bankruptcy Code.

-3-

"Class" shall mean an indicated class of Claims defined in Article III of the Plan.

"Class ___ Claim" shall mean a Claim that is designated to be included in the indicated class of Claims defined in Article III of the Plan.

"Class 3B Percentage" shall mean, for CIBC and each Acquisition Bank, that percentage of the following sum outstanding on the Effective Date held by it, or for which it is liable or committed, on the Effective Date:   (a) Acquisition Debt, plus (b) DiP Debt, plus (c) the aggregate amount available for draw under Acquisition Letters of Credit, plus (d) the New Term Loan Amount set forth in the New Credit Agreement, plus (e) the Revolving Credit Commitment set forth in the New Credit Agreement.

"Common Shareholders Agreement" shall mean an agreement among the holders of the New Common Stock, the form of which shall be filed with the Bankruptcy Court no later than the Confirmation Hearing Date.

"Common Stock Claim" shall mean any Claim with respect to the Old Common Stock of the kind described in Section 510(b) of the Bankruptcy Code.

"Company" shall mean, collectively, Al Copeland Enterprises, Inc., a Texas corporation, and its predecessors in interest.

"Compensatory Cure Claim" shall mean a Cure Claim to the extent that it is for the actual pecuniary loss associated with a breach or default the cure of or compensation for which is required for the assumption of an executory contract or unexpired lease pursuant to Section 365(b)(1) of the Bankruptcy Code.

"Confirmation" shall mean entry of the Confirmation Order.

"Confirmation Date" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing Date" shall mean the date upon which the hearing with respect to the Plan required by Section 1128(a) of the Bankruptcy Code commences.

"Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"Contractual Subordination" shall mean the subordination of the Merrill Lynch Claims to the Acquisition Bank Claims effected by the Bridge Loan Agreement.

-4-

"Copeland" shall mean Alvin C. Copeland, a Louisiana resident and sole holder of the Old Common Stock.

"Copeland Consent" shall mean a form of Consent and Agreement, including annexes thereto, in the form annexed to the Plan as Exhibit A, with such changes as the Proponents may agree to.

"Copeland Proceedings" shall mean, collectively, all civil actions, adversary proceedings, contested matters, and other proceedings heretofore or hereafter brought against any one or more of the parties to the Copeland Consent by or on behalf of the Debtor or the Estate in any court or other tribunal, whether or not persons other than such parties are joined as defendants therein.

"Cure Claim" shall mean any Claim arising at any time under or relating to any executory contract or unexpired lease to which the Debtor was a party on April 12, 1991 and which has been or will be assumed under Section 365(a) of the Bankruptcy Code or pursuant to the Plan (a "Contract"), including, without limitation, (a) any claim of breach of or default under a Contract, (b) any claim for actual pecuniary loss resulting from such a breach or default, (c) any statutory or common law claim arising out of the relationship evidenced by a Contract, including, without limitation, antitrust, unfair trade practices, unfair competition, breach of fiduciary duty, breach of a duty or implied covenant of good faith or fair dealing, tortious interference with the obligations of contract, fraud, intentional or negligent misrepresentation, violation of federal or state laws governing franchising or franchise relationships, and any other claim or cause of action arising in contract, tort, breach of statute, breach of duty, or on any civil law basis, and (d) any claim for multiple, exemplary, or punitive damages or equitable relief relating to any of the foregoing.

"Debtor" shall mean the Company as debtor and as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code and, with respect to actions undertaken on or subsequent to the Effective Date, the New Company.

"DiP Banks" shall mean, collectively, CIBC, Inc., Eaton Vance Prime Rate Reserves, and Van Kampen Merritt Prime Rate Income Trust, and their legal successors and assigns.

"DiP Credit Agreement" shall mean that certain Amended and Restated Secured Credit Agreement dated as of July 31, 1991, as amended or supplemented, among the Debtor, as borrower, CIBC, as Agent, and the DiP Banks, as lenders, and all ancillary instruments, agreements, and documents evidencing or securing the indebtedness incurred, or otherwise covered by, the DiP Credit Agreement.

"DiP Debt" shall mean all indebtedness and obligations of the Debtor under the DiP Credit Agreement, including, without limitation, all Reimbursement Obligations under DiP Letters of Credit whenever arising.

"DiP Letter of Credit" shall mean a letter of credit issued by CIBC or a DiP Bank pursuant to the terms of the DiP Credit Agreement.

"Disclosure Statement" shall mean the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code, together with any exhibits thereto and any documents incorporated therein by reference, as the same may be amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

"Disclosure Statement Hearing" shall mean the hearing before the Bankruptcy Court on approval of the Disclosure Statement.

"Disputed Claim" shall mean a Claim, other than a Superpriority Claim, an Administrative Claim, or a Cure Claim, that (a) would be deemed filed pursuant to Section 1111(a) of the Bankruptcy Code but as to which (i) a proof of claim has been filed that is inconsistent in any way with the description or treatment of such Claim in the schedules filed by the Debtor pursuant to Section 521(1) of the Bankruptcy Code, or (ii) an objection has been filed on or before the Effective Date, or (b) would not be deemed filed pursuant to Section 1111(a) of the Bankruptcy Code, whether by reason of its exclusion from such schedules or its description therein as disputed, contingent, or unliquidated, but as to which (i) no proof of claim has been filed, or (ii) a proof of claim has been filed, to which an objection has been filed on or before the Effective Date; provided, however, that in the event that the Bankruptcy Court or the Plan permits, or the Bankruptcy Code requires, a Claim to be liquidated or allowed in a forum other than the Bankruptcy Court, then such Claim shall be a Disputed Claim until liquidated or allowed by a Final Order or by agreement of the parties.

"Diversified" shall mean Diversified Foods and Seasonings, Inc. (f/k/a New Orleans Spice Company, Inc.), a Louisiana corporation.

"Effective Date" shall mean the date ten (10) Business Days after all conditions to consummation set forth in Section 8.02 of the Plan shall have been satisfied.

"Estate" shall mean the estate created in the Reorganization Case by Section 541 of the Bankruptcy Code.

"Executive Income Plan" shall mean the A. Copeland Enterprises, Inc. Executive Income Plan (effective as of June 15, 1988) and all amendments thereto as authorized by any resolution

of the board of directors of the Debtor occurring prior to
April 12, 1991, but excluding the Supplemental Executive
Retirement Plan purporting to replace and supersede the Executive
Income Plan.

"Exemplary Damage Claim" shall mean a Claim of the kind
described in Section 726(a)(4) of the Bankruptcy Code, including,
without limitation, a Cure Claim to the extent that it is not a
Compensatory Cure Claim, but excluding a Section 157(b)(5) Claim.

"Final Order" shall mean an order or judgment of a court as
to which (a) any appeal or petition for certiorari or review that
has been taken or filed has been finally determined, denied, or
dismissed, and (b) the time for initial or further appeal or
petitioning for certiorari or review has expired and no timely
appeal or petition for certiorari or review has been taken or
filed.

"Formula Agreement" shall mean the Formula Agreement dated
July 2, 1979, among Copeland, A. Copeland Enterprises, Inc.,
Popeyes Famous Fried Chicken, Inc. and others, including any
amendments thereto, which grants to the Company the right to use
and license, and access to, a certain recipe and formula for
preparation of spicy fried chicken, any developments or
improvements relating to the production of such recipe and
formula, and any additional recipes for products suitable for use
in restaurants and take-out establishments operated or franchised
by the Company and operated under the so-called "Popeyes
Concept".

"Insider" shall include (a) an insider of the Debtor as
defined in, but not limited by, Section 101(31)(B), (E), and (F)
of the Bankruptcy Code, (b) an insider of the Company, or of an
Affiliate of the Debtor or the Company, as defined for an entity
of the appropriate character in, but not limited by,
Section 101(31) of the Bankruptcy Code, as though the Company or
such Affiliate were the Debtor, and (c) in addition, an Affiliate
of the Debtor or the Company.

"Insider Contract" shall mean any executory contract or
unexpired lease listed in the Schedule of Insider Contract
Assumptions and Rejections.

"Interest" shall mean an equity interest in the Debtor.

"Large Trade Claim" shall mean a Trade Claim that is not a
Small Trade Claim.

"Merrill Lynch" shall mean Merrill Lynch & Co., Inc., a
Delaware corporation.

"Merrill Lynch Claims" shall mean all Claims of Merrill
Lynch against the Debtor, including, without limitation, Claims
under the Bridge Loan Agreement.

