FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 1 7 2009

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AFC ENTERPRISES, INC.,    )
            )
  Plaintiff,      )
            )
  v.         )  CIVIL ACTION NO.:
            )
DIVERSIFIED FOODS AND  ) **1:09-CV-0416**
SEASONINGS, INC.,     )
            )
  Defendant.     )

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW AFC Enterprises, Inc., plaintiff in the above-styled action, and hereby files this Complaint for Declaratory Judgment, respectfully showing the Court the following:

## INTRODUCTION

Plaintiff AFC Enterprises, Inc. ("AFC") operates and/or franchises Popeyes quick service restaurants throughout the United States and internationally. Defendant Diversified Foods and Seasonings, Inc. ("Diversified") is a food product manufacturer which has for many years served as one of the primary suppliers of products to Popeyes restaurants around the world. The history of the agreements between AFC, Diversified, and their predecessors dates back to the late 1970's.

Pursuant to a Formula Agreement, as amended, and a Supply Agreement, AFC and its franchisees have purchased seasonings and related food products from Diversified that utilize formulas developed by the founder of the Popeyes brand, Alvin C. Copeland (deceased).   Pursuant to these agreements, AFC and its franchisees (who are contractually obligated to sell only products approved by AFC) have purchased seasonings and related food products from Diversified for many years.

The dispute between the parties centers on what AFC chooses to do as opposed to what Diversified contends AFC is required to do.  AFC does not dispute that, if Popeyes restaurants sell products that utilize recipes or formulas developed by Diversified or its predecessors and which are covered by the Supply Agreement, AFC and its franchisees must purchase those products from Diversified.  AFC further does not dispute that it may not "reverse-engineer" these recipes or formulas.   Based on discussions between AFC employees and Diversified's corporate officers, however, Diversified apparently contends that it has a protectable interest not just in its secret recipes, but rather in general products or taste profiles such as "spicy chicken," "biscuits," "macaroni and cheese," or "1000 Island Dressing."  Diversified accordingly contends that regardless of the recipe used, if AFC and its franchisees sell "spicy chicken," "biscuits," "macaroni

and cheese," "1000 Island Dressing," or the like, the wholesale products and ingredients for those items must be supplied by Diversified. These claims are flatly unsupported by the agreements between the parties and, moreover, completely disregard AFC's legitimate business rights and concerns.

As a responsible franchisor, AFC's mission is to develop and implement a business plan that protects its brand and assures long term viability. The success of a Popeyes restaurant hinges on the ability of the restaurant to receive timely deliveries of quality products at fair and reasonable prices and which comply with applicable state and local regulations and/or importation restrictions. AFC has repeatedly discussed these critical issues with Diversified and has repeatedly requested, among other things, that Diversified reformulate its recipes and/or modify its manufacturing processes and procedures to meet state or local dietary regulations, to meet importation requirements, to conform to changing customer tastes, or to provide the Popeyes system (and ultimately Popeyes customers) with more economical choices. Diversified, however, has refused to make these material and necessary changes.

In today's economic climate, AFC cannot rely on a supplier to meet the needs of its franchisee network when that supplier fails to provide transparent, fair, and reasonable pricing. In today's climate of changing and restrictive health and

3

dietary regulations, AFC cannot rely on a supplier who refuses to reformulate recipes as necessary to comply with changing consumer tastes and concerns, changing health regulations or mandates, and changing industry trends. AFC cannot rely on a supplier in international markets who is not authorized to ship products into certain countries or who lacks required certifications. Instead, AFC must have, and does have, the right to develop and utilize its own recipes for its products which can be supplied by manufacturers other than Diversified if AFC so chooses.

For the reasons set forth herein and in furtherance of its business plan, AFC is independently developing new recipes for its product lines, and is independently developing new products. These new recipes and products being developed by AFC may be utilized throughout the AFC system or may be used in particular markets due to various local or international criteria, taste preferences, health concerns, dietary regulations, regulatory issues, importation restrictions, and economic factors. From discussions with Diversified's corporate officers, Diversified contends AFC does not have the right to implement these changes in its recipes and supply chain. AFC accordingly files this action for declaratory judgment pursuant to 28 U.S.C. § 2201.

4

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff AFC is a Minnesota corporation with a principal place of business in Atlanta, Georgia.

2.     Defendant Diversified is a Louisiana corporation with a principal place of business in the State of Louisiana.  Diversified may be served with process through its registered agent for service of process in the State of Louisiana, to wit: Len Brignac, King, Krebs & Jurgens, P.L.L.C., 201 St. Charles Avenue, Suite 4500, New Orleans, Louisiana 70170.

3.     For purposes of jurisdiction, AFC is a resident of the States of Minnesota and Georgia, and Diversified is a resident of the State of Louisiana.  As set forth herein, the amount in controversy in this action as measured by the value of the declaratory relief sought, exclusive of interest and costs, exceeds $75,000.00.

4.     This Court has complete subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

5.     As set forth herein, the acts at issue and performance under the contracts at issue occurred in the Northern District of Georgia.  Diversified regularly and repeatedly conducts business in the Northern District of Georgia and in interstate commerce that is ultimately carried out in this District.  A substantial

part of the events giving rise to the claims herein or a substantial part of the property that is subject of this action is situated in this District.

6.    Venue is proper is this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### History of the Agreements

7.    AFC is engaged in the business of operating or franchising quick service restaurants operating under the name Popeyes Chicken & Biscuits® ("Popeyes") throughout the United States and internationally.

8.    All Popeyes restaurants operated throughout the United States and internationally are either operated by AFC or are operated by franchisees pursuant to franchise agreements between AFC and a franchisee.

9.    Diversified is engaged in the business of manufacturing and selling seasonings and related items to various restaurants either directly or through third party distributors.

10.    Pursuant to an agreement, Diversified has supplied certain seasonings and other food products to Popeyes restaurants for use in the preparation of some of the menu items offered to the public.

11.    The Popeyes brand was originally created and developed by Alvin C. Copeland, deceased. In connection with that development, Mr. Copeland created a

basic recipe or formula (the "Popeye Formula") used in the preparation of spicy fried chicken.

12.    On July 2, 1979, a written agreement was entered into between Alvin C. Copeland, Gilbert E. Copeland, Mary L. Copeland, Catherine Copeland, and Russell J. Jones, A. Copeland Enterprises, Inc., and Popeyes Famous Fried Chicken, Inc.   A true and correct copy of this agreement (the "Formula Agreement") is attached hereto as Exhibit "1" and incorporated herein by reference.

13.    The Formula Agreement provided A. Copeland Enterprises, Inc. and its wholly owned subsidiary, Popeyes Famous Fried Chicken, Inc., the right to use the Popeye formula in the preparation of spicy fried chicken in exchange for a royalty to be paid to Alvin C. Copeland and various other family members.

14.    The Formula Agreement was amended on March 21, 1989 to, among other things, convey certain rights to the Popeye Formula from A. Copeland Enterprises, Inc. to the New Orleans Spice Company, Inc. ("Spice").  Spice also acquired the manufacturing facilities for production of the Popeye Formula.  A true and correct copy of this agreement (the "First Amended Formula Agreement") is attached hereto as Exhibit "2" and incorporated herein by reference.

15.    The Formula Agreement was amended a second time on or about March 21, 1989. This agreement, among other things, contained a representation from Alvin C. Copeland that the Popeye Formula had been committed to writing and placed in a safe deposit box at a bank in New Orleans, Louisiana. A true and correct copy of this agreement (the "Second Amended Formula Agreement") is attached hereto as Exhibit "3" and incorporated herein by reference.

16.    On or prior to March 21, 1989, A. Copeland Enterprises, Inc. and Popeyes Famous Fried Chicken, Inc. were merged with and into Biscuit Investments, Inc. ("Biscuit"), a Louisiana corporation. After the merger, Biscuit operated and franchised Popeyes chicken restaurants throughout the United States.

17.    On or about March 21, 1989, Spice entered into a supply contract with Biscuit. A true and correct copy of the supply contract between Spice and Biscuit (the "Supply Agreement") is attached hereto as Exhibit "4" and incorporated herein by reference.

18.    The Supply Agreement obligated Spice to supply all of the products prepared with the Popeye Formula that were required by Biscuit.

19.    On or about September 11, 1990, Spice changed its name to Diversified Foods and Seasonings, Inc., Defendant herein. At or around the same time, Biscuit changed its name to Al Copeland Enterprises, Inc.

8

20.     Diversified Foods and Seasonings, Inc. and Al Copeland Enterprises, Inc. were the successors to the rights and obligations of the Formula Agreement, as amended, and the Supply Agreement.

The Copeland Bankruptcy

21.     In 1991, Al Copeland Enterprises, Inc. filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Western District of Texas, Austin Division, Case No. 01-12575-FM-11.

22.     As part of the bankruptcy proceeding, the Honorable Frank R. Monroe, as judge of the Bankruptcy Court, ruled that the Formula Agreement, as amended, and the Supply Agreement constituted a single contract or agreement.

23.     After substantial litigation by the parties, CIBC, as agent for proponents of reorganization, submitted a Fourth Amended Plan of Reorganization on or about July 27, 1992.

24.     Under the Fourth Amended Plan of Reorganization, a "New Company" was to be formed which would assume the Formula Agreement, as amended, and the Supply Agreement, on certain conditions.

25.     The conditions for assumption of the Formula Agreement, as amended, and the Supply Agreement were set forth in a Supplemental Disclosure (the "Supplemental Disclosure") filed by CIBC with the Bankruptcy Court on

9

August 13, 1992. A true and correct copy of the Supplemental Disclosure is attached hereto as Exhibit "5" and incorporated herein by reference.

26. The Supplemental Disclosure imposed conditions on the "New Company" assuming the Formula Agreement, as amended, and the Supply Agreement, to wit: "While CIBC believes that substantial legal questions exist as to the appropriate scope of the 'Product' covered by the Supply Contract, in order to avoid further potential disputes it is the New Company's intention for the term of the Supply Contract (i.e., until it terminates on March 21, 2004), to continue purchasing from Diversified, and in effect directing its Popeyes franchisees to purchase from Diversified, all of its requirements for products from Popeyes restaurants as listed in Exhibit A hereto (including any modification or improvements thereto) <u>that are prepared with formulas and recipes which are the subject of the Formula Agreement, as amended</u>. This assumes that Diversified will comply with its obligations under the Supply Contract and will provide high quality products in sufficient quantity and at prices that are fair and reasonable." (Footnotes omitted) (Emphasis added). The products referenced in the Supplemental Disclosure were listed in an attachment to the Supplemental Disclosure marked as Exhibit "A".

10

27.    The Supplemental Disclosure further provided:  "Thus, if any pricing dispute with Diversified cannot be resolved by the parties themselves, the New Company proposes to submit any such dispute to binding arbitration under the auspices of the American Arbitration Association."  (Footnote omitted).[1]

28.    The Supplemental Disclosure also expressed the parties' agreement that AFC was free to develop new recipes or formulas, provided that Diversified was afforded an opportunity to bid on such products.

29.    On or about October 22, 1992, Judge Monroe entered an order confirming the Fourth Amended Plan of Reorganization.  A true and correct copy of this order is attached hereto as Exhibit "6" and incorporated herein by reference.

30.    The "New Company" described in the Fourth Amended Plan of Reorganization later became known as "America's Favorite Chicken Company." After a securities offering, this company ultimately became a publicly traded company known as AFC Enterprises, Inc., Plaintiff herein.

---

[1] A pricing dispute over products that are prepared with Diversified's formulas and recipes and which are supplied by Diversified to Popeyes restaurants has arisen between AFC and Diversified.  AFC has consequently instituted an arbitration proceeding with the American Arbitration Association relating to those issues.

Operation of the Agreements

31.    Subsequent to confirmation of the Fourth Amended Plan of Reorganization, Alvin C. Copeland, his related corporations and entities, and AFC had a number of disputes and were embroiled in various lawsuits.

32.    An Equitable Subordination Adversary Proceeding was filed between the parties in the Bankruptcy Court for the Western District of Texas, Case No. 91-12575-FM, Adv. Pro. 93 1016-FM.

33.    On or about June 13, 1994, a settlement agreement was entered into between the parties which modified the Formula Agreement to provide for sum certain royalty payments in the future. In this settlement agreement, the parties further reaffirmed the Supply Agreement "provided all covenants and obligations under such contract are performed and satisfied by the parties thereto…." A true and correct copy of the June 13, 1994 settlement agreement is attached hereto as Exhibit "7" and incorporated herein by reference.

34.    In a later dispute, Alvin C. Copeland and Diversified filed suit against AFC and other parties in the case of Copeland, et. al. v. Flavorite Laboratories, et. al., United States District Court of the Southern District of Mississippi, Case No. 3:94CV686BS.

12

35.    The <u>Flavorite</u> case was resolved through settlement on or about May 29, 1997. Under the terms of the settlement agreement, the Supply Agreement was extended, and all other terms of the original Supply Agreement remained unchanged. Specifically, the settlement agreement provided: "Diversified will continue to supply product(s) to the Popeyes system utilizing the Copeland formulas under the terms of the Supply Contract dated March 21, 1989 (the 'Supply Contract'). The Supply Contract will be amended to extend the term of such contract until March 20, 2029 (the 'Amended Supply Contract'). The Amended Supply Contract will cover all products covered by the Supply Contract." A true and correct copy of the <u>Flavorite</u> settlement agreement is attached hereto as Exhibit "8" and incorporated herein by reference.

36.    The Formula Agreement and Supply Agreement, as amended and as modified by the Fourth Amended Plan of Reorganization as supplemented and adopted by the Bankruptcy Court, and the settlement agreements identified above, form the agreement by which AFC and Diversified operate and which control their business relationship and operations.

<u>The Dispute Between the Parties</u>

37.    AFC owns and operates Popeyes restaurants and franchises Popeyes restaurants to franchisees throughout the United States and internationally.

38.    AFC owns the Popeyes name and brand and has sole authority to determine what products to offer to the public and what taste preferences it chooses to pursue and market.

39.    Under the terms of its franchise agreements, Popeyes franchisees are only permitted to serve products approved by AFC in Popeyes restaurants.

40.    AFC has and continues to develop a business plan that seeks to maintain and grow its franchise network both domestically and internationally.

41.    The success of a Popeyes restaurant hinges on the ability of the restaurant to receive timely deliveries of quality products at fair and reasonable prices, and which comply with state or local health and dietary regulations. For example, many state and local governments have enacted dietary regulations concerning artificial trans fat in food sold to the public. When those types of regulations are enacted, AFC must ensure that recipes, manufacturing processes, and/or preparation methods are modified so that the products sold in Popeyes restaurants comply with state or local regulations.

42.    In international markets, AFC's business plan must also take into account importation regulations. For example, certain countries require imports to have special certifications due to religious reasons. Other countries such as Turkey

have begun to impose importation restrictions requiring that raw materials for certain products sold must be manufactured in the country.

43.    AFC's business plan must also take into account market considerations so that all Popeyes restaurants provide for sale a quality product that meets the various and changing taste, health and dietary preferences, and price and quality expectations of its consumers.

44.    As part of its business plan, AFC continually seeks to develop and test new products for sale to the public at Popeyes restaurants operated by AFC or by AFC's franchisees.

45.    In furtherance of its business plan, AFC is independently developing new recipes for its product lines, and is independently developing new products.

46.    The new recipes and products being developed by AFC may be utilized throughout the AFC system or may be used in particular markets due to various local or international criteria, taste preferences, health concerns, dietary regulations, regulatory issues, importation restrictions, and economic factors.

47.    AFC, through discussions with representatives of Diversified, has acknowledged its obligation to purchase products AFC requires that use the Popeye Formula from Diversified, pursuant to the Supply Agreement, subject to the conditions set forth in the Supplemental Disclosure, i.e., "that Diversified will

15

comply with its obligations under the Supply Contract and will provide high quality products in a sufficient quantity and at prices that are fair and reasonable." See Exhibit "5".

48.    AFC has further acknowledged to Diversified that AFC is prohibited from "reverse engineering" the Popeye Formula. AFC has not reverse engineered the Popeye formula and has no intention of doing so.

## COUNT I – DECLARATORY JUDGMENT

49.    Paragraphs 1 through 48 are incorporated herein by reference.

50.    Through discussions and meetings between representatives of AFC and representatives of Diversified, an actual controversy has developed over the meaning and application of the Formula Agreement and the Supply Agreement.

51.    From AFC's perspective, the terms of the Supply Agreement clearly provide that AFC is not required to purchase products from Diversified. Rather, the Supply Agreement requires that products "that are prepared with formulas or recipes which are the subject of the Formula Agreement, as amended" must be purchased from Diversified. See Exhibit "5".