-7-

"Merrill Lynch Litigation" shall mean (a) that certain adversary proceeding filed in the Bankruptcy Court and entitled <u>Al Copeland Enterprises, Inc.</u> v. <u>Merrill Lynch & Co., Inc.</u>, Adversary Proceeding No. 92-1017-FM, and all matters relating thereto, (b) that certain lawsuit filed in the United States District Court for the Southern District of New York and entitled <u>Merrill Lynch & Co., Inc.</u> v. <u>Al Copeland Enterprises, Inc.</u>, Case No. 90 Civ. 7307 (LMM), and all matters relating thereto, and (c) that certain lawsuit filed in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, entitled <u>Al Copeland Enterprises, Inc.</u> v. <u>Merrill Lynch & Co., Inc., et al.</u>, Case No. 414-525, and removed on March 25, 1991 to the United States District Court for the Eastern District of Louisiana, and all matters relating thereto.

"Miscellaneous Secured Claim" shall mean (a) a Secured Claim not held by an Acquisition Bank, including, without limitation, any Claim for the delivery of goods or services to the Debtor to the extent of any cash deposit made by the Debtor before, and remaining unapplied on, the Petition Date, and (b) any Unsecured Claim associated with such a Secured Claim as a deficiency claim if the Proponents elect to leave such Claims unimpaired in accordance with Section 1124(2) of the Bankruptcy Code.

"New Common Stock" shall mean the common stock to be authorized under the Articles of Incorporation and issued as provided in Section 6.02 of the Plan.

"New Company" shall mean the corporation organized under the laws of the State of Minnesota pursuant to the Articles of Incorporation, and successor by merger to the Debtor.

"New Credit Agreement" shall mean a form of Second Amended and Restated Loan Agreement, including exhibits, schedules, and annexes thereto, in the form annexed to the Plan as Exhibit B, with such changes as the Proponents may agree to.

"New Credit Documents" shall mean the New Credit Agreement and all ancillary instruments, documents and agreements evidencing or securing the indebtedness incurred, or otherwise covered by, the New Credit Agreement.

"New Preferred Stock" shall mean the preferred stock to be authorized under the Articles of Incorporation and issued as provided in Section 6.02 of the Plan, with an aggregate liquidation preference of $56 million.

"Non-Insider Contract" shall mean any executory contract or unexpired lease of the Debtor that is not an Insider Contract, whether or not a party thereto is an Insider.

"Old Common Stock" shall mean the common stock of the Company and any warrants or other rights to acquire such common stock.

"Old Preferred Stock" shall mean the 17.5% Cumulative Exchangeable Preferred Stock issued by the Company on or about September 21, 1989 and from time to time thereafter, and any rights to acquire, or unpaid dividends with respect to, such preferred stock.

"Petition Date" shall mean April 12, 1991.

"Plan" shall mean this plan of reorganization, together with any exhibits hereto and any documents herein by reference, as the same may be amended, modified or supplemented from time to time in accordance with the provisions set forth herein, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

"Preferred Shareholders Agreement" shall mean an agreement among the holders of the New Preferred Stock, the form of which shall be filed with the Bankruptcy Court no later than the Confirmation Hearing Date.

"Preferred Stock Claim" shall mean any Claim with respect to the Old Preferred Stock of the kind described in Section 510(b) of the Bankruptcy Code.

"Priority Claim" shall mean a Claim to the extent that it is entitled to priority under Section 507(a) of the Bankruptcy Code, other than a Superpriority Claim, an Administrative Claim, or a Tax Claim.

"Proponents" shall mean, collectively, CIBC, the Acquisition Banks, and any other entity that becomes a co-proponent of the Plan.

"Recipe Royalty Agreement" shall mean the Recipe Royalty Agreement dated as of March 21, 1989, as amended or supplemented, among Copeland, the Company, and Diversified.

"Reimbursement Claim" shall mean a Claim of a DiP Bank or an Acquisition Bank for reimbursement on account of a draw under a DiP Letter of Credit or an Acquisition Letter of Credit.

"Rejected Insider Contract" shall mean an Insider Contract to the extent designated to be rejected in the Schedule of Insider Contract Assumptions and Rejections.

"Reorganization Case" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, Case No. 91-12575-FM-11.

"Schedule of Insider Contract Assumptions and Rejections" shall mean the schedule annexed to the Plan as Exhibit C;

provided, however, that at any time on or before the Confirmation Date the Proponents may amend such schedule by notice filed with the Bankruptcy Court.

"Section 157(b)(5) Claim" shall mean a Claim that is unliquidated or contingent as of the date of the Disclosure Statement Hearing and is of the kind described in 28 U.S.C. § 157(b)(5).

"Secured Claim" shall mean a Claim that is not a Superpriority Claim, an Administrative Claim, a Cure Claim, or a Tax Claim, but only to the extent that such Claim is determined to be a secured claim under Section 506(a) of the Bankruptcy Code.

"Small Trade Claim" shall mean a Trade Claim the amount of which does not exceed $1,000, or the amount of which shall be reduced by the holder thereof to $1,000 on the ballot distributed to such holder; provided, however, that all Trade Claims held by a creditor and its Affiliates as of the Petition Date shall be aggregated to determine their status as Small Trade Claims, and no transfers of Trade Claims after the Petition Date shall affect such aggregation.

"Subordinated Insider Claim" shall mean a Claim listed on the schedule annexed to the Plan as Exhibit D; provided, however, that at any time on or before the Confirmation Date the Proponents may amend such schedule by notice filed with the Bankruptcy Court.

"Superpriority Claim" shall mean a Claim to the extent that it is of the kind described in, and is entitled to priority under, Section 364(c)(1) or Section 507(b) of the Bankruptcy Code.

"Supply Contract" shall mean the Supply Contract dated as of March 21, 1989, as amended or supplemented, between the Company and Diversified.

"Tax Claim" shall mean a Claim to the extent that it is of the kind described in, and is entitled to priority under, Section 507(a)(7) of the Bankruptcy Code.

"Trade Claim" shall mean an Unsecured Claim that, (a) as of the date of the Disclosure Statement Hearing, is not a Priority Claim, a Miscellaneous Secured Claim, an Acquisition Bank Claim, a Section 157(b)(5) Claim, a Merrill Lynch Claim, an Exemplary Damage Claim, a Preferred Stock Claim, or a Common Stock Claim, and (b) as of the Confirmation Date, is not a Subordinated Insider Claim.

"Unsecured Claim" shall mean a Claim that is not a Secured Claim, a Superpriority Claim, an Administrative Claim, a Cure Claim, or a Tax Claim.

-10-

ARTICLE II

ADMINISTRATIVE AND TAX CLAIMS

Section 2.01. Superpriority Claims. (a) Except as provided in Subsection (b) or (c) of this Section 2.01, unless otherwise agreed by the holder of an Allowed Superpriority Claim, each Allowed Superpriority Claim shall be paid in full in cash on the later of the Effective Date or the date upon which such Claim becomes an Allowed Superpriority Claim.

(b) With respect to Claims of the DiP Banks arising under or relating to DiP Letters of Credit, other than Reimbursement Claims, the legal, equitable, and contractual rights to which such Claims entitle the holders thereof shall be left unaltered but shall be subject to the terms of the New Credit Agreement.

(c) With respect to Claims of the DiP Banks on account of the DiP Debt, each holder thereof (i) will receive, on the Effective Date, cash equal to its share of the unpaid balance of the DiP Debt other than for principal, (ii) will enter into the New Credit Agreement under the Plan, and (iii) will receive, on or after the Effective Date, such property on account of the DiP Debt as is set forth in the New Credit Agreement.

Section 2.02. Administrative Claims. Unless otherwise agreed by the the holder of an Allowed Administrative Claim, each Allowed Administrative Claim shall be paid in full in cash on the later of the Effective Date or the date upon which such Claim becomes an Allowed Administrative Claim; provided, however, that if by its terms an Allowed Administrative Claim is payable after the Effective Date, such Allowed Administrative Claim may be paid on such later date or dates.

Section 2.03. Tax Claims. Unless otherwise agreed by the the holder of an Allowed Tax Claim, each Allowed Tax Claim shall be paid in full in cash on the later of the Effective Date or the date upon which such Claim becomes an Allowed Tax Claim; provided, however, that the Proponents shall have the option to make deferred cash payments on account of an Allowed Tax Claim, over a period not to exceed six (6) years after the date of assessment of such Allowed Tax Claim, of a value, as of the Effective Date, equal to the amount of such Allowed Tax Claim, which option shall be exercised by written notice to the holder of a Tax Claim delivered not later than ten (10) days before the Confirmation Hearing Date specifying a payment schedule, a rate of interest, and the date by which an objection to such treatment must be filed and served.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

Section 3.01. Class 1 -- Priority Claims. Class 1 consists of all Priority Claims.

Section 3.02. Class 2 -- Miscellaneous Secured Claims. Class 2 consists of all Miscellaneous Secured Claims. Each Miscellaneous Secured Claim shall be treated for all purposes of the Plan and under the Bankruptcy Code as a separate class.

Section 3.03. Class 3 -- Acquisition Bank Claims. Class 3 consists of all Acquisition Bank Claims and shall be divided into the following subclasses:

Class 3A -- Acquisition Letters of Credit. All Claims of CIBC or the Acquisition Banks arising under or relating to Acquisition Letters of Credit, other than Reimbursement Claims.