52.    Diversified has asserted that it has a protectable interest not only in its formulas or recipes but also in a general taste or product, i.e., "spicy chicken," "biscuits," "macaroni and cheese," "1000 Island Dressing," and related products

identified in Exhibit "A" to the Supplemental Disclosure. <u>See</u> Exhibit "5". Diversified therefore contends that so long as AFC or its franchisees are serving "spicy chicken," "biscuits," "macaroni and cheese," "1000 Island Dressing," and the related products identified in Exhibit "A" to the Supplemental Disclosure, AFC and its franchisees must purchase their supply of seasoning and/or product mixes from Diversified at whatever price Diversified chooses to impose regardless of market, regulatory, and governmental forces.

53.    AFC contends that it is free to develop its own recipes for chicken, spicy or otherwise, and that is free to develop its own recipes for all of the products sold in Popeyes restaurants throughout the United States and internationally.

54.    AFC contends it is free to develop and market new products, even if generally similar in taste to the Popeye Formula, as long as the Popeye Formula, of which AFC has no knowledge, is not reverse-engineered.

55.    An actual case and/or controversy exists between AFC and Diversified as to the proper construction and application of the Formula Agreement and the Supply Agreement. The amount of this controversy totals in the millions of dollars. For example, in 2007, AFC and its franchisees purchased in excess of $63,000,000 of products from Diversified.

56.    AFC seeks a declaration of its rights prior to incorporating new recipes into its products offered to the public throughout the United States and internationally.

57.    Pursuant to 28 U.S.C. § 2201, AFC requests that the Court enter a judgment which:

(a)    declares the rights and obligations of the parties under the Formula and Supply Agreements;

(b)    declares that AFC is entitled to develop and create its own recipes or formulas for any products identified on Exhibit "A" to the Supplemental Disclosure, which products are sold or to be sold in Popeyes restaurants throughout the United States and internationally, so long as AFC does not reverse-engineer any recipes owned by Diversified; and

(c)    declares that AFC is not obligated to purchase products from Diversified for use in AFC's own recipes or formulas unless AFC has accepted Diversified's bid to supply such products.

WHEREFORE, AFC Enterprises, Inc. requests the following relief:

(a)    That summons and process issue as provided by law;

(b)    That the Court grant the declaratory relief requested herein and grant such other and further relief as is just and appropriate; and

(c)    That the Court award AFC the costs of this action.

Respectfully submitted, this 17th day of February, 2009.

Respectfully Submitted,

C. Neal Pope
Georgia Bar No. 583769
Jay F. Hirsch
Georgia Bar No. 357185
Alan G. Snipes
Georgia Bar No. 665781
Pope, McGlamry, Kilpatrick, Morrison
   & Norwood, LLP
Synovus Centre, 1111 Bay Avenue, Suite 450
P. O. Box 2128 (31902-2128)
Columbus, GA 31901-2412
706-324-0050
706-327-1536 FAX

Richard H. Gill
George W. Walker, III
Copeland, Franco, Screws & Gill, PA
P.O. Box 347
444 South Perry Street
Montgomery, AL 36101-0347
334-834-1180
334-834-3172 FAX

(Pro Hac Vice Applications to be submitted)

**ATTORNEYS FOR PLAINTIFF
AFC ENTERPRISES, INC.**

STATE OF LOUISIANA

PARISH OF JEFFERSON

KNOW ALL MEN BY THESE PRESENTS, that:

WHEREAS, Alvin C. Copeland ("Alvin"), Gilbert E. Copeland ("Gilbert"), Mary L. Copeland ("Mary"), Catherine Copeland ("Catherine") and Russell J. Jones ("Russell") are now the sole owners of the basic recipe and formula used in the preparation of a spicy fried chicken commonly known as Popeyes Famous Fried Chicken ("Popeye Formula"), said ownership being in the following proportions:

| | |
|---|---|
| Alvin | 80.000% |
| Mary | 5.334% |
| Gilbert | 8.666% |
| Catherine | 4.000% |
| Russell | 2.000% |
| TOTAL | 100.000% |

WHEREAS, pursuant to oral agreements with A. Copeland Enterprises, Inc. ("ACE") and its wholly-owned subsidiary, Popeyes Famous Fried Chicken, Inc. ("PFFC"), Alvin granted ACE the right to use the Popeye Formula and granted PFFC the right to license others to use the Popeye Formula; and

WHEREAS, the parties hereto desire to confirm the prior oral agreements referred to in the preceding paragraph and to enter into a written license agreement;

NOW, THEREFORE, for and in consideration of the premises and mutual undertakings hereinafter set forth, Alvin, Mary, Gilbert, Catherine, Russell, ACE and PFFC do hereby agree as follows:

(1)    Alvin warrants that the Popeye Formula, and detailed instructions with respect thereto, have been committed to writing and have been deposited in a safety deposit box at First

Progressive Bank, 1501 Veterans Memorial
Boulevard, Metairie, Louisiana.  In the event
of the unavailability, incapacity or death of
Alvin, arrangements have been made that one
of the senior officers of ACE will always be in
a position to gain access to the Popeye Formula
so that it will always be available to ACE and
PFFC.

(2)    Alvin, Mary, Gilbert, Catherine and Russell
("Grantors") hereby license and grant to ACE,
its successors and assigns, the exclusive right
to use the Popeye Formula in the United States
of America and all foreign countries, in stores
owned or operated by ACE or any subsidiary of
ACE, subject only to the rights of PFFC as here-
after set forth.

(3)    ACE shall pay to Grantors a royalty for the use
of the Popeye Formula, computed at the rate of
one and one-half (1.5%) per cent on gross receipts
from all items sold, less the direct sales taxes
paid or owed with respect thereto, at all stores
owned or operated by ACE or any subsidiary of
ACE.

(4)    Grantors hereby license and grant to PFFC, its
successors and assigns the exclusive right to
license others, except ACE or any subsidiary of
ACE, to use the Popeye Formula in the United
States of America and all foreign countries, sub-
ject only to the rights of ACE as hereinabove set
forth, and Grantors herewith ratify and confirm
all previous licenses granted by PFFC.

(5)    With respect to any store operated pursuant to a
Franchise Agreement from PFFC or any subsidiary

thereof PFFC shall pay to Grantors a royalty of one-half of one (0.5%) per cent on the gross receipts from all items sold, less the direct sales taxes paid or owed with respect thereto, from all such stores.

(6)    The royalties hereinabove set forth shall be paid on or before the 10th day after the close of each month.  Grantors or anyone designated in writing by any of them shall have the right to examine the books and records of ACE and PFFC or any subsidiary of either, at reasonable times, to such limited extent as may be necessary to determine the accuracy or inaccuracy of the royalty being paid.

(7)    ACE and PFFC specifically covenant and agree to maintain as strictly confidential and secret, and not to disclose to anyone, any or all information obtained or received from Alvin relating to the Popeye Formula.

(8)    During the life of this agreement, Alvin shall not disclose to any party, other than designated representatives of ACE or PFFC, the Popeye Formula or anything related thereto.

(9)    Alvin has disclosed to ACE certain secret methods, secret formulas and secret "know-how" used in connection with Popeyes Famous Fried Chicken restaurants, including and without limitation the following:

A unique system relating to the opening and operating of restaurants specializing in the preparation and sale of highly spiced chicken made with a unique spice and batter formula and other

related menu items utilizing confidential food
formulas (the "POPEYES Famous Fried Chicken
System"), the distinguishing characteristics of
which include, without limitation, the name
POPEYES Famous Fried Chicken; other confidential
food formulas and recipes used in the prepara-
tion of other food products, specialized menus;
specially designed buildings; interior and
exterior layouts, unique trade dress and other
identification schemes ("Indicia of Origin");
standards and specifications for equipment, equip-
ment layouts, products, operating procedures and
management programs.

(10)  The Popeye Formula, for which royalty is being
paid pursuant to Paragraphs 3 and 5 above, was
developed prior to the incorporation of ACE.  The
items referred to in Paragraph 9 above were sub-
stantially developed after the incorporation of
ACE and have always been the property of ACE.  So
that there will be a written record, Grantors
ratify and confirm the ownership of ACE of all of
the items referred to in Paragraph 9, it being
specifically understood that this ratification
and confirmation of ownership does not apply to
the Popeye Formula.

(11)  If Alvin makes, developes, or invents improvements
in methods relating to the production of the
Popeye Formula or has or hereafter acquires addi-
tional secret recipes for products suitable for
use in POPEYES Famous Fried Chicken restaurants,
such improvements and new recipes shall be promptly
disclosed by Alvin to ACE and PFFC and shall be
included herein without any alteration in royalty

payments.

(12)   Mary, Gilbert, Catherine and Russell stipulate
and agree that Alvin knows the entire Popeye For-
mula and is in the best position to determine
how and for what consideration it should be
licensed.  Therefore, Mary, Gilbert, Catherine
and Russell do hereby give and grant to Alvin, his
assigns, his succession representative or anyone
designated by him in his last will and testament,
for the mutual benefit of all owners of the
Popeye Formula, the absolute and irrevocable right,
exercisable by Alvin, in their sole discretion to
(i) reduce the royalty payments due by ACE or
PFFC or any successor or assignee of either,
(ii) grant a moratorium on royalty payments due by
ACE or PFFC or any successor or assignee of either,
(iii) terminate either or all royalty payments,
(iv) change the time at which either or all roy-
alty payments are made or (v) make any other arrang
ment including and without limitation the lease or
sale thereof with any person, firm or corporation
for the use of the Popeye Formula, including the
sale or transfer of ownership of the entire Popeye
Formula to any third person or corporation, not
related in any manner to Alvin, for cash, notes,
stock or any combination thereof.  Additionally,
Mary, Gilbert, Catherine and Russell agree to exe-
cute any and all documents presented to them for
the purpose of accomplishing the foregoing, and,
in the event they are unwilling or unable for any
reason to execute such documents, they hereby
appoint Alvin their agent, which agency is coupled
with an interest, for the purpose of executing any

and all documents necessary or desirable to
accomplish such purpose.  The sole and only
restriction upon Alvin, his assigns, succes-
sion representative or anyone designated by him
in his last will and testament in relation to
the Popeye Formula is that if any when any
cash, notes, stock or other consideration or
any combination thereof is received by Alvin
or available by virtue of the ownership of
the Popeye Formula, 20% thereof will be
delivered or paid to Mary, Gilbert, Catherine
and Russell in their respective proportions at
the same time Alvin receives same.

(13)    This agreement shall be subject to termination
by Grantors or ACE or PFFC upon default by the
other party in the performance of any of the
terms, conditions, or covenants of this agreement
and failure to remedy said default within thirty
(30) days after written notice or demand, except
that the rights of any third person holding under
any franchise agreement from PFFC, its successors
or assigns shall not be prejudiced by any such
termination.  Termination of this agreement in any
manner shall not discharge the liability for roy-
alty accrued or unpaid at the time of such termi-
nation.

(14)    This agreement shall remain in full force and
effect unless otherwise cancelled as provided in
Paragraph 13 above, as long as ACE or any subsid-
iary thereof or any franchisee of PFFC, its suc
cessors or assigns, is using the Popeye Formula,
it being understood that a default or termination
by ACE shall not entitle Grantors to terminate

PFFC and, similarly, a default or termination
by PFFC shall not entitle Grantors to terminate
ACE.

IN WITNESS WHEREOF, the parties have executed this agree-
ment at New Orleans, Louisiana, effective as of the 2nd day of
July, 1979.

WITNESSES:

_____          _____
                                   Alvin C. Copeland

_____          _____
                                   Mary I. Copeland

_____          _____
                                   Gilbert E. Copeland

_____          _____
                                   Catherine Copeland

_____          _____
                                   Russell J. Jones

                                   A. COPELAND ENTERPRISES, INC.

_____          By: _____
                                       W. Ronald Lewis
                                       Vice President

                                   POPEYES FAMOUS FRIED CHICKEN,

_____          By: _____
                                       W. Ronald Lewis
                                       Vice President

2

## AMENDMENT

This Amendment made as of this 21st day of
March, 1989 by and among Alvin C, Copeland ("Copeland"),
New Orleans Spice Company, Inc., a Louisiana corporation
("Spice"), herein represented by its authorized officer,
and Biscuit Investments, Inc., a Louisiana corporation
("Biscuit"), represented herein by its authorized offi-
cer;

## W I T N E S S E T H

WHEREAS, by virtue of a certain agreement (the
"Formula Agreement") dated July 2, 1979, by and among A.
Copeland Enterprises, Inc. ("ACE"), Popeye's Famous Fried
Chicken, Inc. ("Popeye's"), Copeland and others, ACE
acquired the right to use a certain recipe and formula
for preparation of spicy fried chicken, any developments
or improvements relating to the production of such recipe
and formula and any additional recipes for products suit-
able for use in Popeye's restaurants ("Formula") and
Popeye's acquired the right to license others to use the
Formula;

WHEREAS, the manufacturing facilities have been
conveyed to Spice;

WHEREAS, Spice, by virtue of certain contracts
and transfers, has acquired ACE's entire interest in the

Formula and Copeland has acquired an additional four (4%)
percent interest therein, so that Copeland and Spice
together own the entire interest in the Formula in the
proportions of eighty four (84%) percent for Copeland and
sixteen (16%) percent for Spice;

WHEREAS, the parties desire to confer various
rights upon one another and to provide otherwise with
regard to the use of the Formula and compensation there-
for;

NOW THEREFORE, in consideration of the premises
and the agreements herein, and other valuable consider-
ation, the receipt and sufficiency of which are hereby
acknowledged by the parties, the parties agree to amend
the Formula Agreement as follows:

I.

Copeland hereby authorizes Spice to utilize the
Formula, and Spice agrees that it shall enjoy the right
to utilize the Formula in the preparation of all spices,
batter and other ingredients required in the preparation
of spicy fried chicken known as Popeyes Fried Chicken or
other food products ("Product").

II.

Pursuant to a Supply Contract of even date
herewith and annexed hereto for reference, Spice has

2

agreed to supply Biscuit's requirements of Product for Biscuit's company-owned outlets as well as the franchisee-operated outlets in the system.

III.

In compensation for the rights hereby granted Biscuit, Biscuit shall pay to Copeland and Spice the following:

A. As to sales from outlets operated and owned by Biscuit, Biscuit shall pay Copeland one and twenty-six hundredths (1.26%) percent and Spice twenty-four hundredths (.24%) percent of gross receipts from all items sold, less the direct sales taxes paid or owed with respect thereto, at all stores owned or operated by Biscuit or any of its subsidiaries ("gross receipts").

B. As to sales made from outlets operated by Biscuit franchisees and licensees, Biscuit shall pay Copeland forty-two one-hundredt (.42%) percent and Spice eight one-hundredths (.08%) percent of gross receipts.

C. All of such payments to Spice and Copela shall be paid weekly in arrears and shal

3

be based upon sales reports certified by
the chief financial officer or comptroller
of Biscuit, or such other person as the
parties may agree upon.

IV.

Without the other party's written consent first
obtained, neither party may assign or encumber its rights
hereunder; nor may this Agreement be assumed by any other
person.

V.

This Agreement may be amended only by a writing
executed by the parties hereto.

VI.

This Agreement establishes no third party bene-
ficiary rights in any persons not parties hereto.

VII.

This Agreement shall be construed in accordance
with the internal laws of the State of Louisiana.

VIII.

Except as modified herein, all the terms and
conditions of the Formula Agreement shall remain the
unchanged.

4

IX.

Copeland and Spice hereby agree that, upon the
merger of Church's Fried Chicken, Inc. ("Church's") and
Biscuit becoming effective, Church's shall become the
Company hereunder and shall be entitled to all of the
rights and benefits of Biscuit hereunder, subject to all
of the covenants, duties, obligations, promises and li-
abilities of Biscuit hereunder.

5

Executed at New York, New York on the date
first written above.

ALVIN C. COPELAND

BISCUIT INVESTMENTS, INC.          NEW ORLEANS SPICE COMPANY, INC.

By: _____          By: _____
    Its: V.P                             Its:

6

3

SECOND AMENDMENT TO
FORMULA AGREEMENT

This Second Amendment to Formula Agreement (the "Second Amendment") is effective the 21st day of March, 1989.