Class 3B -- Other Acquisition Bank Claims. All Claims of CIBC or the Acquisition Banks on account of the Acquisition Debt.

Section 3.04. Class 4 -- Small Trade Claims. Class 4 consists of all Small Trade Claims.

Section 3.05. Class 5 -- Large Trade Claims. Class 5 consists of all Large Trade Claims.

Section 3.06. Class 6 -- Section 157(b)(5) Claims. Class 6 consists of all Section 157(b)(5) Claims.

Section 3.07. Class 7 -- Compensatory Cure Claims. Class 7 consists of all Compensatory Cure Claims.

Section 3.08. Class 8 -- Merrill Lynch Claims. Class 8 consists of all Merrill Lynch Claims.

Section 3.09. Class 9 -- Exemplary Damage Claims. Class 9 consists of all Exemplary Damage Claims.

Section 3.10. Class 10 -- Subordinated Insider Claims. Class 10 consists of all Subordinated Insider Claims.

Section 3.11. Class 11 -- Preferred Stock Interests. Class 11 consists of all Interests represented by the Old Preferred Stock.

Section 3.12. Class 12 -- Preferred Stock Claims. Class 12 consists of all Preferred Stock Claims.

Section 3.13.    Class 13 -- Common Stock Interests.    Class 13 consists of all Common Stock Claims and all Interests represented by the Old Common Stock.


ARTICLE IV

TREATMENT OF CLASSES NOT IMPAIRED UNDER THE PLAN

Section 4.01.    Class 1 -- Priority Claims.    Unless otherwise agreed by the the holder of an Allowed Priority Claim, each Allowed Priority Claim shall be paid in full in cash on the later of the Effective Date or the date upon which such Claim becomes an Allowed Priority Claim.

Section 4.02.    Class 2 -- Miscellaneous Secured Claims. Unless otherwise agreed by the the holder of an Allowed Miscellaneous Secured Claim, each Allowed Miscellaneous Secured Claim shall be paid in full in cash on the later of the Effective Date or the date upon which such Claim becomes an Allowed Miscellaneous Secured Claim, payment in cash to include the exercise of any setoff or the application of any cash deposit by such holder on or after the Effective Date made after written notice to such holder that the Effective Date has occurred; provided, however, that the Proponents shall have the option to leave a Miscellaneous Secured Claim unimpaired in the manner described in Section 1124(2) of the Bankruptcy Code, which option shall be exercised by written notice to the holder of a Miscellaneous Secured Claim delivered not later than ten (10) days before the Confirmation Hearing Date specifying the manner in which cure and compensation under Sections 1124(2)(A) and 1124(2)(C) of the Bankruptcy Code, respectively, shall be effected, and the date by which an objection to such treatment must be filed and served.

Section 4.03.    Class 3A -- Acquisition Letters of Credit. All Claims in Class 3A shall be Allowed Class 3A Claims and shall be treated as Allowed Secured Claims to the entire unpaid balance thereof.    The legal, equitable, and contractual rights to which Class 3A Claims entitle the holders thereof shall be left unaltered, but shall be subject to the terms of the New Credit Agreement.

Section 4.04.    Class 4 -- Small Trade Claims.    Unless otherwise agreed by the the holder of an Allowed Small Trade Claim, each Allowed Small Trade Claim shall be paid in full in cash on the later of the Effective Date or the date upon which such Claim becomes an Allowed Small Trade Claim.

Section 4.05.    Class 6 -- Section 157(b)(5) Claims.    The legal, equitable, and contractual rights to which Class 6 Claims entitle the holders thereof shall be left unaltered, subject to liquidation in accordance with 28 U.S.C. §§ 157 & 1334.

-13-

Section 4.06.  Class 7 -- Compensatory Cure Claims.  Class 7 Claims shall be treated in accordance with Section 7.06 of the Plan.

Section 4.07.  Unimpaired Classes.  By virtue of the foregoing provisions of this Article IV, the Claims in Classes 1, 2, 3A, 4, 6, and 7 are not impaired under the Plan.


ARTICLE V

TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN

Section 5.01.  Class 3B -- Other Acquisition Bank Claims. All Claims in Class 3B shall be Allowed Class 3B Claims in an aggregate amount as of the Effective Date equal to the Acquisition Debt, plus any Acquisition Debt consisting of Reimbursement Obligations under Acquisition Letters of Credit arising thereafter, and shall be treated as Allowed Secured Claims to the entire aggregate unpaid balance thereof.  CIBC and each Acquisition Bank, as a holder of an Allowed Class 3B Claim, (a) will receive, on the Effective Date, cash equal to its share of the unpaid balance of the Acquisition Debt other than for principal, (b) will enter into the New Credit Agreement under the Plan, (c) will receive, on or after the Effective Date and on account of its Allowed Class 3B Claims, a Tranche A Term Note in the amount set forth in the New Credit Agreement as the Tranche A Term Loan Commitment of such Acquisition Bank, and (d) will receive (i) on account of its Allowed Class 3B Claims, shares of New Preferred Stock, issued on the Effective Date, with a liquidation preference in the amount set forth in the New Credit Agreement as the Exchanged Amount for such Acquisition Bank, (ii) on account of its Allowed Class 3B Claims, shares representing its Class 3B Percentage of fifty and 1/10 percent (50.1%) of the New Common Stock issued on the Effective Date, and (iii) on account of the Contractual Subordination, its Class 3B Percentage of thirty-one and 9/10 percent (31.9%) of such New Common Stock transferred in accordance with Section 5.03(a)(iv)(B) of the Plan; provided, however, that if Class 8 shall reject the Plan, then the distribution of New Common Stock on account of Allowed Class 3B Claims shall constitute one hundred percent (100%) of such New Common Stock.

Section 5.02.  Class 5 -- Large Trade Claims.  Unless otherwise agreed by the the holder of an Allowed Large Trade Claim, each such holder shall receive cash equal to eighty-five percent (85%) of the amount of such Allowed Large Trade Claim on the later of the Effective Date or the date upon which such Claim becomes an Allowed Large Trade Claim.

Section 5.03.  Class 8 -- Merrill Lynch Claims.  (a)  If Class 8 shall accept the Plan in accordance with Section 1126(c) of the Bankruptcy Code, (i) as of the Effective Date, all Claims in Class 8 shall be Allowed Class 8 Claims in the aggregate

-14-

amount of $154,735,165.99, subject to the Contractual Subordination; (ii) not later than ten (10) days after the Effective Date, the Debtor shall execute and deliver to Merrill Lynch stipulations of dismissal with prejudice of the Merrill Lynch Litigation; (iii) as of the Effective Date, the releases set forth in Section 8.01(a)(iii) of the Plan shall take effect; and (iv) Merrill Lynch will receive, on account of its Allowed Class 8 Claims, (A) shares of New Preferred Stock, issued on the Effective Date, with an aggregate liquidation preference of $6 million, and (B) shares representing forty-nine and 9/10 percent (49.9%) of the New Common Stock issued on the Effective Date, of which shares representing thirty-one and 9/10 percent (31.9%) of such New Common Stock will be transferred by Merrill Lynch to the Acquisition Banks under, and in full discharge of, the obligations of Merrill Lynch pursuant to Contractual Subordination. In consideration of the retention by Merrill Lynch of said New Preferred Stock and eighteen percent (18%) of said New Common Stock, all subrogation rights of Merrill Lynch against the Acquisition Banks, whether arising under the Contractual Subordination or at law or equity, shall be discharged and released without further act of the parties.

(b) If Class 8 shall fail to accept the Plan in accordance with Section 1126(c) of the Bankruptcy Code, (i) as of the Effective Date, all Claims in Class 8 shall be Allowed Class 8 Claims in the aggregate amount of $154,735,165.99, subject to the Contractual Subordination, (ii) as of the Effective Date, all Class 8 Claims shall be subordinated to all Claims other than Class 8 Claims, Class 9 Claims, Class 10 Claims, Class 12 Claims, and Common Stock Claims pursuant to Section 510(c) of the Bankruptcy Code, subject only to the Contractual Subordination, (iii) as of the Effective Date, any lien securing a Class 8 Claim shall be transferred to the Estate, (iv) as of the Effective Date, no Class 8 Claim shall be "mutual" with any debt of Merrill Lynch to the Debtor within the meaning of Section 553(a) of the Bankruptcy Code, whether such debt is asserted in the Merrill Lynch Litigation or otherwise, and (v) the holders of Class 8 Claims shall not receive or retain any property under the Plan on account thereof.

Section 5.04. Class 9 -- Exemplary Damage Claims. The holders of Class 9 Claims shall not receive or retain any property under the Plan on account thereof.