WHEREAS, on July 2, 1979, A. Copeland Enterprises, Inc., a Louisiana corporation ("ACE"), Popeyes Famous Fried Chicken, Inc., ("Popeyes"), Alvin C. Copeland ("Copeland"), and certain other individuals (the "Other Parties") entered an agreement providing for the licensing to ACE and Popeyes of certain secret recipes, formulas and processes (the "Formula") used in the preparation of food products sold by Popeyes Famous Fried Chicken restaurants owned and operated by ACE and franchised by Popeyes (the "Formula Agreement");

WHEREAS, subsequent to July 2, 1979, Copeland and ACE acquired all of the rights of the Other Parties in the Formula;

WHEREAS, subsequent to July 2, 1979, ACE and Popeyes each were merged with and into Biscuit Investments, Inc., a Louisiana corporation ("Investments");

WHEREAS, subsequent to July 2, 1979, the facilities of ACE used to manufacture spices, batter and other food products and ingredients prepared with the Formula for use by Popeyes restaurants were conveyed to New Orleans Spice Company, Inc., a Louisiana corporation ("Spice"), along with ACE's ownership interest in the Formula;

WHEREAS, on March 21, 1989, Spice and Investments entered into a Supply Contract whereby Spice agreed to sell and Investments agreed to purchase all of Investments' requirements of spices, batter and other food products and ingredients prepared with the Formula;

WHEREAS, on March 21, 1989, Copeland, Investments and Spice entered into an amendment to the Formula Agreement providing for, among other things, the payment by Investments to Copeland and Spice of certain royalties for the use of the Formula; and

WHEREAS, pursuant to an Amended and Restated Agreement and Plan of Merger, and effective September 21, 1989, Investments will be merged with and into Church's Fried Chicken, Inc., which will be the survivor of such merger and will be renamed "Al Copeland Enterprises, Inc." at the effective time thereof; and

WHEREAS, pursuant to the Amended and Restated Merger Loan Agreement dated September 21, 1989, among Investments, Canadian Imperial Bank of Commerce, New York Agency, as Agent (the "Agent"), and the financial institutions that are parties thereto (the "Merger Loan Agreement"), Biscuit is required to deliver to the

EXHIBIT " C "

Agent, as a condition to the making of the loans provided for under the Merger Loan Agreement (the "Loans"), this Second Amendment.

NOW THEREFORE, in consideration of the premises, the mutual covenants set forth herein, and the individual and collective benefits to Copeland, Investments and Spice of the Merger Loan Agreement and the Loans, the parties hereto agree as follows:

1. Copeland warrants that the Formula, and detailed instructions with respect thereto, have been committed to writing and have been deposited in a safety deposit box at ~~First National Bank of Commerce~~ ~~New Orleans~~, Louisiana. In the event of the unavailability, incapacity or death of Copeland, arrangements have been made that one of the senior officers of Spice will always be in a position to gain access to the Formula so that it will always be available to Spice.

2. The Formula Agreement, as amended, may not be amended after the execution date of this Amendment without the written consent of the Agent for so long as any of the Loans or any Obligations (as such term is defined in the Merger Loan Agreement) are unpaid.

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to be executed on this 21st day of September, 1989.

_____
Alvin C. Copeland

BISCUIT INVESTMENTS, INC.

BY: _____
Title: Executive Vice President

NEW ORLEANS SPICE COMPANY, INC.

BY: _____
Title: Secretary and Treasurer

2



## SUPPLY CONTRACT

This Agreement made this 21st day of March, 1989 by and between New Orleans Spice Company, Inc., a Louisiana corporation ("Spice"), herein represented by its undersigned officer and Biscuit Investments, Inc., a Louisiana corporation ("Biscuit"), herein represented by its undersigned officer,

## W I T N E S S E T H

WHEREAS, Spice, by virtue of a certain agreement dated July 2, 1979, as amended ("Formula Agreement"), has the right to use a certain basic recipe and formula in the preparation of spicy fried chicken commonly known as Popeyes Famous Fried Chicken, any developments or improvements relating to the production of such recipe and formula and any additional recipes for products suitable for use in Popeyes Famous Fried Chicken and Biscuit restaurants ("Popeye Formula");

WHEREAS, the Formula Agreement and the parties' interest therein are more fully described in a certain Amendment of the Formula Agreement, executed of even date herewith by the parties and Alvin C. Copeland;

WHEREAS, Biscuit owns and operates Popeyes Famous Fried Chicken and Biscuits restaurants which specialize in the sale of spicy fried chicken prepared with

batter, spices, and other ingredients prepared with the
Popeye Formula (such batter, spices and other ingredi-
ents, "Product"); and

NOW THEREFORE, the parties for the mutual bene-
fits conferred upon each other herein, the receipt and
adequacy of which are acknowledged, agree that:

I.

Spice shall sell to Biscuit, or as Biscuit
directs, all of the Product required by Biscuit, and
Biscuit shall purchase its requirements for the consider-
ation hereafter stated.

II.

During any month, Spice shall not be obligated
to supply an amount of Product grossly disproportionate
to average amounts customarily supplied for the preceding
twelve month period.

III.

In consultation with Biscuit, Spice shall en-
deavor to estimate the future requirement of Biscuit to
assure maximum compliance herewith.

IV.

Prices for the Product shall be as quoted or
posted from time to time by Spice consistent with past
practices, shall be payable C.O.D. or on such other basis

2

as shall be mutually determined, and shall be uniform throughout the Popeyes Famous Fried Chicken and Biscuit system.

### V.

The term hereof shall be fifteen years. Thereafter, this Agreement may be terminated by the parties' agreement, subject to an accounting for Product already sold but not yet paid for.

### VI.

Without the other party's written consent first obtained, neither party may assign or encumber its rights hereunder; nor may this Agreement be assumed by any other person.

### VII.

This Agreement may be amended only by a writing executed by the parties hereto.

### VIII.

This Agreement establishes no third party beneficiary rights in any persons not parties hereto.

3

IX.

Spice hereby agrees that, upon the merger of Church's Fried Chicken, Inc. ("Church's") and Biscuit becoming effective, Church's shall become the Company hereunder and shall be entitled to all of the rights and benefits of Biscuit hereunder, subject to all of the covenants, duties, obligations, promises and liabilities of Biscuit hereunder.

X.

This Agreement shall be construed in accordance with the internal laws of the State of Louisiana.

Executed at New York, New York on the date first written above.

BISCUIT INVESTMENTS, INC.    NEW ORLEANS SPICE CO., INC.

BY: _____    BY: _____
    Its: _____    Its: _____

4



UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

AUG 13 1992

U. S. DISTRICT COURT
CLERK'S OFFICE
BY _____ DEPUTY

- - - - - - - - - - - - - - - -X
:
In re:                              :      Chapter 11
:
AL COPELAND ENTERPRISES, INC.,      :      Case No. 91-12575-FM-11
:
Debtor.                   :
:
- - - - - - - - - - - - - - - -X

SUPPLEMENTAL DISCLOSURE RELATING TO
PLAN OF REORGANIZATION PROPOSED
BY CANADIAN IMPERIAL BANK OF COMMERCE, AS AGENT

Canadian Imperial Bank of Commerce ("CIBC"), as Agent for
the Proponents of the Fourth Amended Plan of Reorganization
Proposed by CIBC as Agent, as modified (the "CIBC Plan")[1],
submits this Supplemental Disclosure relating to the CIBC Plan as
in order to comply with this Court's conditions to the approval
of the modifications proposed by the Proponents to Sections 5.05,
7.01, and 7.02 of the CIBC Plan, and to respond to certain of the
points raised by Alvin C. Copeland ("Copeland") and Diversified
Foods and Seasonings, Inc. ("Diversified") in reaction to the
original Supplement dated August 10, 1992, which this Supplement
supersedes in its entirety.[2]

---

[1]  Capitalized terms used but not defined in this Supplement
shall have the meanings ascribed to such terms in the Plan.

[2]  PIFA's response to the original Supplement was received as
this Supplement was in its final stages of preparation.  The
points raised by PIFA seem to track the points raised by Copeland
and Diversified.

## I.   Introduction.

On August 6, 1992, the Court granted leave to amend the CIBC Plan to provide for assumption of the Supply Contract as well as the Formula Agreement, as amended, and the Recipe Royalty Agreement.  The CIBC Plan had previously provided for rejection of the Supply Contract and assumption of the Formula Agreement, as amended, and the Recipe Royalty Agreement.  CIBC chose to amend its Plan to provide for assumption of the Supply Contract after the Court ruled on July 28, 1992 that the contracts were unitary in nature for purposes of Section 365 of the Bankruptcy Code and therefore had to be assumed or rejected together.

In a second amendment to the CIBC Plan approved on August 6, 85-cents-on-the-dollar treatment was specified for the Subordinated Insider Claims in the event that this Court concludes that subordination of those claims on any grounds is not appropriate.

As a general matter, it is important to understand that the New Company is not in a position to give comprehensive, detailed answers to some of the points raised by Copeland and Diversified, or answers that would hold true for all time.  The Proponents and the New Company are NOT being evasive, disingenuous, or less than candid.  Certain of these points ask for opinions about the Debtor's present situation that are beyond the scope of any information available to the New Company before the CIBC Plan takes effect, and others ask for predictions of the future course of this business that no one, including Copeland, can give.  When this Supplement speaks in terms of plans or intentions,

-2-

therefore, it does so because that is the only way to address an issue honestly.

## II.   Statement of Intentions.

### A.   Popeyes Supply and Recipes.

If the CIBC Plan is confirmed, the proposed management of the New Company (the "Proposed Management") intends to fully perform and honor all obligations under the Supply Contract, the Formula Agreement, as amended, and the Recipe Royalty Agreement. While CIBC believes that substantial legal questions exist as to the appropriate scope of the "Product" covered by the Supply Contract, in order to avoid further potential disputes[3] it is the New Company's intention for the term of the Supply Contract (i.e., until it terminates on March 21, 2004), to continue purchasing from Diversified, and in effect directing its Popeyes franchisees to purchase from Diversified[4], all of its requirements for products for Popeyes restaurants as listed in Exhibit A hereto (including any modifications or improvements

---

[3]   The use of Exhibit A as a complete list of the "Product" covered by the Supply Contract after confirmation of the CIBC Plan is designed to avoid any dispute on the future scope of that agreement, even though a narrower scope may be supportable in a litigation context.   The New Company will live with this arguably expanded scope of "Product" as long as the CIBC Plan is confirmed, Diversified and Copeland comply with their obligations under the Supply Contract and the Formula Agreement, as amended, and Diversified and Copeland do not themselves attempt to expand the contents of Exhibit A without the New Company's consent.

[4]   The New Company does not intend to change the method of product distribution currently employed by the Debtor, even for those products that will be purchased through cooperatives. Indeed, in the May 5, 1992 Disclosure Statement, the New Company makes a three-year commitment not to impose a "nationwide supply or distribution capability" as a prerequisite to doing business after the Effective Date.

-3-

thereto) that are prepared with formulas and recipes which are the subject of the Formula Agreement, as amended.[5]  This assumes that Diversified will comply with its obligations under the Supply Contract and will provide high quality products in sufficient quantity and at prices that are fair and reasonable. CIBC currently anticipates that Diversified will be able to fulfill its obligations.

CIBC is aware of complaints raised by some franchisees about whether Diversified's past practices on pricing of products have been fair and reasonable.  CIBC is unable to assess these complaints, or to confirm the quality of the products supplied by Diversified, until after the Proposed Management has taken over, has talked to the affected parties, and has worked with Diversified to resolve any problems or misconceptions.[6]  The Proposed Management intends to closely monitor the fairness of Diversified's pricing in the future and may hire consultants, if

---

[5]   Exhibit A is based on a list of products generated in 1991 with Copeland's and Diversified's involvement, and has been amended to add all but two of the items proposed by Copeland and Diversified in their August 11, 1992 letter.  Copeland and Diversified are in a better position than the New Company to determine whether the items listed are prepared with formulas or recipes that are subject to the Formula Agreement, as amended, which this Court determined were the original Popeyes formula and the formulas and recipes referred to in paragraphs 9, 10, and 11 of the Formula Agreement. If any of the items on Exhibit A is not so prepared, Diversified has an obligation to inform CIBC of that fact.  Indeed, one of the items that was not added to Exhibit A (#274) is presently supplied by a third party using its recipes.  The other (#242) is unknown to the Proposed Management.

[6]   CIBC Exhibit Nos. 265, 266, and 360 do not reflect lower prices for "many of the product items listed in Exhibit A", but rather prices for equivalent products using substitute recipes developed by the Proposed Management.

-4-

necessary, to advise it on that subject. The Proposed Management
believes that such efforts should result in prices charged to
franchisees and the New Company by Diversified that are fair and
reasonable. However, CIBC also strongly believes that an
efficient mechanism must exist to resolve any potential pricing
disputes in a businesslike manner. Thus, if any pricing dispute
with Diversified cannot be resolved by the parties themselves,
the New Company proposes to submit any such dispute to binding
arbitration under the auspices of the American Arbitration
Association.[7] With respect to quality, Diversified will be
subject to the same quality-control standards and programs as
will apply to all suppliers.

The Proposed Management intends to continue utilizing
Popeyes' current "core" line of chicken and related products,
subject to presently unanticipated changes in market conditions
(e.g., changes in consumer taste preferences) or product line
profitability or viability.[8] The "core" products are the spicy
fried chicken product, the red beans and rice product, the
biscuit product, the Cajun rice product, the Cajun meat product,
and the Cajun gravy product. The Proposed Management also
anticipates introducing new products from time to time, as is

---

[7] Arbitration is proposed as a sign of the New Company's good
faith and its determination to keep price disputes from
interfering unnecessarily with its relationship with Diversified.
If Diversified is prepared to agree to arbitration in principle,
then the details of the procedure can readily be resolved.

[8] Copeland and Diversified insist that the New Company disclose
its belief concerning any such changes. As they are "presently
unanticipated", that is impossible to do.

-5-

both traditional and essential in the fast food industry, but has not developed any such new products to date. Unless a new product uses. formulas or recipes which are the subject of the Formula Agreement,[9] supply of new products will be determined on the basis of competitive bidding and sourcing, which will be designed to ensure high quality at the best possible price. Diversified will be afforded an opportunity to bid on these products.[10]

The New Company has not "reverse engineered" any products utilizing the formulas or recipes covered by the Formula Agreement, as amended, and has no intention to do so. To prepare for contingencies as prudent business people, the Proposed Management has developed substitute recipes, without "reverse engineering", for various menu items used to the Popeyes chain. The New Company has no intention of using these substitute recipes to replace items listed on Exhibit A, assuming that Diversified complies with its obligations under the Supply Contract and the Formula Agreement, as amended.

In light of this Court's rulings to date, the New Company intends to continue royalty payments to Copeland and Diversified

---

[9]   It is CIBC's understanding that Copeland has the obligation to give the New Company the option to use any new products developed by him that are suitable for use in Popeyes restaurants, as stipulated in paragraph 11 of the Formula Agreement.  If the New Company elects to use such a product, it would be added to Exhibit A and would thus be covered by the Supply Contract.

[10]  The Proposed Management has yet to develop the details of the bidding process, but states unequivocally that Diversified will be treated like any other supplier and will be permitted to bid against the specifications for any new product.

-6-

for the remaining term of the Supply Contract, unless the New Company no longer purchases any and all of the items now or hereafter listed on Exhibit A, e.g., by reason of a failure of Copeland or Diversified to perform their obligations under the Supply Contract or the Formula Agreement, as amended.  Royalties will continue to be calculated in accordance with the Formula Agreement, as amended, and as restricted by the Recipe Royalty Agreement.

  **B. Church's Supply and Recipes.**

 The intentions of the Proposed Management with respect to supply arrangements for products used in the Church's chain are described in a term sheet (copy attached as Exhibit B) negotiated with the Church's Independent Franchise Association.  Among other things, this term sheet commits the New Company to create a purchasing cooperative for the Church's chain that will choose suppliers on the basis of competitive bidding and sourcing, which is designed to ensure high quality at the best possible price.

 Until the cooperative is established, the Proposed Management intends to continue purchasing products used in the Church's stores from current suppliers of these products, subject to a review by the Proposed Management after confirmation to assure itself that these suppliers are performing satisfactorily.  If the Proposed Management determines that a supplier is not performing satisfactorily in areas such as quality, quantity, or price, it may establish alternative supply arrangements.

 Diversified currently supplies certain products for the Church's chain.  It is the New Company's understanding that there

-7-

is no continuing contract requiring purchases of such products from Diversified. Nonetheless, the Proposed Management intends to continue present purchases from Diversified, subject to the New Company's review to determine satisfactory performance, until the purchasing cooperative can be established. Diversified will also be offered an opportunity in the future to bid competitively for the supply of Church's products.

During his Rule 2004 examination in these proceedings, Copeland claimed personal ownership of certain formulas and recipes currently used in connection with certain Church's products, including formulas and recipes for Church's fried chicken batter and biscuits. The New Company does not agree with these claims and believes that these formulas and recipes properly belong to the Debtor; if this dispute is not able to be resolved, the New Company will consider initiating legal action to establish and protect its rights with respect to these formulas and recipes. If for any reason the New Company is not provided by Copeland with access to those formulas and recipes used in Church's products that Copeland claims to own, the New Company will utilize either formulas and recipes used by Church's prior to March 21, 1989, or substitute and equivalent formulas and recipes that have been developed under the supervision of the Proposed Management. These include substitute formulas and recipes for the Church's fried chicken batter mix and marinade and the Church's biscuit mix. The Proposed Management has also established contingency arrangements with available suppliers in order to ensure that Church's franchisees and company-owned

stores will receive an uninterrupted supply of products regardless of any actions by Copeland or Diversified.

## C. Insider Claims.

It is the intention of the Proponents to seek this Court's approval of no distribution on account of the Subordinated Insider Claims, as provided in revised Section 5.05(a) of the CIBC Plan. If this Court concludes, incident to confirmation, that the status of the holders of these Claims as Insiders is insufficient in and of itself to warrant this treatment, then it is the intention of the Proponents to seek their subordination pursuant to Section 510(c) of the Bankruptcy Code as part of the ordinary, post-confirmation process of claims allowance. As set forth below, the CIBC Plan remains feasible even if this Court concludes that the Subordinated Insider Claims are entitled to 85% treatment in accordance with revised Section 5.05.