Section 5.05. Class 10 -- Subordinated Insider Claims. (a) Subject to subsections (b) and (c) of this Section 5.05, the holders of Class 10 Claims shall not receive or retain any property under the Plan on account thereof either (i) by virtue of their identity and status as Insiders of the Debtor under the control of Copeland, or (ii) to the extent that the Bankruptcy Court determines by Final Order after the Confirmation Date, in proceedings on objections to such Class 10 Claims, that such Class 10 Claims shall be subordinated to all Claims other than Class 10 Claims, Class 12 Claims, and Common Stock Claims

pursuant to Section 510(c) of the Bankruptcy Code, any lien
securing a Class 10 Claim shall be transferred to the Estate, and
no such Class 10 Claim shall be "mutual" with any debt of the
holder of such Class 10 Claim to the Debtor within the meaning of
Section 553(a) of the Bankruptcy Code, whether such debt is
asserted in the Copeland Proceedings or otherwise.

        (b)    To the extent that the treatment afforded by
subsection (a)(i) of this Section 5.05 is determined to be
impermissible for any reason, or the Final Order described in
subsection (a)(ii) of this Section 5.05 is not entered, then each
holder of an Allowed Subordinated Insider Claim not so treated
shall receive, on the later of the Effective Date or the date
upon which such Claim becomes an Allowed Subordinated Insider
Claim, cash equal to eighty-five percent (85%) of the excess, if
any, of the amount of such Allowed Subordinated Insider Claim
over the amount of any claims of the Debtor against such holder.

        (c)    Notwithstanding the forgoing provisions of this
Section 5.05, if the Copeland Consent shall become effective on
or before the Effective Date, each Subordinated Insider Claim
scheduled therein shall receive the treatment set forth therein.

        Section 5.06.  Class 11 -- Preferred Stock Interests.  The
holders of Class 11 Interests shall not receive or retain any
property under the Plan on account thereof.

        Section 5.07.  Class 12 -- Preferred Stock Claims.  (a)  As
of the Effective Date, all Class 12 Claims shall be subordinated
to all Claims, other than Common Stock Claims, and to Class 11
Interests pursuant to Section 510(b) of the Bankruptcy Code.

        (b)    The holders of Class 12 Claims shall not receive
or retain any property under the Plan on account thereof.

        Section 5.08.  Class 13 -- Common Stock Interests.  The
holders of Class 13 Interests shall not receive or retain any
property under the Plan on account thereof.

        Section 5.09.  Impaired Classes.  By virtue of the foregoing
provisions of this Article V, the Claims in Classes 3B, 5, 8, 9,
10, and 12, and the Interests in Classes 11 and 13, are impaired
under the Plan.


                          ARTICLE VI

                MEANS OF EXECUTION OF THE PLAN


        Section 6.01.  Articles of Incorporation; Merger.  On the
Effective Date, (a) the New Company shall adopt and file the
Articles of Incorporation, and (b) the Debtor shall merge with
and into the New Company pursuant to Tex. Bus. Corp. Act.
arts. 4.14 & 5.01 et seq. and Minn. Stat. §§ 302A.601 et seq.

                            -16-

Section 6.02.  New Stock.  On the Effective Date, the New Company, pursuant to the Articles of Incorporation, shall issue for distribution the shares of New Preferred Stock and New Common Stock required for distribution pursuant to the provisions of Article V of the Plan.

Section 6.03.  New Credit Agreement; New Credit Documents. On the Effective Date, the terms of the New Credit Agreement and the New Credit Documents to be entered by and between the Debtor, CIBC, such other parties as may be necessary, and such other lenders as CIBC may permit to participate by means of assignment or participation, or both, shall become effective.

Section 6.04.  Cancellation of Securities.  On and as of the Effective Date, the Old Preferred Stock and the Old Common Stock shall be cancelled and rendered null and void.

Section 6.05.  Retiree Benefits.  (a)  On the Effective Date, pursuant to Section 1129(a)(13) of the Bankruptcy Code, the New Company will continue to be obligated to pay all retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, and shall continue to pay such retiree benefits as they become due at the level(s) established at any time prior to the Confirmation Date pursuant to Subsection (e)(1)(B) or (g) of said Section 1114, for the duration of the period the Debtor has obligated itself to provide such benefits.

(b)  The benefits of William A. Copeland, III under the Executive Income Plan shall be treated as 100% vested on the Effective Date and shall be allowed and payable commencing upon cessation of employment by the Debtor, whether such cessation is voluntary or involuntary.  Such benefits shall be paid in accordance with the Executive Income Plan in one hundred twenty (120) monthly installments of $10,417.00 each.  Nothing in this Section 6.05 shall have the effect of allowing any Claim under the Executive Income Plan other than such Claim of William C. Copeland, III.

Section 6.06.  Copeland Consent.  If the parties thereto shall execute, acknowledge, and return the Copeland Consent on or before the Ballot Deadline, or at such later time as the Proponents shall agree in writing, and if the Effective Date shall occur, then (a) the terms of the Copeland Consent shall control and supersede any inconsistent provisions of the Plan, and (b) the Debtor shall be bound by the terms of Copeland Consent.

Section 6.07.  Disputed Claims.  (a)  Except with respect to those Claims the holders of which have and preserve the right to liquidation of such Claims before a court other than the Bankruptcy Court pursuant to 28 U.S.C. § 157(b)(5), all Disputed Claims shall be liquidated and determined, and allowed or disallowed, by the Bankruptcy Court, subject to the discretion

-17-

granted under the applicable sections of Title 28 of the United States Code.

(b)   The Bankruptcy Court may, on or prior to the Confirmation Date or such date or dates thereafter as the Bankruptcy Court may set, fix or liquidate the amount of any contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code, in which event the amount so fixed or liquidated shall be deemed to be the amount of such contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan.

(c)   The Debtor shall not be required to create or maintain any reserves for the payment of Disputed Claims.

## ARTICLE VII

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

<u>Section 7.01</u>.   <u>Supply Contract</u>.   On, and by virtue of the occurrence of, the Effective Date, the Supply Contract shall be assumed, and assigned by the Debtor to the New Company, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code and by virtue of the merger of the Debtor into the New Company.

<u>Section 7.02</u>.   <u>Formula Agreement and Recipe Royalty Agreement</u>.   On, and by virtue of the occurrence of, the Effective Date, the Formula Agreement and the Recipe Royalty Agreement shall be assumed, and assigned by the Debtor to the New Company, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code and by virtue of the merger of the Debtor into the New Company: <u>provided</u>, <u>however</u>, that if the Bankruptcy Court so rules, the Confirmation Order shall include a determination that the "Termination Date" (as defined in the Recipe Royalty Agreement) shall never occur.

<u>Section 7.03</u>.   <u>Insider Contracts</u>.   (a)   On, and by virtue of the occurrence of, the Effective Date, the Assumed Insider Contracts as shall be assumed, and assigned by the Debtor to the New Company, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code and by virtue of the merger of the Debtor into the New Company; <u>provided</u>, <u>however</u>, that such assumption and assignment shall be without prejudice to any right of the Debtor, or of the New Company as successor to the Debtor, to reform any Assumed Insider Contract under applicable nonbankruptcy law.

(b)   On, and by virtue of the occurrence of, the Effective Date, the Rejected Insider Contracts shall be rejected in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code.   Any Claim arising in favor of any Insider under Sections 365(g)(1) and 502(g) of the Bankruptcy Code on account

of such rejection shall be filed not later than thirty (30) days after the Effective Date.

Section 7.04. Non-Insider Contracts. On, and by virtue of the occurrence of the Effective Date, and to the extent permitted by applicable law, all Non-Insider Contracts of the Debtor will be assumed, and assigned by the Debtor to the New Company, in accordance with the provisions of Sections 365 and 1123 of the Bankruptcy Code and by virtue of the merger of the Debtor into the New Company, excluding (a) any and all Non-Insider Contracts that are the subject of separate motions filed pursuant to Section 365 of the Bankruptcy Code by the Debtor prior to the Confirmation Hearing Date, (b) such Non-Insider Contracts as are listed on any "Schedule of Rejected Executory Contracts" filed by the Debtor on or before entry of the Confirmation Order, all of which contracts shall be rejected pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code, and (c) any and all Non-Insider Contracts rejected prior to the entry of the Confirmation Order. Any Claims arising out of the rejection of Non-Insider Contracts under this Section 7.04 must be filed with the Bankruptcy Court (i) 30 days after the Confirmation Date, or (ii) if such rejection is authorized in a separate order of the Bankruptcy Court, such other date as may be set forth in such order.

Section 7.05. Post-Petition Contracts. Contracts entered into or assumed after the Petition Date will be assigned by the Debtor to the New Company by virtue of the merger of the Debtor into the New Company on, and by virtue of the occurrence of, the Effective Date, and will be performed by the New Company in accordance with the terms of contract in the ordinary course of business; provided, however, that for a period of 180 days after the Effective Date, the New Company shall have the right, by appropriate proceedings before the Bankruptcy Court, to seek rescission or reformation of any such contract, other than a pre-petition contract assumed under the Plan, entered into (i) with any Insider, or (ii) out of the ordinary course of the Debtor's business and without the approval of the Bankruptcy Court.