## III. Anticipated Impact Upon the Business.

### A. Supply.

Assumption of the Supply Contract would allow the New Company to maintain its existing relationship with Diversified and would therefore not have an impact on the current business operations of the company with respect to the Popeyes chain. Under the Supply Contract, the New Company and its franchisees will continue to have an uninterrupted source of supply, and the Proposed Management will ensure that pricing is fair and reasonable.

For the reasons set forth above, the New Company anticipates no disruption of supply to the Church's chain whether or not

-9-

Diversified continues to supply certain Church's products after confirmation.

The projections included in the disclosure statement will not change because those projections assumed that the New Company would procure product on terms and conditions substantially consistent with historical practices.[11] The improvement in gross margin is not assumed to occur from changes in the supply arrangement with Diversified, but rather from other changes assumed to occur with respect to the cost of products purchased from other suppliers and reductions in food waste. The magnitude of the savings in product cost is not material -- from 0.5% to 1.0% of sales -- and the Proposed Management believes they will arise from numerous sources because most of these products, in dollar terms, are not purchased from Diversified.

   B.   Insider Claims.

Based on CIBC's analysis of the claims filed by Copeland and his affiliate entities, as well as its analysis of data supplied by the Debtor pertaining to such claims and $6.5 million in uncontested offsetting claims of the Debtor against Copeland and his affiliates, CIBC believes that any net claims against the Debtor are de minimis and their payment would have no impact on the financial feasibility of the CIBC Plan. The following summary of the Class 10 Claims discloses the basis for this

---

[11]  CIBC's use of historical supply practices as the basis for its projections says nothing about whether the prices charged are fair and reasonable. It says only that CIBC lacks sufficient information on that subject to justify an assumption that those costs will change.

conclusion, without prejudice to any defenses or other objections that the Debtor or any other party in interest may have to these Claims.

1.   Claim of Alvin C. Copeland: Proof of Claim amount -- $17,600,384.61.

The only Copeland claims shown on the Debtor's books are for royalties ($100,468.00) and salary (approximately $19,000), against which those books show an offsetting claim of more than $100,000.

In addition, Copeland lists four other items comprising the filed amount of his claim, of which three account for $16,784,602.71.  Copeland's alleged claim for reimbursement on guaranties of notes or leases ($13,634,602.71) will be moot because to the extent that the guaranty backs an Allowed Claim, the guaranteed Claim itself will be paid in accordance with the CIBC Plan.  Copeland's claim for retirement benefits ($3,150,000) does not exist because he is not vested under the only retirement plan currently in effect for the Debtor's executives.  The fourth item is severance pay ($692,308.00).

2.   Claim of My Favorite Year: Proof of claim amount -- $362,588.00.

Given the existence of My Favorite Year's liability to the Debtor in excess of $4.5 million, there are no circumstances under which My Favorite Year can have a net claim against the Debtor.

3.   Claim of National Development Corporation: Proof of
     claim amount -- Unliquidated.

CIBC has not yet concluded its investigation of the NDC

claim.   Since the Debtor's books and records reveal the existence

of approximately $600,000.00 owed to the Debtor by NDC on the

Petition Date, CIBC does not believe NDC has any net claim

against the Debtor.

4.   Claim of Diversified Foods and Seasonings: Proof of
     claim amount -- $669,218.85.

The Debtor's books and records as of the Petition Date

reflect that Diversified owes the Debtor approximately

$400,000.00 and that the Debtor owes Diversified approximately

$364,000.00.

5.   Claim of CP Partnership: Proof of claim amount --
     Unliquidated.

The Debtor's books and records reflect that CP Partnership

owed the Debtor approximately $64,000.00 on the Petition Date,

and that the Debtor owes CP Partnership $5,600.00.

6.   Claim of Gulf Venture Associates (Landmark Hotel):
     Proof of claim amount -- $24,076.35.

The Debtor's books and records reflect that Landmark Hotel

owed the Debtor approximately $167,000.00 on the Petition Date

and that the Debtor owes Landmark Hotel $6,065.00.

7.   Claims of Fast Foods of Amite, Fast Foods of Colorado,
     Fast Foods of Monroe and Kerry Weilbaecher Enterprises,
     Inc.: Proof of claim amounts -- Unliquidated.

These claimants are franchisees of the Debtor controlled by

Copeland, and the Claims are for unspecified pre-petition

breaches of franchise agreements.   All of these franchise

agreements will be assumed under the CIBC Plan, and it is

-12-

inconceivable that this Court would allow any of these Claims since to do so, this Court would have to conclude that, before the Petition Date, one Copeland company (the Debtor) breached contracts with other Copeland companies (the claimants).

Based on the foregoing analysis (which CIBC believes will not be disputed by the Debtor), CIBC will demonstrate at confirmation that no matter how the Court determines that the Class 10 Claims must be treated, such treatment will have no impact on the feasibility of the CIBC Plan.

Dated:   August 12, 1992

                                    CANADIAN IMPERIAL BANK OF
                                       COMMERCE, as AGENT

                          By: _____
                                    R. Bruce Layman
                                    Assistant General Manager

-13-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served this 12th day of August, 1992 on the Confirmation Service List annexed hereto by facsimile transmission or, in the case Mr. Laphen, by Federal Express.

THOMAS E. PITTS, JR.

EXHIBIT A TO SUPPLEMENTAL DISCLOSURE

POULTRY SEASONINGS AND SPICE BLENDS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---------|---------------------|-----------|
| 2 | Spicy Seasoning | 50 - 6 oz. |
| 2A | Spicy Nugget Seasoning | 50 - .72 oz |
| 3 | Mild Seasoning | 60 - 7 oz. |
| 3A | Mild (For Skinless)* | 60 - 7 oz. |
| 4 | Lite Spice | 60 - 5.6 oz. |
| 5 | Taco Seasoning | 24 - 5.75 oz. |
| 6 | Cinnamon Sugar | 8 - 1 lb. |
| 7 | Meat Seasoning | 2 - 1 lb. 3½ oz. |
| 8 | Bean Mix | 4 - 3.14 lb. |
| 14 | Cajun Sparkle | 1 - 25 lb. |
| 18 | Red Rice Seasoning | 30 - 1.76 oz. |
| 232 | Popeyes International Gumbo (Dry) | 50 - 74.2326 g. |
| 233 | Popeyes International Gravy (Dry) | 40 - 104.74 g. |
| 20 | Creamy Italian Dressing | 20 - 3.07 oz. |
| 21 | Popeyes Dressing | 20 - 2.67 oz. |
| 22 | French Dressing | 20 - 1.93 oz. |
| 23 | Cheddar Bleu Cheese Dressing | 22 - 17.15 oz. |
| 24 | 1000 Island Dressing | 24 - 8 oz. |
| 37 | Tartar Sauce Seasoning | 20 - 4.04 oz. 1 - 50 lb. |
| 12 | Cajun Sparkle Bulk | 1 - 20 lb. 2,000 - 1 g. |

* Not currently in use in Popeye's stores.

2

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 44 | Garlic Mayo Dressing | 60 - 1.23 oz. |
| 55 | Apple Spice Mix | 3 - 8.7 lb. |
| 65A | Salad Spice Mix | 50 - 1.55 oz. |
| 676R | Reconstituted Spice - Modified | N/A |
| 66 | Non-Separating Italian | 20 - 13.12 oz. 1 - 50 lb. |
| 67 | Dry Red Bean Mix Int. | 15 -18¼ oz. |
| 68 | Crawfish Breading | 1 - 50 lb. |
| 72 | Roasted Chicken Seasoning - Modified* | 30 - 10.72 oz. |
| 73 | Yellow Rice Spice* | 50 - 2.5 oz. |
| 81 | Catfish Breading | 1 - 50 lb. |
| 82 | Catfish Spice Mix | 30 - 9.16 oz. |
| 87 | Modified Shrimp Seasoning | 75 - 1.13 oz. |
| 165 | Crawfish Seasoning | 75 - 1.25 oz. |
| 186 | Buffalo Wing Spice Blend* | Per lb. |
| 208 | Candied Shrimp Sauce Spice | Per lb. |
| 209 | Stuffin Mix Seasoning | 40 - 21.29 g. |
| 214 | New Cajun Shrimp Seasoning (also called Popcorn Shrimp Seasoning) | 75 - 41.52 g. |
| 215 | Popeyes Garlic Spread Seasoning | 50 - 41.8 g. |
| 217 | C#2 Modified Skinless Seasoning* | 50 - 142.2 g. |
| 271 | Macaroni & Cheese Spice | 25 - 5.53 oz. |
| 270 | Potato Salad Spice | 4 - 5lb. |

* Not currently in use in Popeye's stores.

INGREDIENTS FOR FURTHER PROCESSING

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 7A | Meat Seasoning - Special | 1 - 36 lb. |
| 19 | Dry Red Bean Mix | 1 - 40.2 lb. |
| 208 | Candied Shrimp Sauce Spice | Per lb. |
| 14 | Sparkle Base | 1 - 25 lb. |
| 14A | Sparkle Additive A | 1 - 60 lb. |
| 14B | Sparkle Additive B | 1 - 55.13 lb. |
| 15 | Sweet & Sour Spice Additive | 1 - 25 lb. |
| 16 | B.B.Q. Spice Additive | 1 - 25 lb. |
| 29 | Cajun Mustard Spice Additive | 1 - 25 lb. |
| 28 | Cajun Nugget Gumbo Seasoning | 40 lb. |
| 35 | Boss Pepper Blend | 1 - 50 lb. |
| 52 | Popeyes Cajun Gravy Seasoning | 1 - 50 lb. |
| 216 | Popeyes Gumbo Spice | 1 - 29.52 lb. |
| 193 | Pinto Bean Spice | 1 - 40 lb. |
| 175 | Red Bean Soup Spice | 1 - 40 lb. |
| N/A | Light Red Kidney Beans | Per lb. |
| N/A | Tasso | Per lb. |
| N/A | Potato Salad Seasoning | Per lb. |
| N/A | Andouille Sausage | Per lb. |
| N/A | Beef Taco Seasoning | Per lb. |
| N/A | Ham Fat | Per lb. |
| N/A | Smothered Pea Sauce Seas. Pack | Per lb. |
| N/A | Turkey Stock | Per lb. |
| N/A | Buttered Carrot Sauce Seas. Pack | Per lb. |
| N/A | Blond Roux | Per lb. |

4

## BISCUIT MIX, BATTERS AND BREADINGS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 1 | Chicken Batter | 10 - 4.638 lb. |
| 9 | Biscuit Base Mix | 10 - 5.25 lb. |
| 10 | Nugget Batter | 10 - 4.125 lb. |
| 11 | Nugget Flour | 1 - 50 lb. |
| 68 | Crawfish Breader | 1 - 50 lb. |
| 81 | Catfish Breader | 1 - 50 lb. |
| 86 | Butterfly Shrimp Breading | 1 - 50 lb. |
| 160 | Improved French Fry Bat Mix | 1 - 50 lb. |
| 188 | Buffalo Wing Batter* | 1 - 50 lb. |
| 218 | Popeyes Perch Breading* | 1 - 50 lb. |
| 245 | Mushroom Breading | 1 - 40 lb. |
| 219 | Popeyes Perch Batter* | 1 - 50 lb. |
| 272 | Corn Bread Mix | 700 grams |
| 230 | New Onion Ring Batter* | 10 - 3.97 |

---

* Not currently in use in Popeye's stores.

5

**EDIBLE OILS**

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---------|---------------------|-----------|
| 203 | Non-Separating Italian | 6 - 4.5 lb. |
| 239 | Skinless Chicken Fry Shortening Flavor* | 1 - 400 lb. |

---
* Not currently in use in Popeye's stores.

6

## FULLY CONSTITUTED SAUCES AND COOKED ITEMS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 25 | Cajun Meat | 9 - 4.5 lb. |
| 250 | Modified Seafood Gumbo | 9 - 4.5 lb. |
| 26 | Red Bean Prod. | 9 - 5 lb. |
| 152 | Grilled Chicken Marinade | 9 - 4.5 lb. |
| 51 | Cajun Gravy | 9 - 4.5 lb. |
| 153 | Grilled Chicken Color | 4 gal./case |
| 207 | Popeyes Seafood Gumbo | 9 - 4.5 lb. |
| 151 | Roast Beef Gravy | 9 - 4.5 lb. |
| 212 | Honey Lime Vinaigrette Base | 9 - 5 lb. |
| 275 | Garlic Spread | 12 - 4.5 lb. |
| 17 | Sweet & Sour Sauce | 100 - 1 oz. |
| 276 | Salisbury Gravy | 4 - 5 lb. |
| 19 | Cajun Mustard | 100 - 1 oz. |
| 262 | Red Pasta Sauce | 9 - 5 lb. |
| 38 | Cocktail | 100 - 1 oz. |
| 263 | Beef Taco Filling | 9 - 4.5 lb. |
| 116N | B.B.Q. Sauce | 100 - 1 oz. |
| 264 | Smothered Pea Sauce | 10 - 2 lb. |
| 173 | Pinto Beans | 15 - 3 lb. |
| 265 | Alfredo Sauce | 4 - 4.5 lb. |
| 204 | Oyster Sauce for Fried Rice | 12 - 3.1 lb. |
| 266 | Smothered Corn Sauce | 10 - 2 lb. |
| 201 | Red Bean Soup | 9 - 4.5 lb. |
| 267 | Green Bean Sauce | 10 - 2 lb. |
| 8095 | Honnee Hot Sauce | 9 - 4.5 lb. |
| 268 | Carrot Sauce | 10 - 2 lb. |
| 261 | Butter Sauce | 4 - 4 lb. |
| 273 | Potato Salad | 6 - 5 lb. |

EXHIBIT B TO SUPPLEMENTAL DISCLOSURE

## I.   Depersonalization of Franchisor-Franchisee Relationships

While the New Company will install senior management personnel, and resulting changes in corporate policy, that are designed to produce immediate and wholesale improvements in the relationship between franchisor and franchisee, and while the New Company would not expect these improvements to be so fragile as to succomb to any future (and unanticipated) changes in its ownership or management, the New Company appreciates the sensitivity of the franchisees to that risk in light of their historical experience. Accordingly, the New Company will attempt to institutionalize, and thus depersonalize, these improvements by embodying them, where necessary, in written agreements and statements of policy that protect the franchisees while preserving the franchisor's irreplaceable role as guardian of the system, of the long view, and of the broad perspective.

The following areas are but particular aspects of this overall commitment. Taken as a whole, these specific reforms should provide for such a degree and depth of franchisee involvement in the business of the New Company that future changes in ownership or management should have a limited impact on the quality of the franchisor-franchisee relationship.

## II.   Brand Integrity and Growth

The New Company will be committed to maintaining and enhancing the brand integrity of each chain, maximizing sales and profitability of franchisees, with a view toward making each brand individually competitive in the marketplace. This commitment will be fulfilled by assigning separate personnel to areas such as marketing, operations, purchasing, training, and R&D/menu development. The efficiencies resulting from combined operations will be limited to areas that will not compromise brand integrity.

Beginning immediately upon the Effective Date of the CIBC Plan, the New Company intends to initiate efforts to expand both chains based upon market development models and plans presently under consideration.

Central to this effort will be the adoption of franchising and development guidelines containing the criteria for expansion and for amendments to development rights, site and project acceptance procedures, transfer information, and a copy of the development and franchise agreements. The purpose of these guidelines is to assist franchisees in their planning efforts by providing each with equal access to information, and to promote fairness and

consistency in dealing with franchisees and with those issues encountered most commonly. The franchise and development agreements are the vehicles for insuring that the guidelines are enacted and followed.

Unless the New Company concludes that the continued operation of the store is financially unwise even if sold to a franchisee, the New Company will not close a company-owned store without first offering it to a franchisee in the same chain.

Consistent with the New Company's intention to expand both chains and to maintain brand integrity, the New Company does not have a specific plan to expand one chain at the expense of the other by converting company-owned stores in one chain to stores in the other chain. However, such conversions in either direction may occur from time to time if financially justified on a case-by-case basis.

The New Company agrees to share with the board of the franchisee association all plans to close, sell, or convert existing restaurants in the chain, and expansion plans for future growth in the chain.

In the event that the New Company offers incentive programs for establishing new units or remodeling existing units, those programs will be made available to all franchisees in the chain who meet the programs' criteria for participation. Those criteria will be based solely on objective factors such as financial strength and management capability.

## III. Purchasing and Spices

The New Company will establish a separate, non-profit product purchasing cooperative for each chain, which would include foodstuffs, paper goods, and supplies, which all franchisees will have the opportunity to join. The objective of each coop will be to insure continuity of supply and to reduce costs by volume purchasing. Administrative costs of each coop (salaries, fringes, travel, office expenses, etc.) and any unrecoverable costs associated with obsolete inventories would be funded by membership dues and/or commissions on purchases. Any excess income for a given year will be distributed back to the membership or carried forward to the following year.