Section 7.06. Cure and Compensation. (a) All Cure Claims shall be allowed or disallowed in accordance with the procedures for the allowance of Disputed Claims; provided, however, that no settlement relating to the allowance or payment of a Cure Claim shall require the approval of the Bankruptcy Court. The assumption and assignment of any Insider Contract or Non-Insider Contract shall be fully effective as and when provided in the Plan nothwithstanding that (i) any related Cure Claim remains to be allowed or disallowed by a Final Order, or (ii) any related Allowed Compensatory Cure Claim remains to be paid.

(b) Unless otherwise agreed by the the holder of an Allowed Compensatory Cure Claim or otherwise provided in an order of the Bankruptcy Court, each Allowed Compensatory Cure Claim shall be paid in full in cash on the later of the Effective Date

or the date upon which such Claim becomes an Allowed Compensatory Cure Claim. The exclusive remedy of the holder of an Allowed Compensatory Cure Claim with respect to the nonpayment thereof shall be an action under the Insider Contract or Non-Insider Contract to which said Allowed Compensatory Cure Claim relates.

ARTICLE VIII

CONDITIONS PRECEDENT

8.01 <u>Conditions to Confirmation</u>. It is a condition to confirmation of the Plan, unless waived in writing by the Proponents, that:

(a) the Confirmation Order contain the following provisions:

(i) authority for the New Company to adopt and file the Articles of Incorporation, and for the Debtor to merge with and into the New Company in accordance with Section 6.01(b) of the Plan;

(ii) a full and irrevocable release, by the Debtor and the holders of all Claims that have accepted the Plan, of CIBC, the Acquisition Banks, the DiP Banks, and the New Company and each of their respective shareholders, officers, directors, employees, agents and affiliates, in each case from any and all liabilities, claims, suits, actions and demands which may have arisen out of (A) the Acquisition Credit Agreement and all transactions, relationships and dealings relating thereto or contemplated thereunder, (B) the acquisition of Church's Fried Chicken, Inc. by Biscuit Investments, Inc. in 1989, and all related transactions, relationships, and dealings, and (C) any action by any party in connection with the commencement of, or conduct during, the Reorganization Case, whether accrued, absolute, contingent, unliquidated or otherwise, and whether known or unknown which have or may have arisen out of any transaction or any state of facts existing on or prior to the Effective Date; <u>provided</u>, <u>however</u>, that for the purposes of the foregoing release, a holder of a Claim shall not be deemed to have accepted the Plan if (Y) such Claim is a Superpriority Claim, an Administrative Claim, or a Tax Claim, or (Z) said acceptance occurs solely by virtue of Section 1126(f) of the Bankruptcy Code;

(iii) if and only if Merrill Lynch shall accept the Plan as described in Section 5.03(a) of the Plan, a full and irrevocable release, by the Debtor and the holders of all Claims that have accepted the Plan, of Merrill Lynch and its shareholders, officers, directors, employees, agents and affiliates, from any and all liabilities, claims, suits, actions and demands which may have arisen out of (A) the

-20-

Bridge Loan Agreement and all transactions, relationships and dealings relating thereto or contemplated thereunder, (B) the acquisition of Church's Fried Chicken, Inc. by Biscuit Investments, Inc. in 1989, and all related transactions, relationships, and dealings, and (C) any action by any party in connection with the commencement of, or conduct during, the Reorganization Case, whether accrued, absolute, contingent, unliquidated or otherwise, and whether known or unknown which have or may have arisen out of any transaction or any state of facts existing on or prior to the Effective Date; provided, however, that for the purposes of the foregoing release, a holder of a Claim shall not be deemed to have accepted the Plan if (Y) such Claim is a Superpriority Claim, an Administrative Claim, or a Tax Claim, or (Z) said acceptance occurs solely by virtue of Section 1126(f) of the Bankruptcy Code;

(iv) if and only if the Copeland Consent shall become effective on or before the Effective Date, a full and irrevocable release, by the Debtor and the holders of all Claims that have accepted the Plan, of the parties to the Copeland Consent and each of their respective shareholders, officers, directors, employees, agents and affiliates, in each case from any and all liabilities, claims, suits, actions and demands which may have arisen out of (A) Copeland's actions or omissions to act as a director, officer, agent, employee or shareholder of the Debtor, as a contractor with the Debtor or as a control person of any other entity party to the Copeland Consent, (B) the acquisition of Church's Fried Chicken, Inc. by Biscuit Investments, Inc. in 1989, and all related transactions, relationships, and dealings, and (C) any action by any party in connection with the commencement of, or conduct during, the Reorganization Case, whether accrued, absolute, contingent, unliquidated or otherwise, and whether known or unknown which have or may have arisen out of any transaction or any state of facts existing on or prior to the Effective Date; provided, however, that the foregoing release shall not release the parties to the Copeland Consent from their respective obligations under the Plan, the Copeland Consent, or any Annex thereto; and provided further, that for the purposes of the foregoing release, a holder of a Claim shall not be deemed to have accepted the Plan if (Y) such Claim is a Superpriority Claim, an Administrative Claim, or a Tax Claim, or (Z) said acceptance occurs solely by virtue of Section 1126(f) of the Bankruptcy Code;

(v) one or more injunctions consistent with, and implementing the terms of the foregoing releases;

(vi) one or more decrees effecting the subordinations and transfers of liens contemplated by Sections 5.03(b), 5.05(a), and 5.07(a) of the Plan, to the extent applicable;

(vii) one or more decrees authorizing the assumption, assumption and assignment, or rejection, or ordering the enforcement, of executory contracts and unexpired leases in accordance with Article VII of the Plan or the Copeland Consent;

(viii) authority for the New Company in accordance with Section 9.03 of the Plan, and a determination that the prosecution of any claim pursuant to Section 9.03 of the Plan, including claims in the Copeland Proceedings, is for the benefit of the Estate notwithstanding that any recovery may remain with the New Company or be used to repay indebtedness restated or incurred under the New Credit Agreement;

(ix) making the provisions of the Confirmation Order non-severable and mutually dependent; and

(x) such other provisions as the Proponents shall deem necessary or appropriate in their sole discretion; and

(b) all Tax Claims shall be resolved, or in the process of resolution, in a manner satisfactory to the Proponents.

8.02 <u>Conditions to Consummation</u>. Conditions to the consummation of the Plan, unless waived in writing by the Proponents, shall be that (a) all conditions to confirmation of the Plan shall have been satisfied, and (b) the Confirmation Order shall not have been reversed and no stay thereof shall be in effect.

ARTICLE IX

EFFECTS OF PLAN CONFIRMATION

<u>Section 9.01</u>.   <u>Discharge</u>.  Except as otherwise expressly provided in section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to the Plan will be in full and final satisfaction, settlement, release and discharge as against the Debtor of any debt that arose before the Confirmation Date and any debt of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and all Claims and Interests of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of a Claim or interest based on such debt, obligation or interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) such Claim or Interest is allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim or Interest has accepted the Plan.  Therefore, upon the Effective Date, all holders of Claims and Interests shall be precluded from asserting against the Debtor or the New Company,

-22-

or against any assets or properties of the Debtor or the New Company, any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, and the Confirmation Order shall permanently enjoin said holders of Claims and Interests, their successors and assigns, from enforcing or seeking to enforce any such Claims or Interests against the Debtor, the New Company, or their respective assets or property.

Section 9.02. <u>Revesting</u>. On the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation order, the New Credit Agreement or the New Credit Documents, the Debtor will be vested with all of the property of the Estate free and clear of all claims, liens, encumbrances, charges and other interests of creditors and equity security holders, and may operate its businesses free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court.

Section 9.03. <u>Retention and Enforcement of Causes of Action</u>. Except as otherwise provided in the Copeland Consent or the Confirmation Order, nothing contained in the Plan shall be deemed to be a waiver or relinquishment of any claims, rights, or causes of action that constitute property of the Estate or of the Debtor, whether arising under the Bankruptcy Code or under nonbankruptcy law, all of which are expressly (a) retained and may be enforced by the Debtor and any successors in interest, including the New Company, and (b) may be pursued, as appropriate, in accordance with the best interests of the Debtor, the New Company, or such successors. Without limiting the generality of the foregoing, the Debtor or the New Company may initiate, pursue, settle, or abandon the Copeland Proceedings in its sole discretion and without the approval of the Bankruptcy Court.