After a suitable start-up period, the purchasing coop will seek to broaden its reach to include other products and services as long as specific items can be identified and made available economically through the coop.

The design and operation of each coop would be governed by a coop agreement and by-laws. Each coop would be

governed by a five-member board of directors. Three directors will be the New Company's senior financial, operations, and purchasing officers. The two franchisee directors will be elected to serve for a period of two years. The board will meet quarterly and will invite one or two franchisees to attend each meeting. Franchisee directors will receive $250 for each day of meetings attended, plus customary and reasonable travel expenses. The franchisee association shall have the right to audit each purchasing cooperative and its expenses.

Each coop will have three permanent officers: Chairman of the Board (one of the elected franchisees), President and CEO (the New Company's CFO), and a Senior Vice President (the New Company's senior purchasing officer).

The creation and range of operation of each cooperative must be consistent with any obligations incurred or undertakings made by the New Company incident to the confirmation of the CIBC Plan, including any contracts with Diversified Foods & Seasonings, Inc.

Spice supply is addressed in the CIBC Plan and its exhibits.

## IV. Franchisee Participation

The New Company will encourage a high level of franchisee participation in its business in the areas of marketing, purchasing, operations/training, and menu development, primarily through membership on or other involvement in advisory committees or boards.

Central to this goal is the formalization of a franchisee association for each chain (e.g., CIFA) the purpose of which would be to consider, discuss, and act upon common problems relating to the management and operation of restaurants in that chain, and to foster a better understanding of these problems and their solutions based upon the experience and knowledge of the New Company and the membership.

Each association would be governed by by-laws that will cover, among other things, membership eligibility, representation, voting (one vote per restaurant), and meetings. The New Company will assist in mailing ballots and biographies for board nominees, and in conducting association meetings at the annual franchisee meeting. The New Company will also underwrite up to three meetings per year at which the board and the chairs of subcommittees will discuss areas of concern, prepare reports, or recommend changes or improvements in operations.

-3-

Each association would have a board of directors elected by the membership and representative of its component parts. The board would recommend changes or improvements regarding operations, training, menu and product development, advertising and promotions, and other appropriate matters relevant to the chain.

## V.   Service/Support Systems

The New Company is committed to review and improve existing service and support systems to franchisees, and to extend new services in areas that the New Company believes will be beneficial to the system. In particular, the New Company or its designees (1) will coordinate with third parties to obtain, if available, group, property, and casualty insurance to franchisees at competitive rates, and (2) will offer advice and assistance in matching franchisees with third-party lenders for capital projects.

## VI.   Marketing Funds

For the balance of 1992, the marketing fund for each chain will be used to support remaining programs (including P.O.P. kits) as well as possible given the fund balance and scheduled promotions.

Subject to any constraints imposed by existing franchise agreements, the New Company will redesign the budgeting and use of marketing fund contributions as follows:

The goal of the program will be to maximize the funds available for local media expenditures. Funds will be made available for local coop expenditures in direct proportion to their contribution level.

Company charges to the marketing fund will not exceed 0.75% of total sales, subject to increase if the New Company decides to provide national advertising, sponsorships, or promotions for the chain at a future date out of the marketing fund. Every effort will be made to reduce the foregoing percentage. Company and franchisee stores will pay into this fund at exactly the same rate and receive the same benefits.

National programs of any type (advertising, sponsorships, or promotions) will only be established if a majority of the units in the chain support such programs. All such programs will first be reviewed by the board of the franchisee association. Other than charges for such national programs, if approved, company charges will cover (1) agency fees and production and distribution of materials and programs that support local advertising and promotion

-4-

requirements, including a minimum of four complimentary P.O.P. kits per year, (2) marketing and promotion of new products, and (3) initiation and execution of appropriate public relations, customer relations, and event marketing activities. Funds will not be used to pay corporate general administrative or overhead expenses, or to pay the marketing administrative or overhead expenses. The franchisee association shall have the right to audit the marketing fund and its expenses.

The New Company will encourage and support the establishment of local advertising cooperatives based on ADI areas (one for every ADI with two or more units). Cooperative expenditures will be determined by the members, consistent with applicable agreements and company-wide guidelines. The New Company will provide assistance in identifying and implementing marketing programs consistent with the needs and funding capabilities of a particular cooperative. It is the New Company's intention to assign to such approved marketing coops the authority and responsibility for administering the local portion of the marketing funds in accordance with applicable agreements and company-wide guidelines.

The operative documents governing each coop will be the coop agreement signed by the New Company and the member franchisees, the by-laws, and the advertising coop guidebook published by the New Company. A specimen table of contents for a guidebook is attached to indicate the range of concerns addressed for each coop.

In or before January, 1993 and annually thereafter, the board of the franchisee association will have an opportunity to review the plan and budget put together by the New Company and the franchisee marketing/menu development subcommittee for the chain.

VII. <u>Dispute Resolution</u>

As a matter of corporate policy, the New Company will discuss and negotiate issues and disputes with franchisees, with a view toward achieving a mutually satisfactory resolution, prior to initiating legal or other unilateral action. The New Company will expect its franchisees to conduct themselves in the same manner.

A significant portion, if not a majority, of the disputes that have arisen in the past and could be expected to arise in the future would involve matters within the purview of the marketing coops or other franchisee organizations. The by-laws or guidelines governing these institutions would deal with dispute resolution.

-5-

## VIII.  <u>Transition Procedures</u>

Upon confirmation of the CIBC Plan, the New Company will establish a transition team of experienced professionals to deal with all aspects of franchisee relations in the first months under new management.

To the extent not prejudicial to the parties' rights and permitted by rules of court, the New Company will seek to suspend the prosecution of all actions by the Debtor against franchisees pending on the Effective Date of the CIBC Plan for a reasonable period of time, to permit discussions with these franchisees on a resolution of their individual disputes.

## IX.  <u>Review of Franchise Agreements</u>

The New Company agrees to review all franchise agreements, including their royalty terms, within a reasonable time after the Effective Date of the CIBC Plan.

T1P92A69.URN (8/12/92 3:58pm)

EXHIBIT A TO SUPPLEMENTAL DISCLOSURE

POULTRY SEASONINGS AND SPICE BLENDS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 2 | Spicy Seasoning | 50 - 6 oz. |
| 2A | Spicy Nugget Seasoning | 50 - .72 oz |
| 3 | Mild Seasoning | 60 - 7 oz. |
| 3A | Mild (For Skinless)* | 60 - 7 oz. |
| 4 | Lite Spice | 60 - 5.6 oz. |
| 5 | Taco Seasoning | 24 - 5.75 oz. |
| 6 | Cinnamon Sugar | 8 - 1 lb. |
| 7 | Meat Seasoning | 2 - 1 lb. 3½ oz. |
| 8 | Bean Mix | 4 - 3.14 lb. |
| 14 | Cajun Sparkle | 1 - 25 lb. |
| 18 | Red Rice Seasoning | 30 - 1.76 oz. |
| 232 | Popeyes International Gumbo (Dry) | 50 - 74.2326 g. |
| 233 | Popeyes International Gravy (Dry) | 40 - 104.74 g. |
| 20 | Creamy Italian Dressing | 20 - 3.07 oz. |
| 21 | Popeyes Dressing | 20 - 2.67 oz. |
| 22 | French Dressing | 20 - 1.93 oz. |
| 23 | Cheddar Bleu Cheese Dressing | 22 - 17.15 oz. |
| 24 | 1000 Island Dressing | 24 - 8 oz. |
| 37 | Tartar Sauce Seasoning | 20 - 4.04 oz. 1 - 50 lb. |
| 12 | Cajun Sparkle Bulk | 1 - 20 lb. 2,000 - 1 g. |

---

* Not currently in use in Popeye's stores.

2

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 44 | Garlic Mayo Dressing | 60 - 1.23 oz. |
| 55 | Apple Spice Mix | 3 - 8.7 lb. |
| 65A | Salad Spice Mix | 50 - 1.55 oz. |
| 676R | Reconstituted Spice - Modified | N/A |
| 66 | Non-Separating Italian | 20 - 13.12 oz. 1 - 50 lb. |
| 67 | Dry Red Bean Mix Int. | 15 -18¼ oz. |
| 68 | Crawfish Breading | 1 - 50 lb. |
| 72 | Roasted Chicken Seasoning - Modified* | 30 - 10.72 oz. |
| 73 | Yellow Rice Spice* | 50 - 2.5 oz. |
| 81 | Catfish Breading | 1 - 50 lb. |
| 82 | Catfish Spice Mix | 30 - 9.16 oz. |
| 87 | Modified Shrimp Seasoning | 75 - 1.13 oz. |
| 165 | Crawfish Seasoning | 75 - 1.25 oz. |
| 186 | Buffalo Wing Spice Blend* | Per lb. |
| 208 | Candied Shrimp Sauce Spice | Per lb. |
| 209 | Stuffin Mix Seasoning | 40 - 21.29 g. |
| 214 | New Cajun Shrimp Seasoning (also called Popcorn Shrimp Seasoning) | 75 - 41.52 g. |
| 215 | Popeyes Garlic Spread Seasoning | 50 - 41.8 g. |
| 217 | C#2 Modified Skinless Seasoning* | 50 - 142.2 g. |
| 271 | Macaroni & Cheese Spice | 25 - 5.53 oz. |
| 270 | Potato Salad Spice | 4 - 5lb. |

---

\* Not currently in use in Popeye's stores.

3

## INGREDIENTS FOR FURTHER PROCESSING

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 7A | Meat Seasoning - Special | 1 - 36 lb. |
| 19 | Dry Red Bean Mix | 1 - 40.2 lb. |
| 208 | Candied Shrimp Sauce Spice | Per lb. |
| 14 | Sparkle Base | 1 - 25 lb. |
| 14A | Sparkle Additive A | 1 - 60 lb. |
| 14B | Sparkle Additive B | 1 - 55.13 lb. |
| 15 | Sweet & Sour Spice Additive | 1 - 25 lb. |
| 16 | B.B.Q. Spice Additive | 1 - 25 lb. |
| 29 | Cajun Mustard Spice Additive | 1 - 25 lb. |
| 28 | Cajun Nugget Gumbo Seasoning | 40 lb. |
| 35 | Boss Pepper Blend | 1 - 50 lb. |
| 52 | Popeyes Cajun Gravy Seasoning | 1 - 50 lb. |
| 216 | Popeyes Gumbo Spice | 1 - 29.52 lb. |
| 193 | Pinto Bean Spice | 1 - 40 lb. |
| 175 | Red Bean Soup Spice | 1 - 40 lb. |
| N/A | Light Red Kidney Beans | Per lb. |
| N/A | Tasso | Per lb. |
| N/A | Potato Salad Seasoning | Per lb. |
| N/A | Andouille Sausage | Per lb. |
| N/A | Beef Taco Seasoning | Per lb. |
| N/A | Ham Fat | Per lb. |
| N/A | Smothered Pea Sauce Seas. Pack | Per lb. |
| N/A | Turkey Stock | Per lb. |
| N/A | Buttered Carrot Sauce Seas. Pack | Per lb. |
| N/A | Blond Roux | Per lb. |

4

## BISCUIT MIX, BATTERS AND BREADINGS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---------|---------------------|-----------|
| 1 | Chicken Batter | 10 - 4.638 lb. |
| 9 | Biscuit Base Mix | 10 - 5.25 lb. |
| 10 | Nugget Batter | 10 - 4.125 lb. |
| 11 | Nugget Flour | 1 - 50 lb. |
| 68 | Crawfish Breader | 1 - 50 lb. |
| 81 | Catfish Breader | 1 - 50 lb. |
| 86 | Butterfly Shrimp Breading | 1 - 50 lb. |
| 160 | Improved French Fry Bat Mix | 1 - 50 lb. |
| 188 | Buffalo Wing Batter* | 1 - 50 lb. |
| 218 | Popeyes Perch Breading* | 1 - 50 lb. |
| 245 | Mushroom Breading | 1 - 40 lb. |
| 219 | Popeyes Perch Batter* | 1 - 50 lb. |
| 272 | Corn Bread Mix | 700 grams |
| 230 | New Onion Ring Batter* | 10 - 3.97 |

* Not currently in use in Popeye's stores.

5

## EDIBLE OILS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---------|---------------------|-----------|
| 203 | Non-Separating Italian | 6 - 4.5 lb. |
| 239 | Skinless Chicken Fry Shortening Flavor* | 1 - 400 lb. |

---

\* Not currently in use in Popeye's stores.

6

## FULLY CONSTITUTED SAUCES AND COOKED ITEMS

| PROD. # | PRODUCT DESCRIPTION | PACK SIZE |
|---|---|---|
| 25 | Cajun Meat | 9 - 4.5 lb. |
| 250 | Modified Seafood Gumbo | 9 - 4.5 lb. |
| 26 | Red Bean Prod. | 9 - 5 lb. |
| 152 | Grilled Chicken Marinade | 9 - 4.5 lb. |
| 51 | Cajun Gravy | 9 - 4.5 lb. |
| 153 | Grilled Chicken Color | 4 gal./case |
| 207 | Popeyes Seafood Gumbo | 9 - 4.5 lb. |
| 151 | Roast Beef Gravy | 9 - 4.5 lb. |
| 212 | Honey Lime Vinaigrette Base | 9 - 5 lb. |
| 275 | Garlic Spread | 12 - 4.5 lb. |
| 17 | Sweet & Sour Sauce | 100 - 1 oz. |
| 276 | Salisbury Gravy | 4 - 5 lb. |
| 19 | Cajun Mustard | 100 - 1 oz. |
| 262 | Red Pasta Sauce | 9 - 5 lb. |
| 38 | Cocktail | 100 - 1 oz. |
| 263 | Beef Taco Filling | 9 - 4.5 lb. |
| 116N | B.B.Q. Sauce | 100 - 1 oz. |
| 264 | Smothered Pea Sauce | 10 - 2 lb. |
| 173 | Pinto Beans | 15 - 3 lb. |
| 265 | Alfredo Sauce | 4 - 4.5 lb. |
| 204 | Oyster Sauce for Fried Rice | 12 - 3.1 lb. |
| 266 | Smothered Corn Sauce | 10 - 2 lb. |
| 201 | Red Bean Soup | 9 - 4.5 lb. |
| 267 | Green Bean Sauce | 10 - 2 lb. |
| 8095 | Honnee Hot Sauce | 9 - 4.5 lb. |
| 268 | Carrot Sauce | 10 - 2 lb. |
| 261 | Butter Sauce | 4 - 4 lb. |
| 273 | Potato Salad | 6 - 5 lb. |

## EXHIBIT B TO SUPPLEMENTAL DISCLOSURE

### I.   Depersonalization of Franchisor-Franchisee Relationships

While the New Company will install senior management personnel, and resulting changes in corporate policy, that are designed to produce immediate and wholesale improvements in the relationship between franchisor and franchisee, and while the New Company would not expect these improvements to be so fragile as to succomb to any future (and unanticipated) changes in its ownership or management, the New Company appreciates the sensitivity of the franchisees to that risk in light of their historical experience. Accordingly, the New Company will attempt to institutionalize, and thus depersonalize, these improvements by embodying them, where necessary, in written agreements and statements of policy that protect the franchisees while preserving the franchisor's irreplaceable role as guardian of the system, of the long view, and of the broad perspective.

The following areas are but particular aspects of this overall commitment.  Taken as a whole, these specific reforms should provide for such a degree and depth of franchisee involvement in the business of the New Company that future changes in ownership or management should have a limited impact on the quality of the franchisor-franchisee relationship.

### II.   Brand Integrity and Growth

The New Company will be committed to maintaining and enhancing the brand integrity of each chain, maximizing sales and profitability of franchisees, with a view toward making each brand individually competitive in the marketplace.  This commitment will be fulfilled by assigning separate personnel to areas such as marketing, operations, purchasing, training, and R&D/menu development.  The efficiencies resulting from combined operations will be limited to areas that will not compromise brand integrity.

Beginning immediately upon the Effective Date of the CIBC Plan, the New Company intends to initiate efforts to expand both chains based upon market development models and plans presently under consideration.

Central to this effort will be the adoption of franchising and development guidelines containing the criteria for expansion and for amendments to development rights, site and project acceptance procedures, transfer information, and a copy of the development and franchise agreements.  The purpose of these guidelines is to assist franchisees in their planning efforts by providing each with equal access to information, and to promote fairness and

consistency in dealing with franchisees and with those issues encountered most commonly.  The franchise and development agreements are the vehicles for insuring that the guidelines are enacted and followed.

Unless the New Company concludes that the continued operation of the store is financially unwise even if sold to a franchisee, the New Company will not close a company-owned store without first offering it to a franchisee in the same chain.