Section 9.04. <u>Retention of Jurisdiction</u>. Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Bankruptcy Court, to the extent permitted and subject to the discretion granted under the applicable sections of Title 28 of the United States Code, will retain jurisdiction (a) to determine any Disputed Claims, (b) to determine requests for payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto, (c) to resolve controversies and disputes regarding interpretation and implementation of the Plan, (d) to enter orders in aid of the Plan, including, without limitation, appropriate orders (which may include contempt or other sanctions) to protect the Debtor, (e) to modify the Plan pursuant to Section 10.03 of the Plan, (f) to determine any and all applications, Claims, Interests, adversary proceedings and contested or litigated matters pending on the Effective Date or commenced after the Effective Date as contemplated in the Plan, (g) to allow, disallow, estimate, liquidate or determine any Claim or Interest (including, without

-23-

limitation, Claims that are either not Allowed Claims or Disputed Claims) and to enter or enforce any order requiring the filing of any such Claim before a particular date, (h) to determine any and all pending applications for the rejection or disaffirmance of executory contracts or leases, or for the assumption or assignment of executory contracts and leases, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom, (i) to determine any disputes or controversies arising under the Copeland Consent, (j) to determine any actions or controversies described in Section 9.03 of the Plan, including the Copeland Proceedings, and (k) to enter a final decree closing the Reorganization Case.

Section 9.05.    Post-Consummation Effect of Evidences of Claims or Interests.  Notes, stock certificates and other evidences of Claims against or Interests in the Debtor shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

Section 9.06.    Failure of Court to Exercise Jurisdiction. If the Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of the Reorganization Case, including the matters set forth in this Article IX, this Article IX shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Section 9.07.    Term of Injunctions or Stays.  Unless otherwise provided, all injunctions or stays provided for in the Reorganization Case pursuant to Section 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.


ARTICLE X

MISCELLANEOUS PROVISIONS

Section 10.01.    Unclaimed Distributions.  If any person entitled to receive cash or securities directly from the Debtor under the Plan cannot be located on the Effective Date, such cash or securities will be set aside and (in the case of cash) held in a segregated, interest-bearing fund to be maintained by the New Company.  If such person is located within one year of the Effective Date, such cash or securities, together with any interest or dividends earned thereon will be paid or distributed to such person.  If such person cannot be located within one year of the Effective Date, any such cash or securities and accrued interest or dividends thereon will become the property of and shall be released to the New Company; provided, however, that nothing contained in this Plan shall require the New Company to attempt to locate such person.

Section 10.02.  **Fractional Dollars.**  Any other provision of
the Plan notwithstanding, no payments of fractions of dollars
will be made to any holder of an Allowed Claim or Interest.
Whenever any payment of a fraction of a dollar to any holder of
an Allowed Claim or Interest would otherwise be called for, the
actual payment made will reflect a rounding down of such fraction
to the nearest whole dollar.

Section 10.03.  **Modification of Plan.**  The Proponents
reserve the right, in accordance with the Bankruptcy Code, to
amend or modify the Plan prior to the entry of the Confirmation
Order by unanimous consent.  After the Effective Date, the New
Company may, upon order of the Court, amend or modify the Plan in
accordance with section 1127(b) of the Code, or remedy any defect
or omission or reconcile any inconsistency in the Plan in such
manner as may be necessary to carry out the purpose and intent of
the Plan.  Such modifications shall not include modifications to
any of the Copeland Consent, which modifications may be
effectuated only with the consent of Copeland.

Section 10.04.  **Withdrawal of Plan.**  The Proponents reserve
the right, at any time prior to entry of the Confirmation Order,
to revoke and withdraw the Plan.  If the Proponents revoke or
withdraw the Plan under this section, or if entry of the
Confirmation Order does not occur, then the Plan shall be deemed
null and void.  In that event, nothing contained in the Plan
shall be deemed to constitute a waiver or release of any Claims
by or against the Debtor or any other person, or to prejudice in
any manner the rights of the Debtor or any other person in any
further proceedings involving the Debtor or any other person.

Section 10.05.  **Cramdown.**  The Proponents request
Confirmation under Section 1129(b) of the Bankruptcy Code if
(i) any impaired Class does not accept, or is deemed not to
accept, the Plan pursuant to Section 1126 of the Bankruptcy Code,
and (ii) all of the holders of Claims or Interests in such Class
do not waive in writing the protections afforded to them by
Section 1129(b) of the Bankruptcy Code, or stipulate in writing
that the requirements of Section 1129(b) of the Bankruptcy Code
are satisfied as to such Class.  In that event, the Proponents
reserve the right to modify the Plan to the extent, if any, that
Confirmation pursuant to Section 1129(b) of the Bankruptcy Code
requires modification.

Section 10.06.  **Payment Dates.**  Whenever any payment to be
made under the Plan is due on a day other than a Business Day,
such payment will instead be made, without interest, on the next
Business Day.

Section 10.07.  **Headings.**  The headings used in this Plan
are inserted for convenience only and neither constitute a
portion of the Plan nor in any manner affect the provisions of
the Plan.

Section 10.08.  Successors and Assignees.  The rights, benefits and obligations of any person named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heirs, executors, administrators, successors and assigns of such person.  Without limiting the generality of the foregoing, upon occurrence of the Effective Date and by virtue of the merger of the Debtor into the New Company, the New Company shall succeed to and be bound by all of the rights and obligations of the Debtor under the Plan, including, without limitation, all rights and obligations of the Debtor under Section 9.03 of the Plan or relating to Disputed Claims pending as of the Effective Date and Disputed Claims that become Allowed Claims subsequent to the Effective Date.

Section 10.09.  Governing Law.  The Plan and the rights and obligations of any person named or referred to in the Plan shall be governed by, and construed and interpreted in accordance with, (a) the law of the United States to the extent required by law, or (b) the law of the State of New York (excluding its choice-of-law rules) in all other instances or respects.

Dated: _October 20, 1992

                    CANADIAN IMPERIAL BANK OF COMMERCE,
                      as Agent


               By:   /s/ R. Bruce Layman
                     R. Bruce Layman
                     Assistant General Manager

-26-

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
- - - - - - - - - - - - - - - X
In re:                         :
                               :   Chapter 11
AL COPELAND ENTERPRISES, INC., :
                               :   Case No. 91-12575-FM-11
                    Debtor     :
- - - - - - - - - - - - - - - X
```

CONSENT AND AGREEMENT OF AFFILIATED PARTIES
RELATING TO CHAPTER 11 PLAN OF REORGANIZATION

Parties:   Diversified Foods and Seasonings, Inc.
           My Favorite Year, Inc.
           National Development Corporation
           CP Partnership
           Fast Foods of Colorado Springs, Inc.
           Fast Foods of Amite, Inc.
           Fast Foods of Monroe, Inc.
           K. Weilbaecher Enterprises, Inc.
           Alvin C. Copeland

[Not reproduced]

[Not accepted or effective]

SECOND AMENDED AND RESTATED LOAN AGREEMENT

among

[THE NEW COMPANY],

CIBC, INC.,
acting through its Atlanta Branch,

CERTAIN BANKS,

and

CANADIAN IMPERIAL BANK OF COMMERCE,
acting through its New York Agency,
as Agent

Dated as of [the Effective Date]

[Not reproduced]

[Form annexed to Fourth Amended Plan, subject to change]

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
- - - - - - - - - - - - - - - - - X
In re:                             :
                                   :   Chapter 11
AL COPELAND ENTERPRISES, INC.,     :
                                   :   Case No. 91-12575-FM-11
                        Debtor     :
- - - - - - - - - - - - - - - - - X
```

## SCHEDULE OF INSIDER CONTRACT ASSUMPTIONS AND REJECTIONS

[Covers all Insider Contracts other than Formula, Recipe Royalty, and Supply]

I.   **Assumed Insider Contracts**:  Except as otherwise noted, all insider contracts listed herein shall be assumed as of the Effective Date, subject to any right of the New Company, under applicable non-bankruptcy law, to reform such contracts.  The misidentification or mischaracteriztion of any contract, or the failure to identify all amendments thereto, shall not prejudice the rights of the Debtor under such contract or any such amendment.

A.   **Franchise Agreement -- Store No. 2098**

Date:  August 1, 1978

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990.

Nature of Contract:  Popeye's Franchise

B.   **Franchise Agreement -- Store No. 2099**

Date:  September 25, 1978

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990.