Consistent with the New Company's intention to expand both chains and to maintain brand integrity, the New Company does not have a specific plan to expand one chain at the expense of the other by converting company-owned stores in one chain to stores in the other chain.  However, such conversions in either direction may occur from time to time if financially justified on a case-by-case basis.

The New Company agrees to share with the board of the franchisee association all plans to close, sell, or convert existing restaurants in the chain, and expansion plans for future growth in the chain.

In the event that the New Company offers incentive programs for establishing new units or remodeling existing units, those programs will be made available to all franchisees in the chain who meet the programs' criteria for participation.  Those criteria will be based solely on objective factors such as financial strength and management capability.

## III.  Purchasing and Spices

The New Company will establish a separate, non-profit product purchasing cooperative for each chain, which would include foodstuffs, paper goods, and supplies, which all franchisees will have the opportunity to join.  The objective of each coop will be to insure continuity of supply and to reduce costs by volume purchasing.  Administrative costs of each coop (salaries, fringes, travel, office expenses, etc.) and any unrecoverable costs associated with obsolete inventories would be funded by membership dues and/or commissions on purchases.  Any excess income for a given year will be distributed back to the membership or carried forward to the following year.

After a suitable start-up period, the purchasing coop will seek to broaden its reach to include other products and services as long as specific items can be identified and made available economically through the coop.

The design and operation of each coop would be governed by a coop agreement and by-laws.  Each coop would be

-2-

governed by a five-member board of directors.  Three directors will be the New Company's senior financial, operations, and purchasing officers.  The two franchisee directors will be elected to serve for a period of two years.  The board will meet quarterly and will invite one or two franchisees to attend each meeting.  Franchisee directors will receive $250 for each day of meetings attended, plus customary and reasonable travel expenses. The franchisee association shall have the right to audit each purchasing cooperative and its expenses.

Each coop will have three permanent officers:  Chairman of the Board (one of the elected franchisees), President and CEO (the New Company's CFO), and a Senior Vice President (the New Company's senior purchasing officer).

The creation and range of operation of each cooperative must be consistent with any obligations incurred or undertakings made by the New Company incident to the confirmation of the CIBC Plan, including any contracts with Diversified Foods & Seasonings, Inc.

Spice supply is addressed in the CIBC Plan and its exhibits.

IV.  **Franchisee Participation**

The New Company will encourage a high level of franchisee participation in its business in the areas of marketing, purchasing, operations/training, and menu development, primarily through membership on or other involvement in advisory committees or boards.

Central to this goal is the formalization of a franchisee association for each chain (e.g., CIFA) the purpose of which would be to consider, discuss, and act upon common problems relating to the management and operation of restaurants in that chain, and to foster a better understanding of these problems and their solutions based upon the experience and knowledge of the New Company and the membership.

Each association would be governed by by-laws that will cover, among other things, membership eligibility, representation, voting (one vote per restaurant), and meetings.  The New Company will assist in mailing ballots and biographies for board nominees, and in conducting association meetings at the annual franchisee meeting.  The New Company will also underwrite up to three meetings per year at which the board and the chairs of subcommittees will discuss areas of concern, prepare reports, or recommend changes or improvements in operations.

-3-

Each association would have a board of directors elected by the membership and representative of its component parts. The board would recommend changes or improvements regarding operations, training, menu and product development, advertising and promotions, and other appropriate matters relevant to the chain.

## V. Service/Support Systems

The New Company is committed to review and improve existing service and support systems to franchisees, and to extend new services in areas that the New Company believes will be beneficial to the system. In particular, the New Company or its designees (1) will coordinate with third parties to obtain, if available, group, property, and casualty insurance to franchisees at competitive rates, and (2) will offer advice and assistance in matching franchisees with third-party lenders for capital projects.

## VI. Marketing Funds

For the balance of 1992, the marketing fund for each chain will be used to support remaining programs (including P.O.P. kits) as well as possible given the fund balance and scheduled promotions.

Subject to any constraints imposed by existing franchise agreements, the New Company will redesign the budgeting and use of marketing fund contributions as follows:

The goal of the program will be to maximize the funds available for local media expenditures. Funds will be made available for local coop expenditures in direct proportion to their contribution level.

Company charges to the marketing fund will not exceed 0.75% of total sales, subject to increase if the New Company decides to provide national advertising, sponsorships, or promotions for the chain at a future date out of the marketing fund. Every effort will be made to reduce the foregoing percentage. Company and franchisee stores will pay into this fund at exactly the same rate and receive the same benefits.

National programs of any type (advertising, sponsorships, or promotions) will only be established if a majority of the units in the chain support such programs. All such programs will first be reviewed by the board of the franchisee association. Other than charges for such national programs, if approved, company charges will cover (1) agency fees and production and distribution of materials and programs that support local advertising and promotion

-4-



FILED
OCT 22 1992
CHARLES W. VAGHER, C
By _____ De;

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

- - - - - - - - - - - - - - - -X
                    :

In re:                  :    Chapter 11
                    :

AL COPELAND ENTERPRISES, INC.,  :    Case No. 91-12575-FM-11
                    :

        Debtor.        :
                    :

- - - - - - - - - - - - - - - -X

ORDER CONFIRMING FOURTH AMENDED PLAN
OF REORGANIZATION, AS MODIFIED, PROPOSED BY
CANADIAN IMPERIAL BANK OF COMMERCE, AS AGENT, AND
FIXING BAR DATES FOR FILING ADMINISTRATIVE EXPENSE CLAIMS
AND CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS

This matter came before the Court for hearing (the
"Confirmation Hearing") on July 27, 1992, on the Fourth Amended
Plan of Reorganization proposed by Canadian Imperial Bank of
Commerce, as Agent ("CIBC"), with respect to Al Copeland
Enterprises, Inc. (the "Debtor") dated July 27, 1992 (the "Fourth
Amended Plan"), as modified with respect to Sections 5.05,
6.07(a), 7.01, and 7.02 thereof (the "Modifications", and the
Fourth Amended Plan as modified by the Modifications being
hereinafter referred to as the "Plan").[1]  The Joint Disclosure
Statement, approved by the Court on May 5, 1992, and the Third
Amended Plan of Reorganization proposed by CIBC with respect to
the Debtor dated May 1, 1992 (the "Third Amended Plan"), along
with other materials directed by the Court, having been

-------------------------

[1]  Capitalized terms used but not defined in this Order shall
have the meanings ascribed to such terms in the Plan.

transmitted to the Debtors' creditors and equity security
holders, the Office of the United States Trustee, the Securities
and Exchange Commission, the Internal Revenue Service and all
other parties-in-interest who have requested notice; and the
Court having considered the evidence and testimony presented at
the Confirmation Hearing, the arguments of counsel, the Joint
Disclosure Statement and the Exhibits thereto, the Plan, and the
objections filed with respect to the Plan; and the Court having
entered findings of fact, conclusions of law, and rulings on the
record on October 20, 1992; and good and sufficient cause
appearing therefor; it is hereby

        ORDERED, DECREED, AND ADJUDGED THAT:

        1.    Any and all objections to confirmation of the Plan not
previously withdrawn be, and the same hereby are, overruled, and
all findings of fact, conclusions of law, and rulings entered on
the record on October 20, 1992 be, and the same hereby are,
incorporated in this Order by reference and made a part hereof.

        2.    The Plan, in the form of the Restated Fourth Amended
Plan incorporating the Modifications and annexed hereto as
Attachment I, be, and the same hereby is, approved and confirmed.

        3.    The provisions of the Plan shall bind the Debtor, the
New Company, and all creditors and equity security holders of the
Debtor, whether or not the respective Claims or Interests of such
creditors or equity security holders are impaired under the Plan,
whether or not such creditors and equity security holders have
accepted the Plan, and whether or not such creditors and equity

-2-

security holders have filed proofs of claim or interest or are deemed to have filed proofs of claim of interest.

4.    Except as otherwise provided in the Plan or this Order, on and after the Effective Date:

(a)    The Debtor is hereby discharged from all debts that arose against it before the date of entry of this Order to the extent provided by 11 U.S.C. § 1141(d).  Any judgment at any time obtained, to the extent that such judgment is a determination of liability of the Debtor or the New Company with respect to any discharged debt or claim, whether or not such discharge is waived, is void.

(b)    All individuals and entities which have held, currently hold or may hold a debt, Claim, other liability or interest against the Debtor that is discharged upon Confirmation of the Plan and the Effective Date are permanently enjoined from taking any of the following actions on account of such debt, Claim, liability, interest or right:  (i) commencing or continuing in any manner any action or other proceeding on account of such debt, Claim, other liability or interest against the Debtor, the New Company, or property which is to be distributed under the Plan, other than to enforce any right to distribution under the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any property to be distributed to creditors of the Plan, other than as permitted under subparagraph (i)

-3-

above; and (iii) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under the Plan, other than as permitted by the Plan.

(c) The Debtor, and all entities acting by or through the Debtor, in whole or in part, are permanently enjoined from commencing or continuing in any manner, or otherwise prosecuting, any action or proceeding, whether directly, derivatively or otherwise, on account of or respecting any claim, debt, right, cause of action, or liability that is released or to be released pursuant to the Plan. The foregoing injunction shall apply to the holder of a debt, Claim or Interest, whether or not a proof of claim was filed or deemed filed, whether such Claim was allowed, whether or not the holder of such Claim accepted the Plan, and whether or not the right to payment was reduced to judgment, liquidated, unliqui- dated, fixed, contingent, matured, unmatured, disputed, undis- puted, legal, equitable, secured, or unsecured. Any entity injured by any willful violation of this injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

5.    The Superpriority Claims, the Acquisition Bank Claims, and the Merrill Lynch Claims are hereby allowed in accordance with, and in the amounts set forth in, the Plan.

6.    The Articles of Incorporation, and the terms of the New Common Stock and of the New Preferred Stock, comply in all

-4-

respects with Section 1123(a)(6) of the Bankruptcy Code and are hereby approved.

7.    (a)    The adoption and filing by the New Company of its Articles of Incorporation are hereby ratified and approved.

(b)    The Debtor is hereby authorized to merge with and into the New Company pursuant to Tex. Bus. Corp. Act arts. 4.14 & 5.01 et seq. and Minn. Stat. §§ 302A.601 et seq.

(c)    In furtherance of the foregoing, and as authorized by Tex. Bus. Corp. Act art. 4.14(B)(2), R. Bruce Layman and Heinz H. Noeding, acting singly or jointly, are hereby designated by this Court as the individuals authorized to sign the plan of merger or exchange and the articles of merger or exchange on behalf of the Debtor.

(d)    Except as specifically set forth in the Plan or this Order, the effectiveness of the merger of the Debtor into the New Company shall be determined exclusively in accordance with the above-cited provisions of Texas and Minnesota law.

8.    (a)    The Debtor, the New Company, and their respective officers, directors, agents, employees, and professionals be, and hereby are, authorized to take all actions necessary for the Debtor to merge with and into the New Company, and to enter into, implement and consummate the contracts, instruments, releases and other agreements or documents created in connection with the Plan or to be executed and delivered pursuant to the Plan, including, but not limited to, the Articles of Incorporation, the New Credit Agreement, and the New Credit Documents.

-5-

(b)    In furtherance of the foregoing, R. Bruce Layman and Heinz H. Noeding, acting singly or jointly, are hereby designated by this Court as the individuals authorized to act, and to execute all such contracts, instruments, releases and other agreements or documents, on behalf of the Debtor, without further act of the board of directors or shareholders of the Debtor.

(c)    All actions required of, and all contracts, instruments, releases and other agreements or documents necessary to be executed by, the New Company in order to consummate the Plan shall be authorized, effected, and executed exclusively in accordance with the requirements of Minnesota law, the Articles of Incorporation, and the resolutions of the shareholders or board of directors of the New Company.

(d)    Without limiting the generality of the foregoing provisions of this paragraph 8, all depositary institutions holding funds or other property of the Debtor, including, without limitation, the First National Bank of Commerce, are hereby authorized and directed (i) to assist and cooperate with CIBC and the New Company in preparing for and effecting the transactions to occur on the Effective Date, and (ii) to honor all instructions of the Debtor (acting by R. Bruce Layman and/or Heinz H. Noeding), CIBC, or the New Company with respect to the disposition of any funds or other property of the Debtor on deposit with them or in their possession.

-6-

9.   Pursuant to Section 5.03 of the Plan, not later than ten (10) days after the Effective Date, the Debtor shall execute and deliver to Merrill Lynch stipulations of dismissal with prejudice of the Merrill Lynch Litigation.

10.   Not later than ten (10) days after the Effective Date, the Debtor shall execute and deliver to CIBC a stipulation of dismissal with prejudice of the adversary proceeding pending in this Court and encaptioned <u>Al Copeland Enterprises, Inc. v. Canadian Imperial Bank of Commerce, et al.</u>, Adversary Proceeding No. 92-1096-FM.

11.   The Debtor and the holders of all Claims that have accepted the Plan hereby irrevocably release CIBC, the Acquisition Banks, the DiP Banks, and the New Company and each of their respective shareholders, officers, directors, employees, agents and affiliates, in each case from any and all liabilities, claims, suits, actions and demands which may have arisen out of (A) the Acquisition Credit Agreement and all transactions, relationships and dealings relating thereto or contemplated thereunder, (B) the acquisition of Church's Fried Chicken, Inc. by Biscuit Investments, Inc. in 1989, and all related transactions, relationships, and dealings, and (C) any action by any party in connection with the commencement of, or conduct during, the Reorganization Case, whether accrued, absolute, contingent, unliquidated or otherwise, and whether known or unknown which have or may have arisen out of any transaction or any state of facts existing on or prior to the Effective Date;

-7-

provided, however, that for the purposes of the foregoing
release, a holder of a Claim shall not be deemed to have accepted
the Plan if (Y) such Claim is a Superpriority Claim, an
Administrative Claim, or a Tax Claim, or (Z) said acceptance
occurs solely by virtue of Section 1126(f) of the Bankruptcy
Code.

12.    The Debtor and the holders of all Claims that have
accepted the Plan hereby irrevocably release Merrill Lynch and
its shareholders, officers, directors, employees, agents and
affiliates, from any and all liabilities, claims, suits, actions
and demands which may have arisen out of (A) the Bridge Loan
Agreement and all transactions, relationships and dealings
relating thereto or contemplated thereunder, (B) the acquisition
of Church's Fried Chicken, Inc. by Biscuit Investments, Inc. in
1989, and all related transactions, relationships, and dealings,
and (C) any action by any party in connection with the
commencement of, or conduct during, the Reorganization Case,
whether accrued, absolute, contingent, unliquidated or otherwise,
and whether known or unknown which have or may have arisen out of
any transaction or any state of facts existing on or prior to the
Effective Date; provided, however, that for the purposes of the
foregoing release, a holder of a Claim shall not be deemed to
have accepted the Plan if (Y) such Claim is a Superpriority
Claim, an Administrative Claim, or a Tax Claim, or (Z) said
acceptance occurs solely by virtue of Section 1126(f) of the
Bankruptcy Code.

-8-

13.  All holders of Claims with respect to whom the releases set forth in paragraphs 11 and 12 of this Order are effective are hereby permanently enjoined from taking any action in violation of the terms of such releases.

14.  Pursuant to Section 7.01 of the Plan, the Supply Contract shall be assumed, and assigned by the Debtor to the New Company incident to the merger, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code on, and by virtue of the occurrence of, the Effective Date and the merger.

15.  Pursuant to Section 7.02 of the Plan, the Formula Agreement and the Recipe Royalty Agreement shall be assumed, and assigned by the Debtor to the New Company incident to the merger, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code on, and by virtue of the occurrence of, the Effective Date and the merger.  This Court specifically declines to rule or determine whether the "Termination Date" (as defined in the Recipe Royalty Agreement) has occurred, or will occur ever or at any particular time in the future, and makes no findings of fact or conclusions of law with respect to that issue, which is expressly reserved for decision after the Effective Date in a forum of appropriate jurisdiction.

16.  (a)  Pursuant to Section 7.03(a) of the Plan, the Assumed Insider Contracts shall be assumed, and assigned by the Debtor to the New Company incident to the merger, in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy Code on, and by virtue of the occurrence of, the Effective Date and the

-9-

merger; provided, however, that such assumption and assignment
shall be without prejudice to any right of the Debtor, or of the
New Company as successor to the Debtor, to reform any Assumed
Insider Contract under applicable nonbankruptcy law.

(b)  Pursuant to Section 7.03(b) of the Plan, the
Rejected Insider Contracts shall be rejected in accordance with
Sections 365 and 1123(b)(2) of the Bankruptcy Code on, and by
virtue of the occurrence of, the Effective Date.  Any Claim under
Sections 365(g)(1) and 502(g) of the Bankruptcy Code on account
of such rejection shall be filed not later than thirty (30) days
after the Effective Date.

17.  (a)  Pursuant to Section 7.04 of the Plan, all Non-
Insider Contracts to be assumed thereunder shall be assumed, and
assigned by the Debtor to the New Company incident to the merger,
in accordance with Sections 365 and 1123(b)(2) of the Bankruptcy
Code on, and by virtue of the occurrence of, the Effective Date
and the merger.