Nature of Contract:  Popeye's Franchise

C.    **Franchise Agreement -- Store No. 2204**

Date:  July 18, 1979

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990

Nature of Contract:  Popeye's Franchise

D.    **Franchise Agreement -- Store No. 2210**

Date:  May 5, 1979

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990

Nature of Contract:  Popeye's Franchise

E.    **Franchise Agreement -- Store No. 2454**

Date:  July 1, 1983

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990

Nature of Contract:  Popeye's Franchise

F.    **Franchise Agreement -- Store No. 2672**

Date:  December 10, 1985

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990

Nature of Contract:  Popeye's Franchise

G.    **Franchise Agreement -- Store No. 2844**

Date:  April 6, 1987

Non-debtor party:  Fast Foods of Amite, as assignee

Amendments:  Letter Agreement dated October 5, 1990

Nature of Contract:  Popeye's Franchise

H.    **Franchise Agreement -- Store No. 3068**

Date:  Undated

Non-debtor party:  Fast Foods of Amite

Amendments:  Letter Agreement dated October 5, 1990

Nature of Contract:  Popeye's Franchise

I.    **Franchise Agreement -- Store No. 2231 (2243)**

Date:  November 1, 1979

Non-debtor party:  Fast Foods of Colorado Springs, as
assignee of Vern R. Coghlan and Frank W. Scott

Amendments:  Addendum dated January 19, 1989

Nature of Contract:  Popeye's Franchise

J.    **Franchise Agreement -- Store No. 2425**

Date:  July 18, 1983

Non-debtor party:  Fast Foods of Colorado Springs, as
assignee of Vern R. Coghlan and Frank W. Scott

Amendments:  Addendum dated January 19, 1989

Nature of Contract:  Popeye's Franchise

K.    **Franchise Agreement -- Store No. 2479**

Date:  December 1, 1983

Non-debtor party:  Fast Foods of Colorado Springs, as
assignee of Vern R. Coghlan and Frank W. Scott

Amendments:  Addendum dated January 19, 1989

Nature of Contract:  Popeye's Franchise

L.    **Franchise Agreement -- Store No. 2604**

Date:  December 31, 1984

Non-debtor party:  Fast Foods of Colorado Springs, as
assignee of Vern R. Coghlan and Frank W. Scott

-3-

Amendments:  Addendum dated January 19, 1989

Nature of Contract:  Popeye's Franchise

M.   **Franchise Agreement -- Store No. 2054**

Date:  June 10, 1977

Non-debtor party:  William Copeland, as assignee of William Copeland and Craig Babylon

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

N.   **Franchise Agreement -- Store No. 2152**

Date:  October 20, 1978

Non-debtor party:  William Copeland, as assignee of William Copeland and Craig Babylon

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

O.   **Franchise Agreement -- Store No. 2227**

Date:  May 2, 1979

Non-debtor party:  William Copeland, as assignee of William Copeland and Craig Babylon

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

P.   **Franchise Agreement -- Store No. 2154**

Date:  August 31, 1978

Non-debtor party:  William Copeland, as assignee (CJW Investment Inc.)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

Q.    **Franchise Agreement -- Store No. 2340**

Date:  August 5, 1981

Non-debtor party:  William Copeland, Craig Babylon (Pontchartrain Foods)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

R.    **Franchise Agreement -- Store No. 2515**

Date:  January 8, 1984

Non-debtor party:  William Copeland, Craig Babylon (Pontchartrain Foods)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

S.    **Franchise Agreement -- Store No. 2599**

Date:  May 9, 1984

Non-debtor party:  William Copeland, Craig Babylon (Pontchartrain Foods)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

T.    **Franchise Agreement -- Store No. 2181**

Date:  June 21, 1989

Non-debtor party:  William Copeland

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

U.    **Franchise Agreement -- Store No. 2749**

Date:  April 21, 1986

Non-debtor party:  William Copeland, Craig Babylon (Pontchartrain Foods)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

V.  **Franchise Agreement -- Store No. 2248**

Date:  June 14, 1977

Non-debtor party:  K. Weilbacher Enterprises, Inc., as assignee

Amendments:  Various amendments and assignments as set forth in Amendment to Franchise Option Agreement dated July 20, 1989

Nature of Contract:  Popeye's Franchise

W.  **Franchise Agreement -- Store No. 2256**

Date:  January 23, 1980

Non-debtor party:  K. Weilbacher Enterprises, Inc., as assignee

Amendments:  Various amendments and assignments as set forth in Amendment to Franchise Option Agreement dated July 20, 1989

Nature of Contract:  Popeye's Franchise

X.  **Franchise Agreement -- Store No. 2366**

Date:  December 9, 1981

Non-debtor party:  K. Weilbacher Enterprises, Inc., as assignee

Amendments:  Various amendments and assignments as set forth in Amendment to Franchise Option Agreement dated July 20, 1989

Nature of Contract:  Popeye's Franchise

Y.  **Franchise Agreement -- Store No. 3055**

Date:  December 6, 1990

Non-debtor party:  K. Weilbacher Enterprises, Inc., as assignee

Amendments:  Various amendments and assignments as set forth in Amendment to Franchise Option Agreement dated July 20, 1989

Nature of Contract:  Popeye's Franchise

Z.    **Franchise Agreement -- Store No. 2249**

Date:  Undated

Non-debtor party:  Bonnie Copeland Theriot (CCT Foods)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

AA.    **Franchise Agreement -- Store No. 2013**

Date:  August 29, 1988

Non-debtor party:  Alvin C. Copeland Jr. (Spicy Express, Inc.)

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

BB.    **Franchise Agreement -- Store No. 839**

Date:  May 9, 1990

Non-debtor party:  Alvin C. Copeland Jr. (Spicy Express, Inc.)

Amendments:  N/A

Nature of Contract:  Church's Franchise

CC.    **Franchise Agreement -- Store No. 337**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., as assignee of Fast Foods of Amite

Amendments:  N/A

Nature of Contract:  Church's Franchise

DD.    **Franchise Agreement -- Store No. 339**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., as assignee of Fast Foods of Amite

Amendments:  N/A

Nature of Contract:  Church's Franchise

EE.  **Franchise Agreement -- Store No. 493**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., as assignee of Fast Foods of Amite

Amendments:  Addendum dated April 1, 1991

Nature of Contract:  Church's Franchise

FF.  **Franchise Agreement -- Store No. 501**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., as assignee of Fast Foods of Amite

Amendments:  N/A

Nature of Contract:  Church's Franchise

GG.  **Franchise Agreement -- Store No. 520**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., as assignee of Fast Foods of Amite

Amendments:  N/A

Nature of Contract:  Church's Franchise

HH.  **Franchise Agreement - Store No. 537**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., as assignee of Fast Foods of Amite

Amendments:  N/A

Nature of Contract:  Church's Franchise

II.  **Franchise Agreement -- Store No. 583**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., assignee of Fast Foods of Amite

Amendments:  N/A

Nature of Contract:  Church's Franchise

JJ.  **Franchise Agreement -- Store No. 363**

Date:  Undated

Non-debtor party:  Fast Foods of Monroe, Inc.

Amendments:  N/A

Nature of Contract:  Church's Franchise

KK.  **Franchise Agreement -- Store located at 3850 Veterans Memorial Blvd., Metairie, Louisiana**

Date:  March 13, 1989

Non-debtor party:  My Favorite Year

Amendments:  Amendment dated March 13, 1989

Nature of Contract:  Popeye's franchise

LL.  **Franchise Agreement -- Store located on Carrollton Avenue, New Orleans, Louisiana**

Date:  Undated

Non-debtor party:  Diversified Foods

Amendments:  N/A

Nature of Contract:  Popeye's Franchise

MM.  **Lease (352 Spencer Lane, San Antonio, TX)**

Date:  January 1, 1990

Non-debtor party:  Diversified Foods, lessee

Amendments:  N/A

Nature of Contract:  Batter plant warehouse space

NN.  **Lease (Store No. 2483)**

Date:  April 6, 1989 (Sublease)

Non-debtor party:  My Favorite Year d/b/a Copelands, sublessee

Amendments:  N/A

Nature of Contract:  Store lease -- Popeye's

OO.  **Lease (Store No. 2511)**

Date:  November 1, 1983

Non-debtor party:  Alvin C. Copeland, lessor

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

PP.  **Lease (Store No. 2002)**

Date:  September 8, 1978

Non-debtor party:  Gilbert Copeland and Dr. Charles Chambers, lessors

Amendments:  N/A

Nature of Contract:  Store lease -- Popeye's

QQ.  **Lease (Store No. 2014)**

Date:  November 1, 1985

Non-debtor party:  Gilbert Copeland, Mary Copeland (as assignee of Alvin C. Copeland), lessors

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

RR.  **Lease (Store No. 2001)**

Date:  November 1, 1978

Non-debtor party:  Mary Copeland, lessor, as assignee of Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

SS.  **Lease (Store No. 2003)**

Date:  June 30, 1975

Non-debtor party:  Mary Copeland, lessor as assignee of Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

TT.  **Lease (Store No. 2007)**

Date:  November 1, 1975

Non-debtor party:  Mary Copeland, Catherine Copeland, lessors, as assignees of Gilbert Copeland and Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

UU.  **Lease and Sublease (Store No. 2013)**

Date:  August 1, 1989

Non-debtor party:  Mary Copeland, lessor; Spicy Express, Inc., sublessee

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

VV.  **Lease (Store No. 2024)**

Date:  July 1, 1975

Non-debtor party:  Mary Copeland, lessor, as assignee of Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

WW.  **Lease (Store No. 2033)**

Date:  September 1, 1976

Non-debtor party:  Mary Copeland, lessor, as assignee of Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

XX.  **Lease (Store No. 2037)**

Date:  October 1, 1977

Non-debtor party:  Mary Copeland, lessor, as assignee of Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