(b)  Pursuant to Section 7.04(b) of the Plan, all Non-
Insider Contracts to be rejected thereunder shall be rejected in
accordance with Sections 365 and 1123(b)(2) of the Bankruptcy
Code on, and by virtue of the occurrence of, the Effective Date;
provided, however, that the Proponents' Schedule of Rejected
Executory Contracts and Unexpired Leases filed on July 27, 1992
as contemplated in Section 7.04(b) of the Plan (the "Rejection
Schedule") is hereby amended to delete therefrom item U (Lease
for Store No. 248 - 1442 Hampton Ave., St. Louis, MO) and item RR

-10-

(Lease for Store No. GW 11 – 8402 Broadway, San Antonio, TX); and provided further, that the Rejection Schedule is hereby further amended to add thereto the following leases, of which rejections the Proponents shall send written notice to the landlords not later than the Effective Date:  (x) Store No. 110 – 1585 Magazine St., New Orleans, LA (Landlord, Norman George Nastif); (y) Store No. 676 – 8930 North Seventh St., Phoenix, AZ (Landlord, First Interstate Bank of Arizona); and (z) Regional Office #2008, 10415 Landsbury #200, Houston, TX (Landlord, Teachers Retirement System of Texas).  Any Claim under Sections 365(g)(1) and 502(g) of the Bankruptcy Code on account of the rejection of any executory contract or unexpired lease shall be filed not later than (i) thirty (30) days after the Effective Date, or (ii) if such rejection is authorized in a separate order of this Court, such other date as may be set forth in such order.

18.  Pursuant to Section 7.05 of the Plan, all contracts entered into or assumed after the Petition Date shall be assigned by the Debtor to the New Company incident to the merger on, and by virtue of the occurrence of, the Effective Date and the merger.  The New Company shall commence any proceeding to reform or rescind a contract pursuant to Section 7.05 of the Plan not later than one hundred eighty (180) days after the Effective Date.

19.  (a)  The procedures set forth in Sections 6.07 and 7.06 of the Plan for the resolution of Disputed Claims (including Cure Claims and Compensatory Cure Claims) are hereby approved, and the

-11-

jurisdiction of this Court is hereby specifically retained for that purpose, subject to the terms of the Plan with respect to the liquidation of Disputed Claims in another forum. Not later than sixty (60) days after the Effective Date, the Debtor and the New Company shall file objections to proofs of claim filed during the period subsequent to the bar date set by the Court and through the Effective Date, and the jurisdiction of the Court is retained for the purpose of the resolution of such claims; provided, however, that the foregoing time limitation shall not apply to proofs of claim filed pursuant to paragraph 16(b), 17(b), or 26 hereof. Except as provided in paragraph 16(b), 17(b), or 26 hereof, any proof of claim filed subsequent to the Effective Date shall be disallowed, null, and void.

(b) Treatment of the Subordinated Insider Claims in accordance with Section 5.05(a) of the Plan solely by virtue of the identity of the holders thereof and their status as Insiders of the Debtor under the control of Copeland, as provided in Section 5.05(a)(i) of the Plan, is impermissible. CIBC is hereby authorized to commence one or more adversary proceedings against the holders of Subordinated Insider Claims to seek subordination thereof under Section 510(c) of the Bankruptcy Code and in accordance with Section 5.05(a)(ii) of the Plan.

20. In accordance with Section 9.03 of the Plan, the New Company is authorized to prosecute any claims, rights or causes of action that constitute property of the Estate or of the Debtor, and any such prosecution, including the prosecution of

-12-

claims in the Copeland Proceedings, is hereby determined to be undertaken for the benefit of the Estate notwithstanding that any recovery may remain with the New Company or be used to repay indebtedness restated or incurred under the New Credit Agreement.

21.   (a)   Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of any security, or the making, delivery, filing, or recording of any instrument of transfer, under the Plan shall not be taxed under any law imposing a recording tax, stamp tax, transfer tax, or similar tax.

(b)   Without limiting the generality of subparagraph (a) of this paragraph 21, the making, delivery, filing, or recording at any time of any deed, bill of sale, mortgage, deed of trust, assignment, security agreement, financing statement, or other instrument of absolute or collateral transfer required by, or deemed necessary or desirable by the parties to, the merger or the New Credit Documents shall not be so taxed.

(c)   All filing or recording officers, wherever located and by whomever appointed, are hereby directed to accept for filing or recording, and to file or record immediately upon presentation thereof, all such deeds, bills of sale, mortgages, deeds of trust, assignments, security agreements, financing statements, and other instruments of absolute or collateral transfer without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by federal, state, or local

-13-

law.    Notice in the form annexed hereto as Attachment II
(i) shall have the effect of an order of the Court, (ii) shall
constitute sufficient notice of the entry of this Order to such
filing and recording officers, and (iii) shall be a recordable
instrument notwithstanding any contrary provision of
nonbankruptcy law.    This Court specifically retains jurisdiction
to enforce the foregoing direction, by contempt or otherwise.

22.    In each case where the schedules of assets and
liabilities of the Debtor filed in the Reorganization Case
reflect a Tax Claim that differs in amount from the Tax Claim
reflected in a return subsequently filed by the Debtor, the
amount so scheduled shall be deemed to be the amount reflected in
such return.

23.    (a)    All security and other deposits held by, or
reflected as liabilities on the books of, the Debtor with respect
to Assumed Contracts shall continue to be so held or reflected by
the New Company, subject to the New Company's rights and
obligations with respect thereto under the Assumed Contracts.

(b)    Except as provided in any order heretofore entered
by this Court, any security or other deposit made by the Debtor
before the Petition Date and held by, or reflected as a liability
on the books of, any entity shall be returned, or the amount
thereof remitted, to the New Company upon demand; provided,
however, that such entity may retain and apply such deposit in
accordance with Section 4.02 of the Plan to the extent that it
secures a Miscellaneous Secured Claim.

-14-

24.  Notwithstanding the terms of the Plan, no holder of a Claim shall be paid on account thereof to the extent that payment thereof has already been made by the Debtor.

25.  Notwithstanding the terms of the Plan:

(a)  Each employee of the Debtor who has been or will be terminated by the Debtor or the New Company after the Petition Date and before May 1, 1993 shall be entitled to vacation pay in lieu of vacation taken in accordance with the policy of the Debtor, and shall be paid such vacation pay after the Effective Date, to the extent not theretofore paid, in accordance with such policy.

(b)  Each employee of the Debtor (i) who has been terminated by the Debtor after the Petition Date and before the Effective Date, (ii) who was eligible for severance pay in accordance with the policy of the Debtor set forth on pages 111 and 112 of the Debtor's Human Resources Practices Manual (the "Basic Severance Policy"), and (iii) who has not been paid in full for such severance pay, shall be paid such severance pay after the Effective Date, to the extent not theretofore paid, in accordance with the Basic Severance Policy.

(c)  Each so-called "corporate" employee of the Debtor of whatever seniority, title or position (other than employees covered by the policy of the Debtor set forth on pages 112.1 and 112.2 of the Debtor's Human Resources Practices Manual (the "Senior Severance Policy")) who is terminated involuntarily by the New Company on or after the Effective Date and before May 1,

-15-

1993 for any reason other than dishonesty, insubordination, or
conflict of interest, shall be entitled to severance pay in
accordance with the following schedule:

| Length of Service | Severance Pay |
|---|---|
| Up to 1 year | 1 week's base pay |
| Over 1 year to 2 years | 2 weeks' base pay |
| Over 2 years to 4 years | 3 weeks' base pay |
| Over 4 years | 4 weeks' base pay |

(d)  Each employee of the Debtor who is covered by the
Senior Severance Policy (other than Copeland and William A.
Copeland) and who is terminated involuntarily by the New Company
on or after the Effective Date and before May 1, 1993 for any
reason other than dishonesty, insubordination, or conflict of
interest, shall be entitled to severance pay in accordance with
the Senior Severance Policy.  Copeland is acknowledged to be
covered by the Senior Severance Policy, but his entitlement to
payment thereunder shall be determined by the treatment of his
Subordinated Insider Claim therefor in accordance with
Section 5.05 of the Plan and the existence of any offsetting
claims of the Debtor against him, subject to Copeland's position
that he is entitled to payment in full for such severance rather
than payment of only eighty-five percent (85%) thereof.  By
virtue of the terms of the Senior Severance Policy and
Section 6.05(b) of the Plan, William A. Copeland is not entitled
to payment under the Senior Severance Policy.

(e)  For the purposes of subparagraphs (c) and (d) of
this paragraph 25, length of service shall include eligible
periods of service with either the Debtor or the New Company,

-16-

whether occurring before or after the Petition Date, the
Confirmation Date, or the Effective Date.

(f) Notwithstanding the foregoing provisions of this
paragraph 25, the New Company shall have the right, but not the
obligation, (i) to install new policies with respect to severance
pay, or vacation pay in lieu of vacation taken, for employees
terminated after April 30, 1993; (ii) to extend such new policies
to any employee terminated before May 1, 1993 to the extent that
such new policies are more favorable to such employee than the
policies in effect on the Petition Date; and (iii) with the
consent of any terminated employee, to vary the terms of any such
policy or this paragraph 25 with respect to such employee in
exchange for undertakings made by such employee to the New
Company.

26.   (a)  Except as provided in subparagraph (b) of this
paragraph 26, all requests for the payment of Administrative
Claims incurred prior to the Effective Date, and all final
applications for compensation and reimbursement by professional
persons for services rendered or expenses incurred prior to the
Effective Date, shall be filed with this Court not later than
sixty (60) days after the Effective Date; provided, however, that
no such request is required for Administrative Claims incurred in
the ordinary course of business of the Debtor and arising in
favor of entities other than such professional persons or taxing
authorities whose Claims are covered by subparagraph (b) of this
paragraph 26.  No applications will be filed for compensation and

-17-

reimbursement by professional persons for services rendered or expenses incurred on or after the Effective Date, and such compensation and reimbursement may be paid by the New Company directly in accordance with ordinary business practices and without further authorization by this Court.

(b) All requests for payment of Administrative Claims and other Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which ends within the period from and including the Petition Date through and including the Confirmation Date, and for which no bar date has otherwise been previously established, must be filed on or before the later of (i) sixty (60) days following the Effective Date, or (ii) one hundred eighty (180) days following the filing with the applicable governmental unit of the tax return for such taxes for such tax year or period.

27. Any claims, requests for payment, or applications of a kind specified in paragraphs 16(b), 17(b), or 26 hereof which are not filed on or before the respective deadlines set forth therein shall not participate in any distribution under the Plan and shall be forever barred; neither the Debtor, nor the Estate, nor the New Company, nor any disbursing agent, nor any officer, director, employee or professional person employed by any of the foregoing shall have any liability therefor or with respect thereto; and any holder of any such claim shall be forever barred from asserting any such claim against the Debtor, the Estate, the

-18-

New Company, any disbursing agent, any officer, director,
employee or professional person employed by any of the foregoing,
or their respective property, whether any such claim is deemed to
arise prior to, on or subsequent to the Effective Date.

28.  On the Effective Date, the Old Common Stock and the Old
Preferred Stock shall be deemed to be cancelled.

29.  (a)  Except as provided in the Plan and in
subparagraph (b) of this paragraph 29, in accordance with
Sections 1141(b) and 1141(c) of the Bankruptcy Code, on the
Effective Date the Debtor and, by virtue of the merger, the New
Company shall be vested with all of the property of the Estate,
free and clear of all claims, liens, charges, and other interests
of creditors and equity security holders of the Debtor.  From and
after the Effective Date, the Debtor and, by virtue of the
merger, the New Company may operate each of their businesses free
of any restrictions imposed by the Bankruptcy Code, the
Bankruptcy Court, or the United States Trustee.

(b)  Subject to the terms of the New Credit Documents
and solely by virtue of the occurrence of the Effective Date and
the merger, (i) all "Obligations" of the New Company (as defined
in the New Credit Agreement) shall be secured by all liens,
mortgages, security interests, and assignments that secured the
Acquisition Debt and the DiP Debt, and (ii) such liens,
mortgages, security interests, and assignments shall be perfected
against the New Company and its property to the same extent as
the same were perfected against the Debtor and its property.

-19-

30.  The New Common Stock and New Preferred Stock that is to be issued to creditors under the Plan is subject to the exemption from Section 5 of the Securities Act of 1933 (15 U.S.C. § 77a) and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security as provided in 11 U.S.C. § 1145, except with respect to any recipient that is an underwriter as defined in 11 U.S.C. § 1145(b) or an affiliate as defined in Securities Act Rule 144(a)(1).  Recipients of New Common Stock and New Preferred Stock under the Plan that are neither affiliates nor underwriters (as so defined) will not be subject to further registration requirements under the Securities Act or restrictions on resale under Securities Act Rule 144. From and after the time that CIBC, the Acquisition Banks or Merrill Lynch receives New Common Stock or New Preferred Stock under the Plan, none of them shall be an "underwriter" or an "affiliate" (as so defined) with respect to such stock.

31.  The Proponents have exercised their option to have the Allowed Tax Claims of the United States Internal Revenue Service paid pursuant to the proviso to Section 2.03 of the Plan, and such treatment complies with Section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that the rate of interest to accrue on such Allowed Tax Claims under such treatment shall be (a) seven percent (7%) per annum on the first $100,000 of such Allowed Tax Claims, plus (b) nine percent (9%) per annum on the amount of such Allowed Tax Claims (if any) in excess of $100,000.

-20-

32.  The Proponents have exercised their option to have certain Allowed Miscellaneous Secured Claims paid pursuant to the proviso to Section 4.02 of the Plan, and such Allowed Miscellaneous Secured Claims are not impaired by such treatment within the meaning of Section 1124(2) of the Bankruptcy Code.

33.  During the period from the Confirmation Date to the Effective Date, (a) CIBC is authorized to conduct, and the Debtor is instructed to cooperate fully in, the transition procedures described in Attachment III annexed hereto, and all costs associated with such transition procedures shall constitute costs of administration of the Reorganization Case payable out of the Estate without further order of this Court; and (b) CIBC is authorized to transmit communications to the employees and franchisees of the Debtor in the forms set forth in Attachment IV annexed hereto.

34.  CIBC and the New Company shall have the right, to the full extent permitted by Section 1142 of the Bankruptcy Code, to apply to this Court for an order, notwithstanding any otherwise applicable nonbankruptcy law, directing any entity to execute and deliver any instrument or to perform any other act; provided, however, that without the consent of the affected party, or a determination by this Court that such relief is necessary to ensure the cooperation or compliance of any party or to compensate CIBC or the New Company for damages associated with a lack of such cooperation or compliance, no such order shall modify or impair any right, title, interest, privilege, or remedy

-21-

expressly provided or reserved to such party under the Plan or this Order.

35. The New Company is hereby directed to file, not later than ninety (90) days after the Effective Date, a report containing information regarding the actions taken and the progress made by the New Company in consummating the Plan.

36. Not later than five (5) Business Days after the Effective Date, (a) the New Company shall notify this Court of the occurrence of the Effective Date, and (b) notice of the entry of this Order in the form annexed hereto as Attachment V, which form is hereby approved, shall be mailed by the New Company to all creditors, equity security holders, and other parties that received written notice of the Confirmation Hearing, and shall be published once in each publication in which the notice of the Confirmation Hearing was published.

37. The provisions of this Order are non-severable and mutually dependent.

38. Each of the conditions to confirmation of the Plan, as set forth in Section 8.01 of the Plan, has been satisfied or waived.

39. "Substantial consummation" of the Plan shall be deemed to occur upon completion of all transactions required by the Plan to be effected on the Effective Date, including the mailing or other delivery of distributions to holders of Claims that are Allowed Claims on the Effective Date to the extent so required, but excluding the making of distributions to holders of Claims

-22-

that become Allowed Claims after the Effective Date.

40.    The Proponents shall have the right to modify or amend the Plan after Confirmation to the full extent permitted by law.

41.    The Official Committee of Unsecured Creditors and the professionals hired by or on its behalf shall be continued for the limited purposes of (a) participating in any appeal of this Order, and (b) participating in any hearing on fees and expenses for such Committee or professionals.

[This space intentionally left blank.]

-23-

42.   The Court shall retain jurisdiction over the Reorganization Case to the extent provided in Section 9.04 of the Plan (including, without limitation, jurisdiction over that certain adversary proceeding entitled <u>Alvin C. Copeland</u> v. <u>Merrill Lynch & Co., Inc., et al.</u>, Adversary Proceeding No. 92-1186-FM).

Signed this $\underline{22}$ day of October, 1992.