YY.  **Lease (Store No. 2040)**

Date:  February 1, 1977

Non-debtor party:  Mary Copeland, lessor, as assignee of Alvin C. Copeland

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

ZZ.  **Lease (Store No. 2249)**

Date:  Undated

Non-debtor party:  CCT Foods, Inc., sublessee

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

AAA.  **Lease (Store No. 2006)**

Date:  December 31, 1973

Non-debtor party:  Catherine Copeland, lessor (successor to Gilbert Copeland)

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's

BBB.  **Lease (Store No. 337)**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., sublessee, as assignee

Amendments:  N/A

Nature of Contract:  Store Lease -- Church's

CCC.  **Lease (Store No. 339)**

Date:  Undated

Non-debtor party:  Fast Foods of Monroe, Inc., lessee

Amendments:  N/A

Nature of Contract:  Store Lease -- Church's

DDD. **Lease (Store No. 501)**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., sublessee, as assignee

Amendments:  N/A

Nature of Contract:  Store lease -- Church's

EEE. **Lease (Store No. 520)**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., lessee, as assignee

Amendments:  N/A

Nature of Contract:  Store Lease -- Church's

FFF. **Lease (Store No. 537)**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., sublessee, as assignee

Amendments:  N/A

Nature of Contract:  Store Lease -- Church's

GGG. **Lease (Store No. 493)**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., lessee, as assignee

Amendments:  N/A

Nature of Contract:  Store Lease -- Church's

HHH. **Lease (Store No. 363)**

Date:  July 23, 1990

Non-debtor party:  Fast Foods of Monroe, Inc., sublessee, as assignee

Amendments:  N/A

Nature of Contract:  Store Lease -- Church's

III. **Lease (Store No. [      ])**

Date:  Undated

Non-debtor party:  K. Weilbaecher, lessee

Amendments:  N/A

Nature of Contract:  Store Lease -- Popeye's restaurant, Savannah, GA

JJJ. **CP Partnership Manufacturing, Marketing and Licensing Agreement**

Date:  Undated

Non-debtor party:  CP Partnership

Amendments:  N/A

Nature of Contract:  Manufacture and marketing of restaurant equipment for which CP holds patent rights

Caveat:  Enforceability against debtor subject, among other things, to pending litigation between CP Partnership and third party relating to rights licensed

II. **Rejected Insider Contracts**:  Rejection is without prejudice to any rights of the Debtor to cancel, rescind or terminate a contract by its terms or under applicable nonbankruptcy law.

A. **NDC Listing Agreement**

Date:  March 21, 1989

Non-debtor party:  National Development Corporation

Amendments:  Amendment dated March 19, 1990; Amendment dated October 15, 1990; Amendment dated March 12, 1991

Nature of Contract:  Exclusive right to sell or lease certain real estate assets of the Debtor

B. **CP Partnership Consulting Agreement**

Date:  Undated

Non-debtor party:  CP Partnership

Amendments:  N/A

-14-

Nature of Contract:  Consulting services

C.   **C&J Filter Agreement**

Date:  May 1, 1990

Non-debtor party:  C&J Filter Service

Amendments:  N/A

Nature of Contract:  Provide filter service to Debtor

D.   **Lease (3333 I-10 Service Road, Metairie, Louisiana)**

Date:  September 25, 1990

Non-debtor party:  Diversified Foods, lessor

Amendments:  N/A

Nature of Contract:  Lease for offshore race team HQ

E.   **Lease (1333 South Clearview Parkway, Jefferson, La.)**

Date:  October 8, 1990

Non-debtor party:  My Favorite Year, lessee

Amendments:  N/A

Nature of Contract:  Lease of office space

EXHIBIT D

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
- - - - - - - - - - - - - - - - - X
In re:                             :
                                   :   Chapter 11
AL COPELAND ENTERPRISES, INC.,     :
                                   :   Case No. 91-12575-FM-11
                        Debtor     :
- - - - - - - - - - - - - - - - - X
```

## SCHEDULE OF SUBORDINATED INSIDER CLAIMS

**THE INCLUSION OF ANY CLAIM ON THIS SCHEDULE SHALL NOT PREJUDICE THE RIGHT OF ANY PARTY IN INTEREST, INCLUDING THE DEBTOR AND THE PROPONENTS, TO OBJECT TO THE ALLOWANCE OF SUCH CLAIM ON ANY BASIS**

I.   Filed Claims (as of 9/30/91)

    A.   Claimant:  Diversified Foods & Seasonings

       Court Claim No.:  1212

       Filed priority:  Unsecured

       Scheduled priority (if scheduled):  Secured/unsecured

       Filed amount:  $669,219

       Scheduled amount (if scheduled):  Unliquidated

       Filed status:  Stated claim liquidated/Contingent Claim for Formula Agreement and Supply Contract

       Scheduled status (if scheduled):  Contingent

       Basis of Claim:  Per proof of claim: Quality assurance, supplies, royalties; Per schedules:  Guarantee, Miscellaneous Secured

    B.   Claimant:  Alvin C. Copeland

       Court Claim No.:  1214

       Filed priority:  $17,600,384 Unsecured   $2,000 priority

       Scheduled priority (if scheduled):  Unsecured

Filed amount:   $17,600,384

Scheduled amount (if scheduled):   $4784; $2953; plus contingent/unliquidated amounts

Filed status:   All claims except past due royalties and salary and expenses are contingent

Scheduled status (if scheduled):

Basis of Claim:   Per Proof of Claim:   Unliquidated claims re franchise agreement, formula agreements and recipe royalty agreement;   $100,468 -- past due royalties;   $692,308 -- severance;   $5,740,243 -- guaranties;   $7,894,359 -- lease guarantees;   $23,005 -- salary and expenses;   $3,105,000 -- Supp. Executive Income; Per schedules:   Vendor, Guarantee, Employee Expense

C.    Claimant:  Gulf Venture Associates (Landmark Hotel)

Court Claim No.:   1215

Filed priority:   Unsecured

Scheduled priority (if scheduled):   Unsecured

Filed amount:   $24,076

Scheduled amount (if scheduled):   $5,219

Filed status:   Liquidated

Scheduled status (if scheduled):   --

Basis of Claim:   Supply of goods and services

D.    Claimant:  My Favorite Year

Court Claim No.:   1216

Filed priority:   Unsecured (portion secured by offset rights of Debtor)

Scheduled priority (if scheduled):   Unsecured

Filed amount:   $362,588

Scheduled amount (if scheduled):   $9618 + contingent/ unliquidated

Filed status:   Stated sum, liquidated/Additional sums for breach of lease & franchise agreements unliquidated and contingent

-2-

Scheduled status (if scheduled):
Contingent/Unliquidated

Basis of Claim: Per proof of claim: supply of goods
and services; Per schedules: Vendor, Guarantee

E.  Claimant: Fast Foods of Colorado Springs (Alvin C.
Copeland)

Court Claim No.: 1234

Filed priority: Unsecured

Scheduled priority (if scheduled): --

Filed amount: Unliquidated

Scheduled amount (if scheduled): --

Filed status: Contingent

Scheduled status (if scheduled): --

Basis of Claim: Damages for breach of Option Agreement
dated Feb. 20, 1991

F.  Claimant: Kerry Weilbacher Enterprises

Court Claim No. 1235

Filed priority: Unsecured

Scheduled priority (if scheduled): --

Filed amount: Unliquidated

Scheduled amount (if scheduled): --

Filed status: Contingent

Scheduled status (if scheduled): --

Basis of Claim: Damages relating to franchise
agreement

G.  Claimant: National Development Corp.

Court Claim No.: 1237

Filed priority: Unsecured

Scheduled priority (if scheduled): Unsecured

-3-

Filed amount:  Unliquidated

Scheduled amount (if scheduled):  $17,443

Filed status:  Contingent

Scheduled status (if scheduled):

Basis of Claim:  Corporate Reorganization Agreement and Brokerage Agreement

H.    Claimant:  CP Partnership

Court Claim No.:  1239

Filed priority:  Unsecured

Scheduled priority (if scheduled):  Unsecured

Filed amount:  Unliquidated

Scheduled amount (if scheduled):  $5600

Filed status:  Contingent

Scheduled status (if scheduled):

Basis of Claim:  Vendor

II.   <u>Filed Claims (after 9/30/91)</u>

None, as of April 20, 1992

III.  <u>Scheduled but Unfiled Claims</u>

None, as of April 20, 1992


IV.   <u>Potential Unfiled Claims</u>

A.    Claims of any party to the Copeland Consent of the kind described in Section 502(e), 502(g), 502(h), or 509(a) of the Bankruptcy Code.

B.    Cure Claims of any party to the Copeland Consent.

C.    Administrative Claims of any party to the Copeland Consent (for purposes of Section 5.05(a) only).

D.    Any other Claim of a party to the Copeland Consent not listed above.