_____
UNITED STATES BANKRUPTCY JUDGE

AGREED TO AND ENTRY REQUESTED:

OPPENHEIMER, ROSENBERG &
  KELLEHER, INC.
711 Navarro, Sixth Floor
San Antonio, Texas  78205
(512) 224-2000

By: _____
     JOHN H. TATE, II
     State Bar No. 19666500
     RAYMOND W. BATTAGLIA
     State Bar No. 01918055
     TIMOTHY N. TUGGEY
     State Bar No. 29282900

     ATTORNEYS FOR CANADIAN
     IMPERIAL BANK OF COMMERCE,
     as AGENT

Of Counsel:

J. Ronald Trost, P.C.
State Bar No. 20238200
SIDLEY & AUSTIN
2049 Century Park East
Los Angeles, California  90067
(310) 553-8100

Thomas E. Pitts, Jr.
SIDLEY & AUSTIN
875 Third Avenue
New York, New York  10022
(212) 906-2000

-24-

AGREED AS TO FORM ONLY:

MONROE & LEMANN
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana  70170-3300
(504) 586-1900


By: _____
        Richard P. Wolfe #13634
        Richard W. Bussoff #3719
        Benjamin R. Slater, III #12127
        Mark E. Van Horn #14476
        Donald J. Miester, Jr. #20294

        ATTORNEYS FOR ALVIN C. COPELAND,
        DIVERSIFIED FOODS AND SEASONINGS,
        INC., and NATIONAL DEVELOPMENT CORP.


COX & SMITH INCORPORATED
2000 NBC Bank Plaza
112 East Pecan Street
San Antonio, Texas  78205
(512) 554-5500


By: _10.bxr/DD.C_____
        Deborah D. Williamson
        State Bar No. 21617500

        ATTORNEYS FOR THE OFFICIAL
        COMMITTEE OF UNSECURED CREDITORS


RONALD G. WOODS
United States Attorney
Maxus Energy Tower
717 N. Harwood, Suite 400
Dallas, Texas  75201
(214) 655-3115


By: _____
        Andrew L. Sobotka
        Attorney, Tax Division
        State Bar No. 18819900

        ATTORNEYS FOR THE UNITED STATES OF AMERICA

-25-

AGREED AS TO FORM ONLY:

MONROE & LEMANN
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana  70170-3300
(504) 586-1900

By: _____
    Richard P. Wolfe #13634
    Richard W. Bussoff #3719
    Benjamin R. Slater, III #12127
    Mark I. Van Horn #14476
    Donald J. Miester, Jr. #20294

    ATTORNEYS FOR ALVIN C. COPELAND,
    DIVERSIFIED FOODS AND SEASONINGS,
    INC., and NATIONAL DEVELOPMENT CORP.

COX & SMITH INCORPORATED
2000 NBC Bank Plaza
112 East Pecan Street
San Antonio, Texas  78205
(512) 554-5500

By: _____
    Deborah D. Williamson
    State Bar No. 21617500

    ATTORNEYS FOR THE OFFICIAL
    COMMITTEE OF UNSECURED CREDITORS

RONALD G. WOODS
United States Attorney
Maxus Energy Tower
717 N. Harwood, Suite 400
Dallas, Texas  75201
(214) 655-3115

By: _____
    Andrew L. Sobotka
    Attorney, Tax Division
    State Bar No. 18819900

    ATTORNEYS FOR THE UNITED STATES OF AMERICA

-25-

## ATTACHMENTS TO CONFIRMATION ORDER

Attachment I          Restated Fourth Amended Plan

Attachment II         Notice of Order to Filing and Recording
                      Officers

Attachment III        Transition Procedures

Attachment IV         Letters to Employees and Franchisees

Attachment V          Notice of Confirmation

7



June 13, 1994

Kam M. Nassar
Executive Vice President
Chief Financial Officer

<u>VIA FACSIMILE (504) 832-8918</u>
<u>and FEDERAL EXPRESS</u>
Mr. Al Copeland
Copeland's of New Orleans
1405 Airline Highway
Metarie, Louisiana 70001

      RE:    <u>Pending Litigation</u>

Dear Al:

    This letter is intended to reflect our mutual agreement to settle all claims and demands made by either of us in that certain proceeding in the Chapter 11 Bankruptcy In re Al Copeland Enterprises, Inc. (Bankr. W.D. Tex. Case No. 91-12575-FM, Adv. Pro. 93 1016-FM) ("Equitable Subordination Adversary") and in that certain litigation between us pending in the Federal District Court of the Eastern District of Louisiana (E.D. La. Civil Action No. 92-3961) ("Recipe Royalty Lawsuit"). This letter will bind the parties to the various promises set forth below, and obligates each of the parties to take whatever steps are necessary to conclude the settlement, including but not limited to the execution, delivery, and filing of any necessary formal documentation and the dismissal of the Equitable Subordination Adversary and Recipe Royalty Lawsuit.

    It is understood between AFCC and CIBC, on the one hand, and Al Copeland and his owned or controlled entities (namely Diversified, MFY, NDC, CP Partnership and Gulf Venture) on the other hand, that they wish to fully and finally settle and resolve all claims, disputes and issues relating to the two lawsuits referenced above. Accordingly, the parties agree and promise among themselves as follows:

    1(a).    The Equitable Subordination Adversary (which includes all claims filed by Al Copeland, Diversified, MFY, NDC, CP Partnership and Gulf Ventures or any other party or entity owned or controlled by Al Copeland in the matter of In re: Al Copeland Enterprises, Inc., Debtor, Chapter 11, Case No. 91-12575-FM-11, United States Bankruptcy Court, Western District of Texas) and the Recipe Royalty Lawsuit (the "Litigation") shall be dismissed with prejudice.

    1(b).    In consideration of AFCC entering into the Formula Agreement Modification and other good and valuable consideration, including settlement of all of the Litigation, Al Copeland and Diversified agree that notwithstanding the provisions or current or future status

church's · popeyes.

Six Concourse Pkwy · Suite 1700 · Atlanta, GA 30328-5352
404/391-9500 · DIRECT 404/353-3050 · FAX 404/353-3280

Mr. Al Copeland
June 13, 1994
Page 2

of any other agreements, including the Formula Agreement, as amended, and the Recipe Royalty Agreement, neither they nor any of their heirs, representatives, successors or assigns shall ever be entitled to or ever have any right or claim to royalties or other payments from AFCC relating to sales or any other business whatsoever transacted prior to March 21, 2004 at New Stores or New Franchised Stores. As used in this paragraph, the terms "New Stores" and "New Franchised Stores" have the same meaning as set forth in the Recipe Royalty Agreement. Nothing in this paragraph is meant to constitute an admission by AFCC or in any way to imply that Al Copeland and Diversified may have a legitimate claim for royalties relating to sales or other business transacted subsequent to March 21, 2004 at New Stores or New Franchised Stores, or that, but for this paragraph, Al Copeland and Diversified would be entitled to any such royalties for business transacted at such stores prior to March 21, 2004.

1(c). Al Copeland and Diversified agree to the dismissal with prejudice of the Recipe Royalty Lawsuit by Court order, such dismissal to be subject to the terms and conditions set forth herein. Al Copeland and Diversified further covenant and agree never to file any lawsuit or make any claims against any person or party relating to the past, present or future validity or enforcement of the Recipe Royalty Agreement or to the alleged termination thereof, subject only to the exception set forth in the following sentence. Notwithstanding the foregoing sentence, Al Copeland and Diversified reserve the right to file subsequent to March 20, 2004, but at no time before then, a legal action against AFCC seeking (a) a declaration that the Recipe Royalty Agreement has terminated because the resolutory conditions for its termination have in fact all been fulfilled, and (b) to recover royalties based on sales at New Stores and New Franchised Stores occurring after March 20, 2004. The grounds of and relief sought in any such lawsuit shall be strictly limited as set forth in the preceding sentence. AFCC in turn reserves its right to contest the validity of any such lawsuit or claims on any and all grounds, and by entering into this agreement does not waive any of its rights or available defenses and in no way admits, implies or suggests that any such lawsuit or claims would be valid or legitimate. The parties agree, however, that any such lawsuit shall not be deemed barred by the res judicata effect of the dismissal of the Recipe Royalty Lawsuit, or by the collateral estoppel effect of any decisions rendered therein, because this prospective ground for termination is not one that was raised or could have been raised in the Recipe Royalty Lawsuit.

2.    The Formula Agreement dated July 2, 1979, between Alvin C. Copeland, Gilbert E. Copeland, Mary L. Copeland, Catherine Copeland, Russell J. Jones, on the one hand, and A. Copeland Enterprises, Inc. and Popeyes Famous Fried Chicken, Inc., on the other hand, as amended (the "Formula Agreement") is further amended and modified by providing that in lieu of the royalty payments otherwise required to be paid thereunder, the royalty payments required to be paid under the Formula Agreement for the period beginning May 1, 1994 and ending April 30, 1999, shall be a sum certain in the amount of $237,500.00 per month and thereafter, the royalties required to be paid for the period beginning May 1, 1999 and ending March 20, 2004, shall be a sum certain in the amount of $254,166.67 per

Mr. Al Copeland
June 13, 1994
Page 3

month pro rated for any period less than a full month. Except as otherwise provided herein, the Formula Agreement will remain in full force and effect.

3. AFCC and Al Copeland and Diversified reaffirm the Supply Contract dated March 21, 1989 between New Orleans Spice Company, Inc. and Biscuit Investments, Inc. (the "Supply Contract"), acknowledge that each party intends to perform its obligations under such contract, and agree, provided all covenants and obligations under such contract are performed and satisfied by the parties thereto, that the Supply Contract will remain in full force and effect until March 20, 2004, at which time the parties acknowledge and agree the Supply Contract terminates.

The parties agree that the items covered by the Supply Agreement (the "Covered Items") include such Covered Items as the same may be modified from time to time (with the approval and consent of AFC).

The parties further agree that a change in the method of processing, manufacturing, producing or preparing products used by AFC in the Popeyes system (the "Products") shall not constitute a new Product for purposes of the Supply Agreement. For example a change from (a) fresh to frozen, (b) marination in-store to pre-marination or (c) cooked-in-store to pre-cooked shall not constitute a new Product and AFC shall otherwise continue to purchase the Items identified in the Supply Contract from Diversified used in connection with the preparation of such Product as changed, provided that Diversified modifies such Items, to the extent necessary, in order for such Items to be used in the new processing, manufacturing, and/or preparation of such Products as changed.

By way of further example, AFC has decided to use a freezer-to-fryer butterfly shrimp product versus a fresh product. The Supply Contract identifies as an Item the breading used in the preparation of butterfly shrimp. In order to accommodate AFC's freezer to fryer product, it is necessary to modify the breading in order to obtain the same taste profile and color. In such instance, the breading will continue as an Item under the Supply Agreement provided Diversified modifies such item as above stated.

4. Upon execution of this letter, the parties may enter into a separate Settlement Agreement, but the failure to do so shall not affect this settlement agreement in any way whatsoever; and further, the parties shall cause stipulations of dismissal to be entered with respect to the two lawsuits referenced above, dismissing the actions with prejudice, with each party to bear its respective costs.

5. To the extent that any party institutes legal action against another in connection with the subject matter of the terms of the settlement agreement or any promises made thereunder, the prevailing party will be entitled to recover its costs and attorneys fees incurred in connection with prosecution or defense of the action.

Mr. Al Copeland
June 13, 1994
Page 4

6.    Any sums due AFCC for the Race Team Assets will be forgiven.

7.    The parties specifically except from this settlement agreement any claims or obligations arising under franchise agreements for the operation of Church's or Popeyes restaurants.

.8.    The parties agree to cooperate with each other to the extent possible, to provide for advantageous tax consequences to all parties resulting from the settlement provided for herein; provided that the failure of the parties to reach an agreement regarding the structure of the payments or other aspects of the settlement as provided herein shall not otherwise affect this settlement agreement.

In addition to the foregoing, each party shall bear its own costs and attorneys fees, except as specified above. This letter will be governed by the laws of the State of Louisiana.

Al, if you are in agreement, then please indicate your agreement to the foregoing terms by signing below, fax the executed copy to me and overnight to me the original.

Sincerely,

Kam M. Nassar
Executive Vice President
and Chief Financial Officer
America's Favorite Chicken
Company (AFCC)

I hereby acknowledge that I have
read and understood the terms of
the settlement embodied herein, that
I have consulted with counsel of my
choice in connection therewith, and I
agree to such settlement as set forth
hereinabove.

Al Copeland, individually, and on behalf
of Diversified Foods and Seasonings, Inc.
(Diversified), My Favorite Year, Inc. (MFY),
National Development Corporation (NDC),
Gulf Venture Associates (Gulf Venture) and
CP Partnership

h:\law\psilling\cope.ltr



## SETTLEMENT AGREEMENT BETWEEN
## ALVIN C. COPELAND ("Copeland") AND
## DIVERSIFIED FOODS AND SEASONINGS, INC. ("Diversified")
## AND AFC ENTERPRISES, INC. ("AFC") AND
## FLAVORITE LABORATORIES, INC. ("Flavorite")

1.      AFC will quitclaim, transfer and assign to Copeland and Diversified any interest it may have in the formulas and recipes for Popeyes and Churchs products currently claimed to be owned by Copeland and Diversified (the "Copeland formulas"). Copeland and Diversified will quitclaim, transfer and assign to AFC any interest they may have in the formulas and recipes for Popeyes and Churchs products currently held by AFC (the "Flavorite formulas"). In addition, AFC will direct Flavorite to turn over to AFC all of the documentation in its records relating to the development of the Flavorite formulas (the "Flavorite documentation").

2.      All claims, counter-claims and cross-claims asserted in Copeland, et al. v. Flavorite Laboratories, Inc., et al., Civil Action No. 3:94CV686BS, U.S. District Court for the Southern District of Mississippi, shall be dismissed with prejudice, and the parties will execute a mutual release.

3.      Once the settlement is effective, Copeland, Diversified and AFC agree that no defaults exist under the Formula Agreement or the Supply Agreement and that such agreements are in full force and effect as modified by this Settlement Agreement.

4.      Diversified will continue to supply product(s) to the Popeyes system utilizing the Copeland formulas under the terms of the Supply Contract dated March 21, 1989 (the "Supply Contract"). The Supply Contract will be amended to extend the term of such contract until March 20, 2029 (the "Amended Supply Contract"). The Amended Supply Contract will cover all products covered by the Supply Contract. At the end of its term, the Amended Supply Contract shall be renewed in five (5) year increments, on terms agreed to by Diversified and AFC.

From and after March 20, 2004, and continuing so long as the Amended Supply Contract (or any renewal thereof) shall remain in effect, the Formula Agreement dated June 2, 1979, between Alvin

C. Copeland, et al., on the one hand, and A. Copeland Enterprises, Inc., et al., on the other hand, as amended (the "Formula Agreement"), shall be further amended and modified by providing that in lieu of the royalty payments otherwise required to be paid thereunder, the royalty payment required to be paid shall be a sum certain in the amount of $254,166.67 per month, pro rated for any period less than a full month. Upon any initiation of legal proceedings for the payment of additional royalties the Amended Supply Contract (or any renewal thereof) shall be terminated without additional notice.

Paragraph 1(c) of the Letter Agreement executed on June 13, 1994, by and between Copeland and Diversified, et al., on the one hand, and AFC, on the other hand, as amended by this Agreement, shall remain in full force and effect so long as the Amended Supply Contract (or any renewal thereof) shall remain in effect. The premature assertion of any claim described in said Paragraph 1(c) shall terminate the Amended Supply Agreement (or any renewal thereof) without additional notice. Said Paragraph 1(c) is amended to provide that neither Copeland nor Diversified shall ever seek to recover from AFC royalties based on sales at New Stores and New Franchised Stores occurring while the Amended Supply Contract (or any renewal thereof) is in effect.

5.    AFC will require franchisees in Thailand and Korea to purchase Popeyes products being supplied by Diversified as soon as Diversified receives approval for such products to be imported into each such country; provided, however, in any event, there shall be no such requirement to purchase such products until the event set out above has occurred and there has been a sufficient period of time after the occurrence of such event, not to exceed six months, to run off any inventory of Flavorite, or any other distributor, of existing supplies of products being furnished to such franchisees.

2

This the 29ᵗʰ day of May, 1997.

AGREED TO AND APPROVED:


SIGNATURE PAGE ATTACHED
ALVIN C. COPELAND


DIVERSIFIED FOODS & SEASONINGS, INC.


BY:    SIGNATURE PAGE ATTACHED
       G.J. HART
       PRESIDENT


AFC ENTERPRISES, INC.


BY:    SIGNATURE PAGE ATTACHED
       FRANK J. BELATTI
       CHAIRMAN AND CEO


FLAVORITE LABORATORIES, INC.


BY:    _____
       LARRY D. SHAW
       VICE PRESIDENT FINANCE


3

This the 2 9 th day of MAY , 1997.

AGREED AND APPROVED:

ALVIN C. COPELAND

DIVERSIFIED FOODS & SEASONINGS, INC.

BY: _____
    GUS KARY
    PRESIDENT

AFC ENTERPRISES, INC.

BY: _____
    FRANK J. BELATTI
    CHAIRMAN AND CEO

FLAVORITE LABORATORIES, INC.

BY: _____
    LARRY D. SHAW
    VICE PRESIDENT FINANCE

3